# EXHIBIT A

1  BUETHER JOE & CARPENTER, LLC
   ERIC W. BUETHER *(Pro Hac Vice to be Submitted)*
2  Eric.Buether@BJCIPLaw.com
   CHRISTOPHER M. JOE *(Pro Hac Vice to be Submitted)*
3  Chris.Joe@BJCIPLaw.com
   BRIAN A. CARPENTER (CA SBN 262349)
4  Brian.Carpenter@BJCIPLaw.com
   MARK D. PERANTIE *(Pro Hac Vice to be Submitted)*
5  Mark.Perantie@BJCIPLaw.com
   NIKY BUKOVCAN *(Pro Hac Vice to be Submitted))*
6  Niky.Bukovcan@BJCIPLaw.com
   JAMES ARNOTT *(Pro Hac Vice to be Submitted)*
7  James.Arnott@BJCIPLaw.com
   1700 Pacific Avenue, Suite 4750
8  Dallas, Texas 75201
   Telephone:  (214) 466-1272
9  Facsimile:  (214) 635-1828

10 *Attorneys for Plaintiffs*
   MAX SOUND CORPORATION, ELI ATTIA
11 AND ELI ATTIA ARCHITECT PC

12 FUTTERMAN DUPREE DODD CROLEY MAIER LLP
   JAMIE L. DUPREE (158105)
13 180 Sansome Street, 17th Floor
   San Francisco, California 94104
14 Telephone:  (415) 399-3840
   Facsimile:  (415) 399-3838
15 jdupree@fddcm.com

16 *Local Counsel for Plaintiffs*
   MAX SOUND CORPORATION, ELI ATTIA
17 AND ELI ATTIA ARCHITECT PC

18                    **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

19                        **FOR THE COUNTY OF SANTA CLARA**

20  Max Sound Corporation, Eli Attia, and Eli      Case No.  **114CV274103**
    Attia Architect PC,
21                                                 UNLIMITED JURISDICTION
                       Plaintiffs,
22                                                 **COMPLAINT FOR**
          v.                                       **1. MISAPPROPTIATION OF TRADE
23                                                     SECRETS**
    Google, Inc., Flux Factory, Inc., Larry Page,  **2. BREACH OF CONTRACT (NDA)**
24  Sergey Brin, Sebastian Thrun, Eric "Astro"     **3. BREACH OF CONTRACT (ISA)**
    Teller, Michelle Kaufmann, Jennifer Carlile,   **4. BREACH OF CONFIDENCE**
25  Augusto Roman, Nicholas Chim, and DOES 1-      **5. BREACH OF THE COVENANT
    100,                                              OF GOOD FAITH AND FAIR
26                                                     DEALING**
                       Defendants.                 **6. SLANDER OF TITLE    BY FAX**
27                                                 **7. CONVERSION**
                                                   **8. UNFAIR COMPETITION**
28                                                 **9. FRAUD/DECEIT**
                                                   **10. DECLARATORY RELIEF**

1

1  Plaintiffs, Max Sound Corporation, Eli Attia, and Eli Attia Architect PC (collectively
2  "plaintiffs," "MAXD," or "Mr. Attia"), by and through their attorneys, allege as follows:

3  ## INTRODUCTION

4      1.   Defendant Google, Inc. through its secretive research arm, Google[x]—under the
5  supervision of other Defendants—stole Mr. Attia's trade secrets, proprietary information, and
6  know-how regarding a revolutionary process poised to change the face of architecture and
7  construction around the world—a global industry larger than all other industries combined.
8  When fully realized, Mr. Attia's technology will give access to cost-effective, energy-efficient,
9  environmentally sustainable buildings to the whole of the global community. The Defendants
10  induced Mr. Attia to disclose his ideas and know-how through a non-disclosure agreement and a
11  services agreement. Realizing, and admitting, that Mr. Attia is "the creator" of a technology that
12  Google valued to yield \$120 billion in annual revenue, Google then pumped Mr. Attia for as
13  much of his information as possible. Despite Google's own motto of "Don't be evil," the
14  Defendants remorselessly discarded Mr. Attia, misappropriated his proprietary information and
15  know-how, and proceeded to develop and exploit Mr. Attia's ideas and know-how for their own
16  benefit, picking for themselves the fruit of Mr. Attia's life work at his expense. Defendants
17  callously wasted three years of Mr. Attia' life, drastically inhibiting his ability to pursue his
18  creation on his own—risking that it will be lost forever. In the process, Defendants have
19  deprived humanity of the efficient, sustainable technology it urgently needs. Defendants Google,
20  Chim, Teller, Carlile, Roman, and Kaufmann then helped form a new company, defendant Flux
21  Factory, Inc. to further exploit Mr. Attia's trade secrets and proprietary information. The
22  decision to misappropriate was made at Google's highest echelons, involving Sergey Brin and
23  Sebastian Thrun.

24      2.   Eli Attia is one of the world's leading and most innovative architects. Mr. Attia
25  has spent the last 50 years creating a game-changing new technology that can fundamentally
26  change the way buildings are created forever. He has named this revolutionary technology
27  Engineered Architecture, or "EA." This technology enables the creation of buildings of all types
28  and sizes, that are more sustainable and of better quality, in substantially less time and at a

2

1   greatly reduced cost compared to what is currently possible.

2   3.   In 2009, Mr. Attia began searching for a partner to help him fulfill his dream of
3   bringing Engineered Architecture to the world, particularly in light of the need to double the
4   entire existing global building stock in the next forty years. Google recognized the endless
5   possibilities inherent in Engineered Architecture. Through a non-disclosure agreement and a
6   services agreement, Google induced Mr. Attia to divulge his trade secrets and precious know-
7   how regarding Engineered Architecture.

8   4.   Google agreed to engage Mr. Attia for a period of months during which Google
9   would provide to him the software engineers and the resources he needed to prove the
10   technology's viability and the industry's acceptance of it. In exchange, Mr. Attia would share,
11   for a limited time, his proprietary information and know-how and help Google develop his ideas,
12   essentially helping Google translate his proprietary information and know-how into software.
13   Based out of Google's secretive Google[x] development lab, this became known as "Project
14   Genie." Mr. Attia then worked with Google on Project Genie to incorporate his proprietary ideas
15   into a working proof of concept and introduced Google to industry leaders to gain support for it.

16   5.   The parties agreed that at the end of the proof of concept period Google would
17   either choose to develop this invention with Mr. Attia's approval or would drop the project. It
18   was clear from the outset of their relationship that Google would need to license or otherwise
19   compensate Mr. Attia for his proprietary information and know-how, under conditions
20   satisfactory to Mr. Attia, if Google were to proceed with the project in any manner.

21   6.   Google did neither. Google reneged. Google and the other Defendants squeezed
22   Mr. Attia out of his own project. Defendants then continued to develop a product embodying
23   Mr. Attia's proprietary information and know-how for their own benefit at Mr. Attia's expense.
24   Realizing that the trade secrets and proprietary information they had taken from Mr. Attia were
25   sure to yield unprecedented results, Google decided that Project Genie could be successful
26   enough to sustain its own company. Thus, Google spun-off Project Genie into a new company,
27   Flux Factory, Inc. Adding insult to injury, Flux Factory, Inc. was co-founded and is headed by
28   Defendants and former Project Genie team members Michelle Kaufmann, Jennifer Carlile,

3

1 Augusto Roman, and Nicholas Chim, with whom Mr. Attia had entrusted almost all of his
2 valuable Engineered Architecture secrets. Defendants Larry Page, Sebastian Thrun, Sergey Brin,
3 and Eric "Astro" Teller, were crucial in luring Mr. Attia to Google. Defendant Teller now sits as
4 chairman of the board of Flux Factory. Defendant Chim commands Flux Factory as its CEO.

5     7.     Flux Factory, Inc. currently sells Engineered Architecture features embodied in
6 the Flux Metro Austin Preview service on its website, profiting from Mr. Attia's innovation and
7 Google's betrayal of his trust.

8     8.     On May 22, 2014, Eli Attia entered into a "Representation Agreement" with Max
9 Sound Corporation ("Max Sound"), whereby Max Sound was granted the exclusive rights to
10 enforce Engineered Architecture, or "EA" intellectual property rights.

11     9.     Plaintiffs bring this Complaint against Defendants to seek redress for their
12 misappropriation of Mr. Attia's life's work.

13                                  **PARTIES, JURISDICTION, AND VENUE**

14     10.     Plaintiff Eli Attia is an individual who resides in Cold Springs, New York.

15     11.     Plaintiff Eli Attia Architect PC is a California Professional Corporation with its
16 principal place of business located at 927 Industrial Avenue, Palo Alto, CA, 94303. Eli Attia is
17 the majority owner and principal of Eli Attia Architect PC.

18     12.     Defendant Google, Inc. ("Google") is a corporation organized under the laws of
19 the State of Delaware with its principal place of business at 1600 Amphitheatre Parkway,
20 Mountain View, California 94043.

21     13.     Defendant Flux Factory, Inc. ("Flux" or "Flux Factory") is a corporation
22 organized under the laws of the State of Delaware with its principal place of business at 15456
23 Ventura Boulevard, Suite 500, Sherman Oaks, California 91403.

24     14.     Defendant Larry Page is an individual and an executive, agent, and representative
25 of Google. Plaintiffs do not know where Larry Page resides, but are informed and believe it is in
26 the State of California.

27     15.     Defendant Sebastian Thrun is an individual and an executive, agent, and
28 representative of Google. Plaintiffs do not know where Sebastian Thrun resides, but are

4

1  informed and believe it is in the State of California.

2  16.    Defendant Sergey Brin is an individual and an executive, agent, and representative
3  of Google. Plaintiffs do not know where Sergey Brin resides, but are informed and believe it is
4  in the State of California.

5  17.    Eric "Astro" Teller is an individual and an executive, agent, and representative of
6  Google and an executive, agent, and representative of Flux Factory. Plaintiffs do not know
7  where Eric "Astro" Teller resides, but are informed and believe it is in the State of California.

8  18.    Defendant Nicholas Chim is an individual and is or was an executive, agent, and
9  representative of Google. Chim is also an executive, agent, and representative of Flux Factory.
10 Plaintiffs do not know where Nicholas Chim resides, but are informed and believe it is in the
11 State of California.

12 19.    Defendant Michelle Kaufmann is an individual and is or was an executive, agent
13 and representative of Google. Kaufmann is also an executive, agent, and representative of Flux
14 Factory. Plaintiffs do not know where Michelle Kaufmann resides, but are informed and believe
15 it is in the State of California.

16 20.    Defendant Jennifer Carlile is an individual and was or is an executive, agent, and
17 representative of Google. Carlile is also an executive, agent, and representative of Flux Factory.
18 Plaintiffs do not know where Jennifer Carlile resides, but are informed and believe it is in the
19 State of California.

20 21.    Defendant Augusto Roman is an individual and is or was an executive, agent, and
21 representative of Google. Roman is also an executive, agent, and representative of Flux Factory.
22 Plaintiffs do not know where Augusto Roman resides, but are informed and believe it is in the
23 State of California.

24 22.    Does 1-100 are individuals or entities who were responsible in whole or in part for
25 the matters alleged in this complaint, and whose identities are currently unknown to Mr. Attia.

26 23.    Because the obligations and liabilities resulting from Defendants' unlawful and
27 improper acts arose in the County of Santa Clara, venue in this Court is proper under California
28 Code of Civil Procedure Section 395.5.

5

1              **FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

2                 **1.    Mr. Attia Developed Engineered Architecture**

3         24.     For more than four decades Mr. Attia has established his reputation as one of

4 America's leading and most innovative architects. His award-winning skyscrapers, from New

5 York's 101 Park Avenue to San Francisco's 101 California Street, have proved to be both

6 commercially and aesthetically successful.

7         25.     During the course of his professional work, Mr. Attia isolated the "DNA" of all

8 buildings and invented a revolutionary set of technologies that apply to their design and

9 construction, with particular application for tall and large buildings. He termed certain of his

10 technologies Engineered Architecture. Among other things, Engineered Architecture employs a

11 method of utilizing intelligent "cells" and "supercells" that represent basic building blocks of

12 architectural design to create buildings dramatically better, faster, with fewer resources, and with

13 less energy and environmental impact than conventional methods. This technology enables the

14 creation of buildings of limitless types and sizes, buildings that are environmentally sustainable

15 and of better quality, in substantially less time and at a greatly reduced cost than ever before

16 possible.

17         26.     In 2009, Mr. Attia began searching for a partner to help him achieve broad

18 adoption of his techniques within the construction industry. Recognizing the value of his

19 technology, Mr. Attia did not discuss the details of Engineered Architecture with third parties

20 outside of expressly confidential business communications.

21               **2.    Defendants Induced Mr. Attia to Share His Proprietary Information**
22                    **and Know-How Under a Non-Disclosure Agreement and an Inbound**
                   **Services Agreement**

23         27.     On or about July 25, 2010, Google's affiliate, Google[x], through defendant

24 Teller, approached Mr. Attia. Defendant Teller stated that he heard that Mr. Attia had "an idea to

25 change the world" and claimed that he wanted to discuss partnering with Mr. Attia to develop his

26 inventions.

27         28.     Mr. Attia introduced his Engineered Architecture technology to Google

28 executives, including Defendants Page, Brin, and Thrun. To say they were impressed would be

1 | an understatement.

2 | 29. Defendants Page, Brin, and Thrun, acknowledging the marvelous work Mr. Attia
3 | had done in creating Engineered Architecture, as well as the limitless possibilities Mr. Attia's
4 | technology could bring to Google and the people of world, decided to bring Mr. Attia to Google
5 | under the auspices of a mutually beneficial partnership.

6 | 30. To induce Mr. Attia to disclose his ideas and know-how, Google proposed and, on
7 | or about August 8, 2010, executed with Mr. Attia a Non-Disclosure Agreement ("NDA"),
8 | Exhibit 1. Under the NDA, Google was permitted to use confidential information received from
9 | Mr. Attia only "to facilitate technical discussions concerning existing or future product
10 | development efforts by the parties." The NDA expires five years from disclosure unless the
11 | parties agree otherwise in writing. The NDA was neither subject to a novation nor amended, and
12 | it continues to be in effect.

13 | 31. As part of Google's plan, Google lured Mr. Attia (and his family) to relocate to
14 | Palo Alto in late 2010, so that he and Google agents and representatives could work directly
15 | together at Google's Mountain View campus.

16 | 32. Pursuant to and in reliance on the NDA, Mr. Attia shared his proprietary
17 | information and know-how about Engineered Architecture with Defendants Google, Page,
18 | Thrun, Brin, and the entire Genie team, including Defendants Teller, Kaufmann, Carlile, Roman,
19 | and Chim.

20 | 33. On information and belief, all Defendants were aware of the NDA and of the fact
21 | that Mr. Attia was revealing his trade secrets and proprietary information in confidence.

22 | 34. After meetings and negotiations with Defendants Thrun and Teller on Google's
23 | behalf, Mr. Attia and Google (and its affiliates) executed an Inbound Services Agreement
24 | ("ISA"), Exhibit 2, which included a Statement of Work No. 1 ("SOW"), Exhibit 3, effective as
25 | of January 12, 2011.

26 | 35. To induce Mr. Attia to enter the ISA and SOW, Google and defendant Teller
27 | specifically affirmed and represented to Mr. Attia that Google's confidentiality obligations under
28 | the NDA would continue to be in force and in effect and that Google will continue to abide by

7

1  the NDA after execution of the ISA and SOW.

2  36.   The SOW refers to the "Genie Project." In the SOW, Google acknowledges that
3  the "Genie Project was inspired by [Mr. Attia's] experience and Pre-Existing Intellectual
4  Property." Exhibit A to the SOW describes certain of Mr. Attia's proprietary information,
5  including his idea of "revolutionizing the global building industry by dramatically changing the
6  way in which buildings are designed, fabricated and constructed. . . ." The SOW identifies
7  documents that contain Mr. Attia's proprietary information, including, without limitation, "All
8  presentations & brochures," notes, emails, patents, and "other related intellectual property
9  developed as of the SOW Effective Date."

10  37.   Under the ISA, any "invention, improvement, development, concept, discovery or
11  other proprietary information" that Mr. Attia had an interest in before January 12, 2011, remain
12  the property of Mr. Attia.

13  38.   During the negotiation of the ISA, Google through defendant Thrun specifically
14  told Mr. Attia that "any IP/know how" Mr. Attia brings to the Genie Project, including all the
15  knowledge, information, and Pre-Existing Intellectual Property that Google admits inspired
16  Genie, would continue to belong to Mr. Attia.

17  39.   On information and belief, all Defendants were aware of the ISA and of the fact
18  that it acknowledged Mr. Attia was the owner of his proprietary information.

19  40.   The Defendants acknowledged that they would ultimately need to license Mr.
20  Attia's proprietary information through some mechanism if the project developed. Google first
21  asked for a non-exclusive, royalty free, perpetual, irrevocable, worldwide license from Mr. Attia
22  to use his proprietary information. That request was rejected. Google then proposed to pay
23  royalties for to obtain a non-exclusive license, which was rejected as well. Ultimately, the parties
24  agreed in the ISA that Mr. Attia would provide to Google a "non-commercial" and nonexclusive
25  license to use his proprietary information *only up until June 31, 2011* [sic]. Google also agreed
26  that, if the "proof of concept" for the Genie Project was successful and to the extent Mr. Attia's
27  pre-existing property was used to "develop Genie," Google "in its sole discretion, [would]
28  consider seeking an exclusive license and will make reasonable efforts to negotiate" one. Google

8

1  acknowledged in the ISA that it would need to obtain a license from Mr. Attia if it wanted to
2  proceed with Genie after the proof of concept.

3       41.    Google then engaged Mr. Attia for a five month period during which Google
4  would provide to him the software engineers and the resources he needed to prove to Google the
5  technology's viability and the industry's acceptance of it.

6       42.    The Genie Project was assigned to Google[x], Google's reclusive arm responsible
7  for developing new technologies for Google's future. Defendant Chim was put in charge of the
8  project. Neither defendant Chim nor Google had any knowledge of the construction industry
9  before working with Mr. Attia. Eventually the Genie team grew to more than ten people,
10 including Defendants Carlile and Roman and defendant Kaufmann, who acted as Mr. Attia's
11 assistant during his time at Google.

12      43.    Based on the NDA and the ISA/SOW, Mr. Attia began openly and completely
13 teaching the fundamentals of the construction industry and sharing with the Genie team the ideas
14 and technology he had spent 50 years creating. Mr. Attia disclosed and made available to Google
15 his proprietary information, much of which was expressed in original written works. In fact, Mr.
16 Attia personally sat down with every member of the Genie team and taught them everything that
17 was to become Project Genie. Mr. Attia shared with all Defendants his own proprietary
18 information and know-how, including core concepts, details, and refinements of Engineered
19 Architecture that were not in the public domain. The materials shared with Google include,
20 among other things, five booklets that describe Engineered Architecture, Mr. Attias's
21 "Roundhouse Technology," and related proprietary information.

22           **3.    Defendants Induced Mr. Attia to Cooperate in a Joint Venture to**
               **Develop Genie**
23

24      44.    At the conclusion of the initial five month period, as the proof of concept period
25 reached its conclusion, Google and the other Defendants were very happy with the progress.
26 Seeing the potential in Mr. Attia's ideas and know-how, they claimed internally that the product
27 could yield annual revenue around $120 billion. Google saw Genie Project and the global
28 construction industry as the way to power its next stage of growth. Google's revenue in 2011

9

1   was approximately \$37.9 billion, meaning the Genie Project stood to provide more than three
2   times Google's current revenue.

3       45.     Google extended the Genie Project an additional seven months and had planned to
4   spin-off Genie as a separate company. The Defendants and Mr. Attia engaged in a *de facto* joint
5   venture to create a separate company to develop and to bring to market products employing
6   Mr. Attia's proprietary information.

7       46.     In the course of discussing the creation of a new company, Google offered
8   Mr. Attia a seven percent (7%) interest in the new company specifically to compensate Mr. Attia
9   for his proprietary information. Google's draft "Cap Tables" identify shares for "Google IP" and
10  shares for "Eli IP," admitting that "Genie" employed Mr. Attia's proprietary information and that
11  Google should pay for it. Google offered Mr. Attia an additional eight percent (8%) as a co-
12  founder of the new venture in addition to a percentage for his proprietary information.

13      47.     In connection with the venture, Defendants Teller and Chim along with Mr. Attia
14  approached potential investors and leaders in the construction industry, many of whom were
15  introduced to Google by Mr. Attia.

16      48.     Mr. Attia and defendant Chim presented Genie to several industry leaders, among
17  them renowned architect Richard Meier, major developers, construction companies, and potential
18  investors. During presentations, Defendants and Mr. Attia used a video to show a "prototype"
19  software application which consisted entirely of Mr. Attia's Engineered Architecture proprietary
20  information. The response was uniformly enthusiastic. Mr. Meier indicated that he would use
21  the product if it were available at that moment. Another potential investor almost immediately
22  began negotiations with Google to partner in Genie's development.

23      49.     The "prototype" used not only the core concept that Mr. Attia developed, but also
24  many of the details of Mr. Attia's proprietary information and know-how that Mr. Attia disclosed
25  under the NDA and under the limited license in the ISA. The prototype shows Engineered
26  Architecture in action, including the use of the specific "super cells" and "cells" that Mr. Attia
27  invented. In essence, the "prototype" followed the blueprint of Mr. Attia's proprietary
28  information and know-how. In the documentary presentation that Defendants Teller and Chim

10

1 showed along with the "prototype" video, Google described Mr. Attia as the "creator of core
2 Genie concepts."

3     50.    Google internally acknowledged in a "Fact Sheet" that Mr. Attia is "the creator of
4 Genie technology." Defendants admit that the "Key technical insights" of Genie came from Mr.
5 Attia and that Mr. Attia's "work led him to the creation of [Engineered Architecture] which
6 provided key concepts and technology behind Genie." The "Fact Sheet" described "key insights"
7 that match directly with Mr. Attia's trade secrets and proprietary information.

8
9         **4.**    **Google Implemented its Scheme to Squeeze Mr. Attia Out of the Genie Project**

10     51.    While Google was pumping Mr. Attia for all his proprietary information and
11 know-how, Defendants Google, Page, Brin, Thrun, Teller, Kaufmann, Carlile, Roman, and Chim
12 were plotting to squeeze Mr. Attia out from his own project.

13     52.    At some point known to Defendants but not to Mr. Attia, Defendants decided that
14 stealing Mr. Attia's ideas would not violate their own "Don't be evil" code of conduct. In 2011,
15 they implemented their plan to squeeze Mr. Attia out of the new venture, to misappropriate Mr.
16 Attia's proprietary information, to deprive Mr. Attia of the economic benefits of his labor and his
17 inventions, and to appropriate for themselves (and Google), the economic benefits of Mr. Attia's
18 proprietary information and know-how.

19     53.    Indeed, for about eight months, unbeknownst to Mr. Attia, Google was using Mr.
20 Attia's proprietary information and know-how to develop products in a manner disapproved by
21 Mr. Attia and behind Mr. Attia's back. Google and its agents specifically concealed this misuse
22 of Mr. Attia's technology from Mr. Attia. In fact, when Mr. Attia unexpectedly walked into a
23 conference room where such a meeting was being held, the participants immediately stopped all
24 conversation, each staring at the others like a fox caught in the henhouse, until defendant Chim
25 ordered everyone to disperse.

26     54.    While Defendants were meeting secretly, they slashed Mr. Attia's compensation
27 and then proceeded to completely purge him from the project and joint venture.

28     55.    Even while squeezing Mr. Attia out of the project, defendant Teller asked Mr.

11

1 | Attia for a "license for [his] pre-existing IP," again acknowledging that "Genie" employed Mr.
2 | Attia's proprietary information and know-how. Google, Page, Brin, Thrun, and the other
3 | Defendants fully understood "Genie" was essentially a manifestation of Mr. Attia's proprietary
4 | information and know-how.

5 | 56. Google then pretended to kill the Genie Project. On December 7, 2011, another
6 | date which will live in infamy, defendant Chim informed the Genie team by e-mail that he was
7 | torpedoing Project Genie. "We learned a new industry," he wrote, "solved very interesting
8 | technical problems and wow'd the industry with the ambitiousness of our vision." He stated
9 | flatly, "Effective Friday, we'll stop working on Genie." That very same day, defendant Teller
10 | wrote to Mr. Attia, "I'm very sorry Genie will end. It would have been a great thing to make for
11 | the world." Chim and Teller were sinking Mr. Attia's dream.

12 | 57. Within a week, however, Mr. Attia learned that rather than Genie being shut
13 | down, again without his knowledge, defendant Chim had been speaking to the same potential
14 | partners and investors they had visited, and he was telling them that Mr. Attia was no longer
15 | involved with Genie, but that he, Chim, had the right to continue.

16 | 58. On December 16th, only nine days after being informed that Genie was being shut
17 | down, Mr. Attia informed Defendant Thrun, "I've just heard the fourth version of Nick's pitch to
18 | industry leaders. And [defendant Chim stated], 'I've got the license and control of Genie's IP.'"

19 | 59. On December 21st, exactly two weeks after acknowledging "with regret" the end
20 | of Genie, defendant Teller sent an e-mail to Mr. Attia containing a proposed agreement between
21 | defendant Chim and Mr. Attia, ending with the words, "Eli will continue to pursue his path and
22 | the Genie team will continue with a different path." "The Genie team will continue."

23 | 60. In removing Mr. Attia from the project and by continuing to misappropriate
24 | Mr. Attia's proprietary information and know-how, Google deprived him of the economic
25 | benefits of his labor and his inventions, and appropriated for itself the economic benefits of
26 | Mr. Attia's work.

27 | ///

28 | ///

12

CASE NO. _____

COMPLAINT

**5.   Google Proceeded to Misappropriate Mr. Attia's Proprietary Information and Breach the NDA**

61.   After Defendants squeezed Mr. Attia out from the venture, they continued to make presentations to investors, showing the "prototype" video and utilizing Mr. Attia's proprietary information without permission and without any rights to do so. Defendants did not obtain any license from Mr. Attia. By using Mr. Attia's proprietary information and know-how without obtaining a license from Mr. Attia, Defendants are acting as if they had a non-exclusive license, a term specifically rejected during the negotiations of the ISA.

62.   Upon information and belief, Defendants Google and Chim have falsely represented to third parties that they owned rights to Mr. Attia's proprietary information and know-how.

63.   On information and belief, Defendants Google, Page, Brin, Thrun, and Teller subsequently agreed to invest approximately one million dollars of Google's money in a company that Defendants Teller, Chim, Carlile, Roman, and Kaufmann were forming with the Genie team—without any participation by or permission from Mr. Attia and without Mr. Attia retaining any ownership—to continue developing Genie.

64.   This new company was formed in 2012 and is known as Flux Factory, Inc. Flux Factory, Inc. is simply a reconstitution of the Genie project under a different name. Flux Factory employs several individuals who worked at Google on the Genie project, including Defendants Kaufmann, Carlile, and Roman, with defendant Chim acting as CEO. Defendant Teller sits as chairman of the board of directors for defendant Flux Factory. Being nothing more than a spin-off of Google's Project Genie, Flux Factory inherited from Google all contractual liabilities material to this Complaint.

65.   Flux Factory, Inc. currently offers the Flux Metro Austin Preview service for sale on its website. The Flux Metro Austin Preview is design software for the building design and construction industry. This software uses trade secrets and proprietary information that Mr. Attia developed as part of Engineered Architecture. In fact, most, if not all, of the Flux Metro Austin Preview features are the trade secrets and proprietary information stolen from Mr. Attia.

13

1    66.    On information and belief, Flux Factory currently employs individuals, including
2  Defendants Carlile, Roman, Teller, Chim, and Kaufmann, who are fully aware that Flux
3  Factory's products and services incorporate Mr. Attia's stolen trade secrets and proprietary
4  information.

5    67.    As a result of Defendants' misappropriation of Mr. Attia's proprietary information
6  and know-how and their misrepresentations that they own the technology, other potential
7  development partners have shunned Mr. Attia's attempts to further develop and commercialize
8  Engineered Architecture. His reputation within the architectural community and the global
9  construction industry has been tarnished.

10    68.    On information and belief, Defendants Kaufmann, Chim, Carlile, Roman, Teller,
11  and Flux Factory continue to publicly claim that the work done at Genie and being done a Flux
12  Factory are their original ideas. They continue to refuse to acknowledge Mr. Attia's hard work in
13  the development of his trade secrets and proprietary information that comprise Flux Factory's
14  services.

15    69.    In short, Google and the other Defendants had express and implied obligations to
16  Mr. Attia to use his proprietary and confidential information only in support of a joint effort with
17  Mr. Attia to develop technologies. Google and the other Defendants had the option to negotiate a
18  license for Mr. Attia's technology if it wanted to continue using it, but it did not exercise that
19  option. Google, Flux, and the other Defendants have thus intentionally misappropriated Mr.
20  Attia's confidential information for its own benefit.

21              **FIRST CAUSE OF ACTION**

22          **(Misappropriation of Trade Secrets Against All Defendants)**

23    70.    Plaintiffs reallege, and incorporates herein by reference, as though fully set forth,
24  paragraphs 1-69 inclusive.

25    71.    Mr. Attia owns trade secrets, including confidential and proprietary information
26  that can be used to create buildings dramatically better, faster, with fewer resources, and with less
27  energy and environmental impact than conventional methods.

28    72.    Mr. Attia has made reasonable efforts to maintain the secrecy of its confidential

                                    14

                                                              COMPLAINT
                                                    CASE NO. _____

1 and proprietary information. Mr. Attia has not shared this information with third parties except
2 in the course of confidential business communications.

3     73.     At all times material to the Complaint, Mr. Attia fully and clearly identified the
4 pre-existing secret information as part of Exhibit A to the agreements between the parties,
5 including as referenced in the Non-Disclosure Agreement (NDA).

6     74.     Mr. Attia's confidential and proprietary information derives independent
7 economic value and competitive advantages from not being generally known.

8     75.     As detailed above, Defendants are subject to both express and implied contractual
9 obligations to maintain the secrecy of Mr. Attia's confidential and proprietary information.

10     76.     Defendants willfully and maliciously misappropriated Mr. Attia's trade secrets by,
11 among other acts, continuing to incorporate and use them in "Genie," or otherwise, after the end
12 of the license period, by sharing Mr. Attia's trade secrets with third parties in an attempt to gain
13 support for "Genie," and by using them towards business ventures, including Flux Factory, Inc.,
14 that do not include Mr. Attia.

15     77.     By reason of Defendants' conduct, described above, Mr. Attia will suffer great
16 and irreparable harm and damage, which damage will be difficult to ascertain, and Mr. Attia is
17 without an adequate remedy at law. Mr. Attia is entitled to an injunction restraining Google from
18 further misappropriation.

19     78.     As a result of Defendants' misappropriation, Mr. Attia has been damaged and
20 Defendants have been unjustly enriched in an amount to be determined at trial.

21                    **SECOND CAUSE OF ACTION**

22         **(Breach of Contract Against Google and Flux Factory – NDA)**

23     79.     Plaintiffs reallege, and incorporates herein by reference, as though fully set forth,
24 paragraphs 1-78 inclusive.

25     80.     On or about January 12, 2011, Google entered into a contractual relationship with
26 Mr. Attia, including a Non-Disclosure Agreement ("NDA"). The parties' NDA is an enforceable
27 contract between the parties.

28        81.     Mr. Attia has performed all conditions, covenants and promises required on his

15

1   behalf to be performed in accordance with the terms and conditions of the NDA, or its

2   performance has been excused by virtue of Google or Flux's conduct.

3        82.    Google and Flux Factory breached the NDA by engaging in the conduct alleged

4   herein, including, without limitation, disclosing and using such information provided by Mr.

5   Attia and using such information for the purpose of pursuing business ventures that do not

6   include Mr. Attia.

7        83.    As a result of Google and Flux's breaches of their agreement with Mr. Attia, he

8   has suffered damages in an amount to be proven at trial.

9        84.    In addition, Mr. Attia has suffered and will suffer harm that cannot be remedied in

10   damages, and that will require equitable relief.

11                        **THIRD CAUSE OF ACTION**

12               **(Breach of Contract Against Google and Flux –ISA)**

13        85.    Plaintiffs reallege, and incorporates herein by reference, as though fully set forth,

14   paragraphs 1-84 inclusive.

15        86.    On or about January 12, 2011, Google entered into a contractual relationship with

16   Mr. Attia, including an Inbound Services Agreement ("ISA"). The parties' ISA is an enforceable

17   contract between the parties.

18        87.    Mr. Attia has performed all conditions, covenants and promises required on his

19   behalf to be performed in accordance with the terms and conditions of the ISA, or his

20   performance has been excused by virtue of Google or Flux's conduct.

21        88.    Google and Flux have breached the ISA by engaging in the conduct alleged

22   herein, including, without limitation, using Mr. Attia's preexisting information for commercial

23   purposes and doing so beyond the termination date recited in the ISA.

24        89.    As a result of Google and Flux's breaches of their agreements with Mr. Attia, he

25   has suffered damages in an amount to be proven at trial.

26        90.    In addition, Mr. Attia has suffered and will suffer harm that cannot be remedied in

27   damages, and that will require equitable relief.

28   ///

                                   16

                                                        COMPLAINT
                                              CASE NO. _____

1                      **FOURTH CAUSE OF ACTION**

2                **(Breach of Confidence Against All Defendants)**

3       91.    Plaintiffs reallege, and incorporate herein by reference, as though fully set forth,
4  paragraphs 1-90 inclusive.

5       92.    Mr. Attia conveyed confidential and novel information to Defendants, including,
6  without limitation, confidential and proprietary information that can be used to create buildings
7  dramatically better, faster, with fewer resources, and with less energy and environmental impact
8  than conventional methods.

9       93.    Defendants had knowledge that the information was being disclosed in
10  confidence, as acknowledged by both parties in negotiating the NDA and ISA.

11       94.    There was an understanding between Defendants and Mr. Attia that the
12  confidence be maintained, as reflected in the NDA, the ISA, and related communications.

13       95.    Defendants disclosed and utilized Mr. Attia's confidential information in violation
14  of that understanding by, among other acts, continuing to incorporate such information in
15  "Genie" after the end of its license period with Mr. Attia and by sharing such information with
16  third parties in an attempt to gain support for Genie and Flux Factory.

17       96.    As a result of Defendants' conduct, Mr. Attia has suffered damages in an amount
18  to be proven at trial.

19       97.    In addition, Mr. Attia has suffered and will suffer harm that cannot be remedied in
20  damages, and that will require equitable relief.

21                   **FIFTH CAUSE OF ACTION**

22  **(Breach of Covenant of Good Faith and Fair Dealing Against Google and Flux Factory)**

23       98.    Plaintiffs reallege, and incorporate herein by reference, as though fully set forth,
24  paragraphs 1-97 inclusive.

25       99.    The parties' NDA and ISA are enforceable contracts between the parties.

26      100.    Mr. Attia has performed all conditions, covenants and promises required on his
27  behalf to be performed in accordance with the terms and conditions of the NDA and ISA, or his
28  performance has been excused by virtue of Google's or Flux Factory's conduct.

17

1    101.   These agreements were intended to protect the confidential and novel information
2 || Mr. Attia disclosed to Defendants, including, without limitation, confidential and proprietary
3 || information that can be used to create buildings dramatically better, faster, with fewer resources,
4 || and with less energy and environmental impact than conventional methods. The agreements
5 || were also intended to safeguard Mr. Attia's exclusive rights and ownership over his pre-existing
6 || intellectual property.

7    102.   All the conditions required by the agreements for Defendants' performance have
8 || occurred.

9    103.   Defendants Google and Flux Factory breached the implied covenant of good faith
10 || and fair dealing embodied in its agreements with Mr. Attia by disclosing and utilizing Mr. Attia's
11 || confidential information in violation of those agreements, and, among other acts, continuing to
12 || incorporate such information in "Genie" after the end of its license period with Mr. Attia and by
13 || sharing such information with third parties in an attempt to gain support for Genie and Flux
14 || Factory. Google further breached the covenant by impairing Mr. Attia's right to exclusively
15 || license his pre-existing intellectual property. Flux Factory further breached the covenant by
16 || continuing to offer Mr. Attia's innovations for sale on its own website.

17    104.   As a result of the Defendants Google and Flux Factory's breaches of the covenant
18 || of good faith and fair dealing, the Defendants have been unjustly enriched and Mr. Attia has been
19 || damaged in an amount to be proven at trial. .

20                              **SIXTH CAUSE OF ACTION**

21                      **(Slander of Title Against All Defendants)**

22    105.   Plaintiffs reallege, and incorporate herein by reference, as though fully set forth,
23 || paragraphs 1-104 inclusive.

24    106.   Mr. Attia is the sole and exclusive owner of his pre-existing intellectual property,
25 || including the trade secrets, other proprietary information, and know-how that he brought to the
26 || Genie project.

27    107.   On information and belief, Defendants Google, Page, Brin, Thrun, and Chim have
28 || slandered Mr. Attia's title and rights to his pre-existing intellectual property and damaged his

                                        18

                                                               COMPLAINT

                                                     CASE NO. _____

1   reputation and potential contractual relationships with development partners in the architectural
2   community and global construction industry by making false statements to third parties that they
3   owned rights to Mr. Attia's proprietary information and know-how.

4       108.    On information and belief, Defendants Google, Page, Brin, Thrun, and Chim
5   acknowledged that "Genie" employed Mr. Attia's proprietary information and know-how and
6   fully understood that "Genie" was essentially a manifestation of Mr. Attia's proprietary
7   information and know-how.

8       109.    On information and belief, within a week after being told that Genie was being
9   shut down, Defendants Google, Page, Brin, Thrun, and Chim represented to potential partners
10  and investors that Mr. Attia was no longer involved with Genie but that he, defendant Chim, had
11  the right to continue and that he and Google owned the intellectual property rights to Mr. Attia's
12  proprietary information and know-how.

13      110.    On information and belief, Defendants Kaufmann, Chim, Teller, Carlile, Roman,
14  and Flux Factory represented and continue to represent that they own the ideas which comprise
15  Flux Factory's work, when in reality, the products and services from Flux Factory are comprised
16  of Mr. Attia's trade secrets and proprietary information.

17      111.    Defendants' representations, by and through their authorized agents, were
18  knowingly false and made with the clear intent to harm Mr. Attia, mislead the public, and for
19  economic profit in a malicious, devious, and reckless manner.

20      112.    During all times relevant to these acts of slander, the Defendants knew that the
21  representations were false because they knew that Genie utilized Mr. Attia's proprietary
22  information and know-how and fully understood that Genie and Flux Factory were nothing more
23  than a manifestation of Mr. Attia's proprietary information and trade secrets.

24      113.    Defendants' representations regarding their purported ownership of Mr. Attia's
25  proprietary information are patently false, and they made such representations intentionally,
26  maliciously, and with utter disregard for the truth.

27      114.    Defendants had no justification for making their representations regarding their
28  purported ownership of Mr. Attia's proprietary information.

19

COMPLAINT

CASE NO. _____

1       115.    Defendants' conduct has caused Mr. Attia direct pecuniary loss.

2       116.    As a consequence of Defendants' conduct, Mr. Attia has incurred actual and

3 special damages in an amount to be proven at trial.

4                                **SEVENTH CAUSE OF ACTION**

5                          **(Conversion Against All Defendants)**

6       117.    Plaintiffs reallege, and incorporate herein by reference, as though fully set forth,

7 paragraphs 1-116 inclusive.

8       118.    Under the ISA and SOW, Mr. Attia owns the intellectual property he had an

9 interest in before January 12, 2011, when he entered into the contract with Google.

10       119.    The SOW refers to the "Genie Project," and Google acknowledged that the

11 "Genie Project was inspired by [Mr. Attia's] experience and Pre-Existing Intellectual Property."

12 Exhibit A to the SOW describes certain of Mr. Attia's proprietary information, including his idea

13 of "revolutionizing the global building industry by dramatically changing the way in which

14 buildings are designed, fabricated and constructed. . . ." The SOW identifies certain documents

15 that contain Mr. Attia's proprietary information, including, without limitation, "All presentations

16 & brochures," notes, emails, patents, and "other related intellectual property developed as of the

17 SOW Effective Date."

18       120.    Under the ISA, any "invention, improvement, development, concept, discovery or

19 other proprietary information" that Mr. Attia had an interest in before January 12, 2011, remain

20 the property of Mr. Attia.

21       121.    During the negotiation of the ISA, defendant Google through defendant Thrun

22 specifically told Mr. Attia that "any IP/know how" Mr. Attia brings to the Genie project,

23 including all the knowledge, information, and Pre-Existing Intellectual Property that Google

24 admits inspired Genie, would continue to belong to Mr. Attia.

25       122.    Notwithstanding Mr. Attia's ownership in this intellectual property, Defendants

26 have exercised dominion over such property in derogation of Mr. Attia's rights. Among other

27 acts, Defendants continued to incorporate this intellectual property in "Genie" after the end of

28 Google's license period with Mr. Attia. Defendants have also disclosed this intellectual property

1 to third parties in an attempt to gain support for Genie and Flux Factory. Defendants Flux
2 Factory, Kaufmann, Roman, Carlile, and Chim continue to offer Mr. Attia's proprietary
3 information for sale on Flux Factory's website.

4     123.    The intellectual property converted by Defendants is of value in enabling
5 Defendants to further develop and commercialize Engineered Architecture. On information and
6 belief, Defendants Google, Page, Brin, and Thrun agreed to invest approximately one million
7 dollars in a company, defendant Flux Factory, that Defendants Chim, Carlile, Roman, and
8 Kaufmann were forming with the Genie team—without any participation by or permission from
9 Mr. Attia and without Mr. Attia retaining any ownership—to continue developing Genie.

10     124.    Mr. Attia has been damaged by Defendants' conversion of his intellectual
11 property because he has been denied the exclusive right to develop and commercialize the trade
12 secrets, other proprietary information and know-how that he owns under the ISO and SOW, and
13 in an amount to be determined at trial.

14                   **EIGHTH CAUSE OF ACTION**

15 **(Unfair Competition under Cal. Bus. & Prof. Code § 17200 et seq. Against All Defendants)**

16     125.    Plaintiffs reallege, and incorporate herein by reference, as though fully set forth,
17 paragraphs 1-124 inclusive.

18     126.    California Business & Professions Code § 17200 et seq. forbids unlawful, unfair,
19 and fraudulent business practices in the State of California.

20     127.    Defendants' wrongful acts, including, without limitation, misappropriating
21 Mr. Attia's trade secrets, proprietary information, and know-how after squeezing him out of the
22 project to develop "Genie," constitute unfair, unlawful, and fraudulent business practices under
23 California Business and Professions Code § 17200 et seq.

24     128.    Mr. Attia has a property interest in his trade secrets, proprietary information, and
25 know-how. Defendants have deprived Mr. Attia of that property interest by misappropriating his
26 intellectual property. Mr. Attia has suffered injury in fact and has lost money or property as a
27 result of the unlawful, unfair, and fraudulent business acts or practices alleged above.

28     129.    The unlawful, unfair, and fraudulent business practices of Defendants, as

21

1  described above, present a continuing threat to Mr. Attia.  If Defendants are allowed to continue

2  their wrongful acts, Mr. Attia will suffer further immediate and irreparable injury and loss.

3      130.    As a result of Defendants' conduct, Mr. Attia is entitled to injunctive relief,

4  including directing Defendants to return Mr. Attia's confidential information and to stop using

5  the information for the benefit of Defendants or other third parties.

6                          **NINTH CAUSE OF ACTION**

7  **(Fraud Against Defendants Google, Page, Thrun, Brin, Flux Factory, Teller, and Chim)**

8      131.    Plaintiffs reallege, and incorporate herein by reference, as though fully set forth,

9  paragraphs 1-130 inclusive.

10     132.    During the 2010 and 2011 time period, Defendants Google, Page, Brin, Thrun,

11  Chim, and Teller knowingly and intentionally made false representations of facts to Mr. Attia

12  about the nature of the joint venture for the Genie Project, the alleged protection of Mr. Attia's

13  trade secret and proprietary information rights, and Google's avowed intent to jointly develop,

14  market, and profit from the use of Mr. Attia's pre-existing IP rights as the foundation for Genie.

15  The misrepresentations included, but are not limited to, that any pre-existing IP rights owned by

16  Mr. Attia would be protected and not misused, and that Defendants would act in good faith and

17  fair dealing.

18     133.    Defendants Google, Page, Brin, Thrun, Chim, and Teller made these false

19  representations in order to induce Mr. Attia to reveal trade secrets, pre-existing IP rights, ideas,

20  concepts, and technology.

21     134.    As a spin-off of defendant Google, defendant Flux Factory inherits all liabilities

22  material to the Complaint.

23     135.    Mr. Attia justifiably relied on the representations and developed a genuine belief

24  that Defendants Google, Page, Brin, Thrun, Chim, and Teller were acting in good faith and fully

25  intended to co-develop the technology into a workable and profitable final product.

26     136.    The deceit, fraudulent misrepresentations, and active concealment of facts were

27  made by Defendants Google, Page, Brin, Thrun, Chim, Flux Factory, and Teller, and proximately

28  caused damages, the amount of which will be proved at trial.

22

COMPLAINT

CASE No. _____

1 | **TENTH CAUSE OF ACTION**

2 | **(Declaratory Relief Against All Defendants)**

3 |     137.    Plaintiffs reallege, and incorporate herein by reference, as though fully set forth,

4 | paragraphs 1-136 inclusive.

5 |     138.    Mr. Attia has an interest in certain pre-existing intellectual property rights under

6 | the ISA and SOW. Specifically, Mr. Attia owns certain trade secrets, other proprietary

7 | information, and know-how that he brought to the "Genie Project" and which now make up the

8 | services being sold by Flux Factory.

9 |     139.    Max Sound Corporation has the right to enforce Engineered Architecture

10 | intellectual property rights, pursuant to the Representation Agreement.

11 |     140.    Defendants have created a controversy regarding Mr. Attia's pre-existing

12 | intellectual property by continuing to incorporate this intellectual property in "Genie" and Flux

13 | Factory after the end of Google's license period with Mr. Attia. Defendants have also disclosed

14 | Mr. Attia's intellectual property to third parties in an attempt to gain support for Genie and Flux

15 | Factory.

16 |     141.    Plaintiffs seek a declaration that Mr. Attia owns certain trade secrets, proprietary

17 | information and know-how that he brought to the "Genie Project," and has the exclusive right to

18 | license his intellectual property.

19 |     142.    Plaintiffs seek a declaration that the Defendants had express and implied

20 | obligations to Mr. Attia to use his proprietary and confidential information only in support of a

21 | joint effort with Mr. Attia to develop technologies.

22 | **PRAYER FOR RELIEF**

23 | WHEREFORE, Plaintiffs pray for judgment as follows:

24 |     143.    That Defendants be enjoined temporarily and permanently from misappropriating

25 | Plaintiffs' confidential and proprietary information and know-how, including, without limitation,

26 | any development, use, or manipulation of Genie-related materials;

27 |     144.    Actual, incidental, and consequential damages from Defendants, together with

28 | interest, in an amount to be proven at trial;

23

1    145.    Recovery of amounts by which Defendants were unjustly enriched;

2    146.    For an order requiring that any funds and all profits that Google acquires or has

3    already acquired by wrongful conduct and any funds and all profits that Flux Factory acquires or

4    has already acquired by wrongful conduct be placed into a constructive trust for the sole benefit

5    of Plaintiff;

6    147.    For restitution and/or disgorgement of all revenues, earnings, profits,

7    compensation, and benefits which may have been obtained by Defendants as a result of such

8    unfair, unlawful and/or fraudulent business acts and practices;

9    148.    For punitive damages in an appropriate amount to be determined by the Court;

10    149.    Declaratory relief clarifying the parties' rights under the NDA, ISA, and SOW;

11    150.    For Plaintiffs' attorneys' fees and costs in this matter; and

12    151.    For such other and further relief as the Court may deem just and proper.

13    Dated: December 5, 2014                    FUTTERMAN DUPREE DODD CROLEY
                                                MAIER LLP
14

15

16                                        By: _____
                                              Jamie L. Dupree
17                                            *Local Counsel for Plaintiffs*
                                              MAX SOUND CORPORATION, ELI
18                                            ATTIA AND ELI ATTIA ARCHITECT PC

19

20

21

22

23

24

25

26

27

28

24

COMPLAINT
CASE NO. _____

**EXHIBIT 1**

From:  Google Legal <do-not-reply@google.com>
Subject:  You have accepted Google's Non-Disclosure Agreement
Date:  August 13, 2010 11:22:36 AM PDT
To:  eli@eliattia.com
Reply-To:  Do-Not-Reply@google.com

You have accepted the terms and conditions presented in Google's Non-Disclosure Agreement on 2010-08-13 18:22:35.

Company Name: Eli Attia architect PC
Name: Eli Attia
Title: Owner
Email: eli@eliattia.com
Address:
1131 20th Street
Santa Monica, California, 90403
United States

Below is a copy of the Agreement for your reference:


NON-DISCLOSURE AGREEMENT .

In order to facilitate technical discussions concerning existing or future product development efforts by the parties (the 'Purpose'), Google Inc., for itself and its subsidiaries and affiliates, and the other party identified below hereby agree:

1. The Effective Date of this agreement is the date this agreement is accepted by the party identified below.

2. A party (the 'Discloser') may disclose to the other party (the 'Recipient') information pertaining to the Purpose that the Discloser considers confidential ('Confidential Information').

3. Recipient may use Confidential Information only for the Purpose. Recipient must use a reasonable degree of care to protect Confidential Information and to prevent any unauthorized use or disclosure of Confidential Information. Recipient may share Confidential Information with its employees, directors, agents or third party contractors who need to know it and if they have agreed with either party in writing to keep information confidential.

4. Confidential Information does not include information that: (a) was known to Recipient without restriction before receipt from Discloser; (b) is publicly available through no fault of Recipient; (c) is rightfully received by Recipient from a third party without a duty of confidentiality; or (d) is independently developed by Recipient. A party may disclose Confidential Information when compelled to do so by law if it provides reasonable prior notice to the other party, unless a court orders that the other party not be given notice.

5. Either party may terminate this agreement with thirty days prior written notice, but this agreement's provisions will survive as to Confidential Information that is disclosed before termination.

6. Unless the parties otherwise agree in writing, Recipient's duty to protect Confidential Information expires five years from disclosure.

7. This agreement imposes no obligation to proceed with any business transaction.

8. No party acquires any intellectual property rights under this agreement except the limited rights necessary to use the Confidential Information for the Purpose. Further, each party recognizes that the other party may in the future develop or purchase products or services related to or similar to the subject matter of Confidential Information disclosed under this agreement. Accordingly, Recipient may use Residuals for any purpose, including use in the acquisition, development, manufacture, promotion, sale, or maintenance of products and services; provided that this right to Residuals does not represent a license under any intellectual property and/or proprietary rights of Discloser.
The term 'Residuals' means information that is retained in the unaided memories of Recipient's employees or contractors as permitted herein who have had access to Discloser's Confidential Information.
Memory is unaided if the employee or contractor has not intentionally memorized the Confidential Information for the purpose of retaining and subsequently using or disclosing it.

9. This agreement does not create any agency or partnership relationship. This agreement is not assignable or transferable by either party without the prior written consent of the other party.

10. This agreement is the parties' entire agreement on this topic, superseding any prior or contemporaneous agreements. Any amendments must be in writing. The parties may execute this agreement in counterparts, which taken together will constitute one instrument. Failure to enforce any of provisions of this agreement will not constitute a waiver.

11. This agreement is governed by the laws of the State of California, excluding its conflict-of-laws principles. The exclusive venue for any dispute relating to this agreement shall be Santa Clara County, California.

**EXHIBIT 1**

**EXHIBIT 2**

## GOOGLE INBOUND SERVICES AGREEMENT

**CONTRACTOR:** Eli Attia Architect PC ("Contractor")

**ADDRESS:** 1131 20th Street #1, Santa Monica, CA 90403

**EFFECTIVE DATE:** January 12, 2011

This Agreement between Google Inc. and its affiliates ("Google"), located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, and Contractor sets forth the terms governing Contractor's provision of services to Google ("Services").

**1. SERVICES AND COMPENSATION**
Contractor will provide Services as specified in mutually executed Statements of Work issued under this Agreement (each a "SOW"), or at Google's request, Contractor will provide Google with a quotation that references this Agreement and contains information regarding Services in accordance with the form provided by Google ("Quotations"). Quotations will not bind either party. Google will pay Contractor the amounts specified in each SOW or, upon approval of a Quotation, Google will provide Contractor with a Purchase Order ("PO") that incorporates the applicable Quotation. Unless otherwise stated in the SOW or PO, Contractor will invoice Google for all Services monthly in arrears, and Google will pay Contractor within 30 days of its receipt of a correct invoice. Google will not pay for work performed prior to the execution of a SOW or issuance of a PO. For an extension of the term of the Services or addition of funds in a SOW or a Quotation, Google may provide Contractor with a PO referencing the applicable SOW and/or Quotation and stating the new term for Services terms and/or additional funds. Any terms or conditions on the Quotation or PO that conflict with this Agreement shall be superseded by this Agreement.

**2. TERM**
This Agreement takes effect on the Effective Date and continues unless terminated as specified below. Google may terminate this Agreement, or any SOWs or POs, at any time, with or without cause, by providing Contractor with written notice. Termination is effective immediately unless otherwise specified in the termination notice. Contractor may terminate this Agreement at the later of (a) acceptance by Google of all Services in a SOW or PO, or (b) thirty (30) days after Contractor provides Google written notice. Termination of the Agreement also terminates all then-outstanding SOWs and POs, but Google will pay any fees previously accrued for Services performed as set forth in this Agreement and applicable SOW or PO.

**3. RIGHTS TO DELIVERABLES**
Google will own all software (including modifications and documentation), products, inventions, documents, writings and other materials created, conceived, prepared, made, discovered or produced by Contractor and any of its employees or agents that are provided to Google pursuant to a SOW or PO (the "Deliverables"). The Deliverables will be works made for hire to the extent permitted by applicable law, and Google will own all copyright, patent, trade secret, trademark and any other intellectual property or proprietary rights ("Intellectual Property Rights") in the Deliverables. Contractor hereby assigns to Google all right, title and interest and all Intellectual Property Rights in such Deliverables and all extensions and renewals thereof. If requested by Google, Contractor will execute a written assignment of such rights to Google and any other documents necessary for Google to establish or protect its Intellectual Property Rights. If Contractor fails to do so, Google is hereby granted the power and interest to act as Contractor's attorney-in-fact to execute such documents. Contractor will not assert, and otherwise waives, any "moral rights" in the Deliverables and assigns to Google any "moral rights" in the Deliverables..

To the extent Contractor plans to or does incorporate any invention, improvement, development, concept, discovery or other proprietary information, which is set forth in the applicable SOW, in which Contractor has an interest in prior to the Effective Date ("Pre-existing Property") into any Deliverable, Contractor will identify such Pre-existing Property upon request by Google to the extent such Pre-existing Property is incorporated into any Deliverable. Google will not be liable to Contractor for any Pre-existing Property that Contractor has failed to identify in the applicable SOW prior to incorporating it into any Deliverable. From the Effective Date until June 31, 2011 (the "Services End Date"), Contractor hereby grants, for non-commercial purposes only, Google and its affiliates, partners, and developers, and each of their respective affiliates, partners, developers, customers and end users, a nonexclusive, royalty-free, worldwide license: (i) under Intellectual Property Rights (other than patent) of the Pre-existing Property to use, reproduce, modify, display, perform, sublicense and distribute the Pre-existing Property (or portions thereof) in connection with the use or development of the Deliverables, or products or services derived from or related to the Deliverables; and (ii) under patents and/or patent rights of the Pre-existing Property, to make, use, sell, practice, offer for sale, import, export, have made, have sold, have used, have practiced, have offered for

-1 of 4-
ISA 2-10

**EXHIBIT 2**

sale, have imported, have exported, and/or otherwise dispose of any products and/or related services in connection with the use or development of the Deliverables, and/or products and/or services derived from and/or related to the Deliverables. Contractor will not incorporate any proprietary information owned by Contractor or any third party into any Deliverable without Google's prior written permission.

Solely for (i) any and all modifications, enhancements, and refinements, whether patentable or not, made to the Pre-existing Property, except for any software, and (ii) any patents that may be issued for inventions filed for which Contractor is listed as an inventor or co-inventor ((i) and (ii) collectively the 'Co-inventor Patents"), Google hereby grants Contractor and Contractor's spouse or spouse's lineal descendant (whether or not adopted) a non-transferable, non-assignable (including by operation of law), personal, non-sublicensable, non-exclusive, royalty-free, perpetual, irrevocable, worldwide, limited license under the Co-inventor Patents for use solely in the field of architecture and construction and solely to permit Contractor or Contractor's spouse or spouse's lineal descendant (whether or not adopted), subject to the confidentiality provisions of Section 4 of this Agreement, to engage in his professional practice in a personal capacity, including, but not limited to, the plan, design or construction of residential or commercial structures for third parties.

## 4.   CONFIDENTIAL INFORMATION
"Confidential Information" means all information and material to which Contractor has access in connection with providing the Services, including the Deliverables. Confidential Information does not include information that: (i) was known to Contractor without restriction before receipt from Google; (ii) is publicly available through no fault of Contractor; (iii) is rightfully received by Contractor from a third party without a duty of confidentiality; or (iv) is independently developed by Contractor without reference to any Confidential Information. Contractor may disclose Confidential Information when compelled to do so by law if it provides reasonable prior notice to Google. Contractor will use Confidential Information solely for the purposes of providing the Services. Contractor will not disclose or make Confidential Information available to any third party, except as specifically authorized by Google in writing. Upon Google's written request, Contractor will promptly return all Confidential Information and copies, or certify in writing that it has destroyed all such materials.

## 5.   INDEPENDENT CONTRACTOR
Contractor represents and warrants that Contractor will provide services to Google as an independent contractor and not as a Google employee. Contractor agrees that Contractor will not be entitled to any compensation, options, stock or other rights or benefits accorded to Google employees, waives any right to them and promises never to claim them. Google reserves the right to obtain or to request Contractor to obtain a similar assurance from any person Contractor would utilize to provide services to Google. Contractor promises to comply with all tax laws, including tax withholding requirements.

## 6.   REPRESENTATIONS AND WARRANTIES
Contractor represents and warrants that:
  A.The Services will be of professional quality and performed consistently with generally accepted industry standards.
  B.  There exists no actual or potential conflict of interest concerning the Services.
  C.  Contractor's performance under this Agreement does not require the breach of any agreement or obligation to keep in confidence the proprietary information of another party. Contractor will not bring to Google or use in providing the Services any materials or documents of another party considered confidential or proprietary without the written authorization of such party and Google.
  D.Contractor will comply with all applicable laws and regulations.
  E.Contractor will comply with all relevant export laws and regulations, including trade sanctions programs and restrictions relating to the the U.S. Treasury Department's List of Specially Designated Nationals list.
  F.Contractor and its directors, officers, employees and agents ("Personnel") have not and will not offer, pay, promise or authorize the payment, directly or through any other person or entity, of anything of value for the purpose of inducing or rewarding any favorable action or influencing any act or decision in connection with Google's business to a candidate for public office or to an official or employee of a government, government-controlled entity, public international organization or political party.
  G.Contractor is an equal-opportunity employer, does not discriminate on the basis of age, race, creed, color, religion, sex, sexual orientation, national origin, disability, marital or veteran status or any other basis that is prohibited by law and will not so discriminate in providing the Services.

## 7.   ACCEPTANCE OF SERVICES

Google will accept or reject the Services or any Deliverable in accordance with the acceptance criteria set forth in the applicable SOW. If there is no SOW for the Services, then the Services or Deliverables must be accepted by the applicable Google Project Manager. Such acceptance will not be unreasonably withheld.

If the Services or the Deliverables do not meet the warranties or criteria of this Agreement or a SOW, Google may (i) require Contractor to correct (at no cost to Google) any defective or nonconforming item, or (ii) correct the defective or nonconforming item itself and charge Contractor for the cost of such correction. Contractor will promptly repair or replace at its own expense all damages to any materials on Google's premises caused by Contractor or its personnel.

## 8. INDEMNIFICATION

A. Contractor will defend and indemnify Google, its officers, directors, and employees from any claims and liabilities (i) related to any third party claim that the Services or any Deliverables infringe or misappropriate any third-party Intellectual Property Rights, (ii) arising from Contractor's breach of warranty, negligence, willful misconduct, fraud, misrepresentation, or violation of law, or (iii) any property damage, personal injury or death related to performance of the Services.

B. Google will have the right to approve any counsel retained to defend against any claim in which Google is named a defendant, and will not unreasonably withhold such approval. Google will have the right to control and participate in the defense of any such claim concerning matters that relate to Google, and Contractor will not settle any such claim without Google's reasonable consent. If, in Google's reasonable judgment, a conflict exists between the interests of Google and Contractor in such a claim, Google may retain its own counsel whose reasonable fees will be paid by Contractor.

## 9. LIMITATION OF LIABILITY

EXCEPT FOR INFRINGEMENT OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY RIGHTS, BREACHES OF CONFIDENTIALITY UNDER SECTION 4, OR INDEMNIFICATION OBLIGATIONS UNDER SECTION 8: (A) NEITHER PARTY WILL BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES; AND (B) NEITHER PARTY'S LIABILITY ARISING OUT OF THIS AGREEMENT WILL EXCEED THE AMOUNT ACTUALLY PAID OR PAYABLE TO CONTRACTOR UNDER THIS AGREEMENT.

## 10. INSURANCE; BACKGROUND CHECKS

If a SOW requires Contractor to maintain insurance coverage, Contractor will do so at its expense for the term of this Agreement, and will provide Google (or Google's third-party vendor) documentation evidencing the required coverage. If a SOW requires Contractor to conduct background checks on its Personnel, Contractor will do so according to the policies provided by Google, and will provide confirmation of the results of such checks to Google or its third-party vendor upon request. If Google requests its own background checks, Contractor will obtain written consent from its Personnel and supply information reasonably requested by Google. Contractor will require its Personnel performing Services to provide prompt notice of any change of status after the initial background check, and will notify Google of any change of status.

## 11. NO PUBLICITY

Without the prior written approval of the other party, neither party will issue any public statements or promotional materials disclosing the existence of this Agreement or the performance of Services.

## 12. GENERAL

A. Contractor may not assign or transfer its rights or obligations under this Agreement without Google's prior written consent, whether by operation of law or otherwise.

B. Contractor may not subcontract any work performed under the terms of this Agreement without Google's prior written consent. If such consent is granted, Contractor will be responsible for its subcontractor's performance under this Agreement.

C. Google may examine the Deliverables at any time. Within 15 days of Google's written request, Contractor will provide access to its books and records for Google to verify that Contractor is complying with this Agreement, SOWs or POs.

D. This Agreement is governed by the laws of the State of California (excluding its conflict-of laws principles), and the exclusive venue for any related dispute is Santa Clara County, California.

E. The obligations in Sections 3, 4, 7, 8, 9, 11, and 12 will survive any expiration or termination of this Agreement. This Agreement supersedes any prior agreements or understandings between the parties. This Agreement, including any SOWs or POs, constitutes the entire Agreement between the parties related to this subject matter, and any change to its terms must be in writing and signed by the parties.

GOOGLE INC.

(Authorized Signature)

SEBASTIAN    THRUN
(Name)

VP / GOOGLE FELLOW
(Title)

CONTRACTOR: Eli Attia Architect PC

(Authorized Signature)

_____
(Name)

_____
(Title)

- 4 of 4-
ISA 2-10

**EXHIBIT 3**

Google Confidential

## STATEMENT OF WORK NO. 1

### · Project Title: Genie

### NO SERVICES MAY BE PERFORMED UNTIL GOOGLE AND CONTRACTOR SIGN THIS STATEMENT OF · WORK AND GOOGLE ISSUES A VALID PURCHASE ORDER

This Statement of Work ("SOW") is entered into between Google Inc. ("Google"), with offices at 1600 Amphitheatre Parkway, Mountain View, California 94043, and

| Contractor Name ("Contractor"): Eli Attia Architect PC |
| Address: 1131 20th Street #1, Santa Monica, Ca 90403 · |
| Project manager: Eli Attia |
| Telephone: 310.453.8430 |
| Email: 310.666.5871 |

and is effective as of January 12, 2011 ("SOW Effective Date").

| Google project manager: Astro Teller |
| Telephone: 412.680.3217 |
| Email: astroteller@google.com |

This SOW is governed by, incorporated into, and made part of the Google Inbound Services Agreement, executed between the parties on January 12, 2011 (the "ISA"). The terms of this SOW are limited to the scope of this SOW and shall not be applicable to any other SOWs which may be executed and attached to the ISA. This SOW and the ISA represent the entire agreement and understanding between the parties relating to the subject matter hereof and supersede all prior and contemporaneous representations, discussions, negotiations and agreements, whether written or oral.

1. **TERM.** Unless terminated earlier as set forth in the ISA, the Services will end and this SOW will terminate on the completion of the Services by Contractor, which will not be later than June 31, 2011.

2. **SERVICES.** Contractor hereby agrees to perform for Google services as described below (the "Services") in this subsections (a) and (b) of this Section 2.

a) Description:

Google is building a software system ("Genie") that dramatically improves the ability of technical and non- · technical people to design or participate in the design of buildings. The Genie Project was inspired by Contractor's experience and Pre-existing Intellectual Property (Exhibit A). Notwithstanding the foregoing, Contractor hereby acknowledges and agrees that this inspiration does not give rise to any claim of intellectual property beyond what is otherwise expressly provided for in the Agreement and this SOW. Genie will drive use of component parts and construction methods that, to a great extent do not limit design flexibility, but that allow for the following benefits: 1) the time and cost to make the building can be seen in real time as the design is in progress; 2) when the design is complete, full design details in various forms can be created and sent to responsible parties including the architect/engineer, the fabricator of the custom parts for the building, the wholesaler for the non-custom building parts, the general contractor, etc.; and 3) the complete design and construction process will deliver buildings that are more enjoyable and healthier to live in, cheaper to make, faster to make, last longer, are less wasteful to produce, produce less waste to operate, are easier to maintain and update, and are more intelligent and responsive to the needs of the people who use the buildings. ..

In Phase One of the development of Genie, as covered by this SOW, Contractor will provide consulting services on the Roundhouse & Engineered Architecture processes of designing buildings and fabricating their parts, finding ways to automate as many steps of the process as possible to develop a proof of concept software system for Genie. Contractor will assist with building out a detailed set of risks, details, and potential resolutions to how Genie could be rolled out as a product business. The services will include both a report and assistance in identifying and interviewing a wide range of experts in this field including architects, engineers, general contractors, construction managers, fabricators, zoning board members, etc.

EXHIBIT 3

Google Confidential

If the proof of concept program in Phase One is successful and to the extent any Pre-existing Property is used to develop Genie, (i) Google, in its sole discretion, will consider seeking an exclusive license and will make reasonable efforts to negotiate for a license to a portion or all of the Pre-existing Property at mutually agreed upon price and terms, and (ii) both parties intend to negotiate in good faith appropriate new terms and conditions in a separate SOW under the ISA pursuant to which Contractor will provide consulting services as to the development of Genie.

b) Location: Contractor will provide the Services at the Mountain View Google campus a minimum of three days per week during this time (averaged across any month).

**3. DELIVERABLES.** "Deliverables" means any material(s) which Contractor provided, contributed to, collaborated on, or was involved with, while engaged by Google during the course of performing Services. Deliverables shall be as set forth below in this Section 3:

1. A proof of concept software system for Genie, including a report on the feasibility of creating a full launchable version of such a software system that both functions as intended technically and that is a highly usable tool.

2. Cost comparison of using the process that the Genie software would enable vs. standard fabrication and ensuring that the benefits (quality of the building, cost of the building, time to make the build) are significant enough to gain market adoption. A detailed cost analysis on houses of various types to reduce the unknowns associated with this point #2 as much as possible.

3. A 5-10 page report on what has been done to date to mitigate major risks to the project or plans for mitigating such risks as much as possible in Stage 2 should Genie proceed towards future commercialization by Google.

**4. PERFORMANCE/ACCEPTANCE CRITERIA.** The parties hereby agree that the Services and Deliverables will meet the acceptance criteria, and will pass the tests, as set forth below in subsections (a) and (b).

a) Acceptance Criteria: Google will either (a) notify Contractor that Google accepts the Services, or (b) advise Contractor of any deficiencies in the Services. If Google advises Contractor of deficiencies in the Services, Contractor will correct those deficiencies as soon as possible, but in any event prior to any applicable deadlines, and will again notify Google upon completion. Google will then respond to Contractor notice, and Contractor will correct any further deficiencies noted. This process will continue until Contractor has corrected all deficiencies and Google accepts the Services pursuant to this Section 4.

b) Testing: NA

**5. PAYMENT.**

a) Maximum Payment Amount. Notwithstanding anything else in the Agreement to the contrary and unless otherwise agreed upon in writing by Google, Google's maximum liability for all Services under this SOW will not exceed US $150,000.00.

b) Payment for Services:

Immediately following the Effective Date, Google will pay Contractor $10,000.00. Thereafter, on each monthly recurrence of the Effective Date, Google will pay Contractor $25,000.00 up until the earlier of: 1) the date of termination of this SOW, or 2) the date the maximum payment amount set forth in this SOW has been reached.

c) Expenses. Google will reimburse the following expenses under this SOW: None, unless otherwise agreed upon in writing by Google  The foregoing expenses will only be approved if such expenses are (i) reasonable, actual, and necessary (without mark-ups or commissions); (ii) approved in writing by the Google project manager whose name is first written on page one of this SOW) in advance of incurring such expense; and (iii) a request for reimbursement is accompanied by such documentation as Google may request establishing the type, date, amount, payment and purpose for such expense.

d) Invoices. Contractor's invoices will include the Google PO number and be sent to:

Accounts Payable
Google Inc.
PO Box 2050

Google Confidential

Mountain View, CA 94042
USA

**6. CONTRACTOR RESOURCES.** Contractor will utilize the following to complete the Services and deliver Deliverables pursuant to this SOW:

a) <u>Contractor's Pre-existing Property</u> – Please see Exhibit A.

b) <u>Contractor's Resources</u> – N/A.

c) <u>Third Party Technology:</u> Contractor represents and warrants that it will not include any open source software in the Deliverables.

**7. GOOGLE RESOURCES.** All property and assets, whether tangible or intangible, provided by Google to Contractor will remain property of Google.

**8. INSURANCE.** Pursuant to Section 10 of the ISA, Contractor will maintain the following insurance coverage:

a) <u>Worker's Compensation</u> – In accordance with all federal, state and local requirements;

b) <u>Commercial General Liability</u> – Coverage for bodily injury and property damage liability, including contractual liability coverage - $1,000,000 each occurrence bodily injury and property damage combined;

c) <u>Business Automobile Liability Insurance</u> – Coverage for bodily injury and property damage liability, including coverage for all non-owned, hired and rented automotive equipment - $600,000 each occurrence, bodily injury and property damage combined.

<u>Unless otherwise instructed by Google,</u> Contractor will send all Certificates of Insurance and other documentation evidencing coverage to:

Google Inc.
Attn: Treasury Department / Risk Management
1600 Amphitheatre Parkway
Mountain View, CA 94043

**9. BACKGROUND CHECKS.** Pursuant to Section 10 of the ISA, Contractor will perform the following background checks on its employees, contractors or agents performing Services hereunder:

a) Criminal Court Check (all counties of residence and work for prior seven (7) years);
b) Social Security Number Trace; and
c) Prohibited Parties/Terrorist Watch List

The parties execute this Statement of Work by persons duly authorized as of the SOW Effective Date set forth above.

**10. SPECIAL TERMS.** None.

Google Inc.

(Authorized Signature)

SEBASTIAN THRUN
(Name)

VP, GOOGLE FELLOW
(Title)

Address: 1600 Amphitheatre Parkway
Mountain View, CA 94043



Contractor:

(Authorized Signature)

_____
(Name)

_____
(Title)
Address:

Google Confidential

Google Confidential

## Exhibit A
### Publicly available Pre-existing Property

#### Engineered Architecture / Roundhouse Technology

A vision for revolutionizing the global building industry by dramatically and fundamentally changing the ways in which buildings are designed, fabricated and constructed, enabling the creation of better quality, more sustainable buildings quicker and less expensive to build.

* All sketches, drawings, images, notes, emails and all other related material developed or produced as of the SOW Effective Date;
* All presentations & brochures;
* RH projects: RHBH, RHBRH, RH Earth, RH Santa-Fe, RH Malibu, PW, Or Yehuda, Holon, Peat-Yam, RG Tower, Junction Tower ;
* Patents: RHT- Provisional Patent application 61331161

    Engineered Architecture - U.S. Patent Application 12/404,263;

* All other related intellectual property developed as of the SOW Effective Date.

#### Architect - Designed Projects

* Fully designed buildings - from conceptual to detailed design.
* Projects list (Exhibit B)
* All sketches, drawings, images, models, notes, narratives and all other related material developed or produced as of the SOW Effective Date;
* All presentations, brochures & shows;
* All other related intellectual property developed as of the SOW Effective Date.

#### Other Inventions:

#### Super-Tall Buildings [STB]

Structural and construction techniques that enable super tall buildings to reach record heights without the traditional structural cost premium, be constructed much more rapidly, while providing unprecedented flexibility in floor to floor heights and column-free interiors arrangements.

* All sketches, drawings, images, notes, emails and all other related material developed or produced as of the SOW Effective Date;
* All presentations & brochures;
* All other related intellectual property developed as of the SOW Effective Date.

#### Airport terminals

A more efficient method for the operation of airports, focusing on the interaction between passengers and planes.

* All sketches, drawings, images, notes, emails and all other related material developed or produced as of the SOW Effective Date;
* All presentations;

Google.Confidential

* All other related intellectual property developed as of the SOW Effective Date.

**Publications**

Lectures (including keynote speech in CTBUH, Hong Kong, world congress);

All books, articles, and other published work or work prepared for publication as of the SOW Effective Date.

**Web sites**

EAA (ellattia.com);
Ground Zero (threefortheworld.org).

Google Confidential

## Exhibit B
### Project List

| | | Project name | In colaboration |
|---|---|---|---|
| with | | | |
| 1 | | 1960 High School - Technion submission to Sao Paulo Bienale | |
| 2 | | 1961 Ramat Hadar - Residential Community, Halfa, Israel | |
| 3 | | 1962 Multi Purpose Theater | |
| 4 | | 1962 Kibbutz - Prefabricated Dwelling System, Mt. Carmel, Israel | |
| 5 | | 1962 Tower - icosahedron based structure | |
| 6 | | 1962 Rangoon Mausoleum | D. Yanai |
| 7 | | 1962 Buildings in Process - Exhibition | D. Yanai |
| 8 | | 1963 Israel pavilion for the New York's World Fair | D. Yanai, S.Edelman |
| 9 | | 1963 Hotel by Lake Galilee | |
| 10 | | 1963 Wimpy Bar - Prototype for fast food kiosk system | |
| 11 | | 1963 Israel National Museum | A. Mansfeld |
| 12 | | 1963 Beit Haoman - Artist's Center - Competition/2nd prize | D. Yanai & TOAM |
| 13 | | 1964 Prefabricated Housing System, Luxemburg | D. Yanai & TOAM |
| 14 | | 1964 City Hall, Jerusalem, Israel - Competition/2nd prize | D. Yanai & TOAM |
| 15 | | 1964 Civic Center, Kfar Saba, Israel - Competition/2nd prize | D. Yanai & TOAM |
| 16 | | 1964 Tel Giborim General Hospital, Holon, Israel - Competition/2nd prize | D. Yanai & TOAM |
| 17 | | 1964 Beit Hahayal - Soldiers Home, Tel Avive, Israel | D. Yanai & TOAM |
| 18 | | 1964 Ramat Hadar - Civic Center / Res. Community, Haifa, Israel | D. Yanai & TOAM |
| 19 | | 1965 Bachelor's qutrs/med. clinic/dining, Kibbutz Degania, Israel | |
| 20 | | 1965 Sports Center, Ashdod, Israel | D. Yanai & TOAM |
| 21 | | 1965 Benin Office Tower, Tel Aviv,, Israel | D. Yanai & TOAM |
| 22 | | 1965 Jerusalem Commercial Center, Israel | |
| 23 | | 1966 Vocational High School, Jerusalem, Israel | D. Yanai & TOAM |
| 24 | | 1966 ORT Vocational High School, Tel Aviv, Israel | D. Yanai & TOAM |
| 25 | | 1966 Residential Community - Kiryat Gat, Israel | D. Yanai & TOAM |
| 26 | | 1966 Ashdod Town Center - Competition / 2nd prize | D. Yanai & TOAM |
| 27 | | 1967 Nazareth New Town Center, Israel | D. Yanai & TOAM |
| 28 | | 1967 Beth Lehem, Galilee, Village Center, Israel | |
| 29 | | 1967 Nahariya New Town Center, Nahariya, Israel - Competition/2nd prize | D. Yanai & TOAM |
| 30 | built | 1968 Oceanographic / Limnologic Research Center, Haifa, Israel | D. Yanai & TOAM |
| 31 | | 1968 Central Loop Study 1 - Office Building, Chicago, Ill | |
| 32 | | 1968 Central Loop Study 2 - Major Urban Plaza, Chicago, Ill | |
| 33 | | 1968 Calumet City - Office Complex Development, Calumet City, Ill | |
| 34 | | 1968 Hospital Research Project | |
| 35 | | 1969 FBI Headquarters - Roof garden/Recreation Area, Washington D.C. | |
| 36 | | 1969 General Hospital, Louisville, KY | |
| 37 | | 1969 Grasslands Medical Center, Valhalla, NY | |
| 38 | | 1969 C.F. Murphy Associates - new office brochure | |
| 39 | | 1970 Lehman Brothers Headquarters , New York, NY | |
| 40 | built | 1971 Morningside House-Nursery / Infirmary, Bronx NY | |
| 41 | built | 1971 Fine Arts Center, Muehlenberg College, Alantown, PA | |
| 42 | built | 1972 Pennzoil Place, Houston, TX | |
| 43 | | 1972 Chicago Public Library Extension | |
| 44 | | 1972 Lod Airport, International Arrivals Terminal, Israel Scheme #1 | |
| 45 | | 1972 Lod Airport, International Arrivals Terminal, Israel Scheme #2 | |
| 46 | | 1972 NBC Headquarters, Dallas TX | |
| 47 | | 1973 Pan American Life Ins. Co.Headquarters, New Orleans, LA | |
| 48 | | 1973 Prototypical Domestic Flights Terminal for Israel | |
| 49 | | 1973 Nicolette Mall, Minneapolis MN | |
| 50 | | 1973 Airport's Passengers Terminals - Research Project | |
| 51 | built | 1974 Post Oak Central 1, Houston TX | |
| 52 | built | 1974 Post Oak Central 2, Houston TX | |

Google Confidential

| | | Project name | In collaboration |
|---|---|---|---|
| with | | | |
| 53 | built | 1974 Post Oak Central 3, Houston TX | |
| 54 | | 1974 General American Life Insurance Co. St Louis, MA | |
| 55 | | 1974 Office Building, Fort Worth TX | |
| 56 | | 1974 Monaco's New Village | Philip Johnson |
| 57 | | 1974 Block 84 Office Building All 1, Houston, TX | |
| 58 | | 1974 Block 84 Office Building All 2, Houston, TX | |
| 59 | built | 1975 Tamanaco Office Building, Caracas, Venezuela | |
| 60 | built | 1975 Morningside House-Nursery/Infirmary, Bronx NY | |
| 61 | | 1975 Hyatt Hotel Caracas Venezuela | |
| 62 | built | 1975 Century Center, South Bend IN | |
| 63 | | 1975 Beth Lehem's Church of the Nativity addition, New Town Square, Israel | |
| 64 | | 1976 Post Oak Central 2, Houston TX | |
| 65 | built | 1976 80 Field Point Road, Greenwich, CT | |
| 66 | | 1976 Trump Hotel, New York, NY | |
| 67 | | 1976 Amin Project - Apartment Buildings Isfahan, Iran | |
| 68 | | 1976 Bunker Hill Office Development, Los Angeles, CA | |
| 69 | | 1976 Town Square, Isfahan, Iran | Philip Johnson |
| 70 | built | 1976 Alila Residence, Brooklyn Heights, NY. | |
| 71 | built | 1977 Garden Grove Community Church "The Crystal Cathedral", Garden Grove, CA | |
| 72 | built | 1977 Nieman Marcus Dept. Store, San Francisco, CA | Philip Johnson |
| 73 | built | 1977 Peoria Civic Center, Peoria IL | Philip Johnson |
| 74 | built | 1977 Fine Arts Center Muhlenberg College | Philip Johnson |
| 75 | | 1977 Dallas Galleria, Dallas TX | |
| 76 | | 1978 Cullen Center Commercial Development Houston, TX | |
| 77 | built | 1978 101 California Street, Office Building, San Francisco, CA | |
| 78 | built | 1978 PPG Corporate Headquarters, Pittsburgh, PA | Philip Johnson |
| 79 | built | 1978 AT&T Corporate Headquarters, New York, NY | Philip Johnson |
| 80 | | 1979 James & Michelle Farentino Guest House Los Angeles, CA. | |
| 81 | built | 1979 101 Park Avenue, Office Building, New York NY. | |
| 82 | built | 1979 Keil House, East Hampton, NY | |
| 83 | built | 1980 Republic National Bank Of New York World Headquarters New York, NY. | |
| 84 | built | 1980 H.J. Kalikow Offices, New York, NY. | |
| 85 | | 1980 Banco Safra Headquarters, Sao Paulo, Brazil | |
| 86 | built | 1980 Solow Townhouses, New York, NY. | |
| 87 | | 1980 Restoration of RMBH Tomb, Tiberias, Israel | |
| 88 | | 1981 Resurgence Plaza/Johnstown Development, Atlanta, GA. (1 tower scheme) | |
| 89 | | 1981 Resurgence Plaza/Johnstown Development, Atlanta, GA. (2 tower scheme) | |
| 90 | | 1981 St. Bartholomew's Office Building 1, New York NY | |
| 91 | | 1981 St. Bartholomew's Office Building 2, New York, NY | |
| 92 | | 1981 500 Park Avenue Office Building, New York NY | |
| 93 | | 1982 St. Tammany Parish, LA | |
| 94 | | 1982 Pier's Site Office Building, Staten Island, NY. | |
| 95 | | 1982 Battery Park City - Building K, New York, NY. | |
| 96 | | 1982 Palm Beach Office Building, Palm Beach FL. | |
| 97 | | 1982 Codex Corporate Headquarters, MA | |
| 98 | | 1982 Pelham Country Club, Pelham NY | |
| 99 | | 1982 10 Barclay Street - Mixed Use Building, New York, NY. | |
| 100 | | 1982 Stallon Place, Commercial/Residential Center - New Rochelle, NY. | |
| 101 | | 1982 New Rochelle Condominiums - New Rochelle, NY. | |
| 102 | | 1983 Washington Street Urban Renewal Area Development, New York, NY. | |
| 103 | built | 1983 ABC Television Technical Support Building, New York, NY. | |
| 104 | built | 1983 Morgan Lewis Backius - law firm Office Interiors, New York NY. | |

Google Confidential

|  |  | Project name | In colaboration |
|---|---|---|---|
| with |  |  |  |
| 105 |  | 1983 Beyer Cadillac, Cadilac Dealership and Service Center, Long Island City, NY. |  |
| 106 | built | 1983 Canterbury Green - Mixed Use Complex, Stamford CT. |  |
| 107 |  | 1983 60th Street Heliport Hotel, New York, NY. |  |
| 108 | built | 1983 195 Broadway Restoration, New York, NY. |  |
| 109 |  | 1983 Roseland Mixed Use Development, New York, NY - Scheme 1. |  |
| 110 |  | 1983 Roseland Mixed Use Development, New York, NY - Scheme 2. |  |
| 111 |  | 1983 Roseland Mixed Use Development, New York, NY - Scheme 3. |  |
| 112 |  | 1983 250 Hamilton Avenue - Office Building, White Plains, NY. |  |
| 113 |  | 1983 Barclay's International Bank - U.S. Headquarters, New York, NY. |  |
| 114 |  | 1983 Kalikow World Trade Center Hotel, New York, NY. |  |
| 115 |  | 1984 66th Street & 3rd Ave - Commercial Center and residential Tower, New York, NY. |  |
| 116 | built | 1984 441 Lexington Ave. Office Bldg. - renovation & addition, New York, NY. |  |
| 117 |  | 1984 110 Fifth Avenue restoration, New York, NY. |  |
| 118 |  | 1984 East End Development - 4 Tower Scheme, New York, NY. |  |
| 119 |  | 1984 St. Agnes Tower (East 44th Street), New York, NY. |  |
| 120 | built | 1984 Chase Manhattan Bank Financial Center, New York, NY. |  |
| 121 |  | 1986 Attia Residence, Amagansett, NY. - 1st design |  |
| 122 |  | 1985 84th & 1st - Residential Tower, New York, NY. |  |
| 123 |  | 1985 East End Development - "Y" Tower Scheme, New York, NY. |  |
| 124 |  | 1985 Naftali Residence, VT. |  |
| 125 |  | 1985 10 Columbus Circle, New York, NY. |  |
| 126 |  | 1985 East End Development - "X" Tower Scheme, New York, NY. (1986) |  |
| 127 |  | 1985 The Calhoun School - alteration & addition, New York, NY. |  |
| 128 |  | 1985 Brooklyn Transit Parcel, Brooklyn, NY. |  |
| 129 | built | 1985 Gulf Tower Restoration, Pittsburgh, PA. |  |
| 130 |  | 1986 Fulton / Church Office Building. - Scheme 1, New York, NY. |  |
| 131 |  | 1986 Attia Residence, Amagansett, NY. - 2nd design |  |
| 132 | built | 1986 Robb Peck McCooey, New York, NY. |  |
| 133 |  | 1986 Middle Income Housing - Prototype Development, New York NY. |  |
| 134 | built | 1986 Kew Gardens Office Building, Queens, NY. |  |
| 135 |  | 1986 The Mayor's Blue Ribbon Panel, New York, NY. |  |
| 136 |  | 1986 East End Development - Trifoil Tower Scheme, New York, NY. |  |
| 137 |  | 1986 Peconic Park Hotel & Office Development, Long Island, NY. |  |
| 138 |  | 1986 Fulton / Church St. Office Building - Schemes 2, New York, NY. |  |
| 139 | built | 1986 Statue of Liberty Foundation - Offices & Exhibition Space, New York, NY. |  |
| 140. | built | 1986 Broadway Tower (26W62), New York, NY. |  |
| 141 | built | 1987 New York Hospital Major Modernization Program, New York, NY. |  |
| 142 |  | 1987 1633 Broadway - Annex, New York, NY. - scheme 1 |  |
| 143 |  | 1987 1633 Broadway - Annex, New York, NY. - scheme 2 |  |
| 144 |  | 1987 Ocean Vista Residential Development |  |
| 145 |  | 1987 East End Development - As Of Right Scheme, New York, NY. |  |
| 146 | built | 1987 Kalikow Residence, Montauk, NY. |  |
| 147 |  | 1987 Hartz Commercial Development, Queens, NY. (tower - scheme 1) |  |
| 148 |  | 1987 Hartz Commercial Development, Queens, NY. (tower - scheme 2) |  |
| 149 |  | 1987 Hartz Commercial Development, Queens, NY. (lowrise - scheme 3) |  |
| 150 |  | 1987 Paramount 57th Street, Office Bulding, New York, NY. |  |
| 151 | built | 1987 63rd Street Synagogue (Congregation Beit Yaakov), New York, NY. |  |
| 152 |  | 1988 Hartz Development / Chase Manhattan Bank - Operations Center, Queens, NY. |  |
| 153 |  | 1988 South Street Residential Tower, New York, NY. |  |
| 154 |  | 1988 Montreal Office Building, Montreal, Canada |  |
| 155 | built | 1988 Delancey Street Department Store, New York, NY. |  |
| 156 | built | 1989 60 Broad Street, New York, NY. |  |

Google Confidential

|  | | Project name | In colaboration with |
|---|---|---|---|
| 157 | bult | 1988 Hilton Millenium Hotel, New York, NY. | |
| 168 | | 1989 New York Hospital Residential Tower, New York, NY. | |
| 159 | | 1989 Municipal Parking Garage Development, Long Island City, NY. | |
| 160 | | 1989 1080 3rd Avenue - Retail Center and residential tower, New York, NY. | |
| 161 | | 1989 Republic National Bank - Miami Tower, Miami, FL. | |
| 162 | | 1989 New York Trade Center, New York, NY. | |
| 183 | | 1990 Circle in a Square Office Complex, Los Angeles, CA | |
| 164 | | 1990 Geometry in Art and Architecture, exhibition- Ell & Noa Attia,SOHO, NY | |
| 165 | | 1991 Kostabi World Tower, NY. | |
| 166 | | 1991 Lubavitch World Headquarters, Brooklyn, NY. | |
| 167 | | 1991 RASHBI Restoration, Miron, Israel | |
| 168 | | 1991 Project X- Residential Tower, New York, NY. | |
| 169 | | 1992 Young Israel of Woodmere Synagogue, Woodmere, NY. | |
| 170 | | 1992 Eli Attia - Architecture of Tall Buildings. Exhibit in The Israel Museum | |
| 171 | bult | 1992 The Shalom Center- A mixed-use Complex, Tel Aviv, Israel. | |
| 172 | built | 1993 Michelle Lee Residence expansion, Los Angeles, CA. | |
| 173 | | 1993 Private residence, Amagansett, NY | |
| 174 | | 1993 Private residence, Amagansett, NY | |
| 175 | | 1994 Hayarkon Apartment Hotel, Tel Aviv, Israel | |
| 176 | | 1994 2400 Development. Herzlia, Israel | |
| 177 | | 1995 Harajuku Commercial Building, Tokyo, Japan | |
| 178 | | 1996 1756 2nd Avenue, New York, NY | |
| 179 | | 1995 Dania - Carmel Residential Development, Haifa, Israel | |
| 180 | | 1995 Rechassim Industrial Park, Israel | |
| 181 | | 1995 Peal Yam Herzlia, Herzlia, Israel | |
| 182 | | 1996 Marina - Island Development, Herzlia, Israel | |
| 183 | | 1996 Middle East Trade Center, Haifa, Israel | |
| 184 | | 1996 Technopole, Gili Yam, Israel | |
| 185 | | 1998 Hamerkava Center, Holon Israel | |
| 186 | | 1998 Eshel Hasharon Tower, Herzlia, Israel | |
| 187 | | 1998 Hashikma, Ramat Gan, Israel | |
| 188 | | 1998 Aluf Sadeh Decelopment, Ramat Gan, Israel | |
| 189 | | 1999 Or Yehuda Development, Or Yehuda, Israel | |
| 190 | | 2000 Herzl Tower Ramat Gan, Isrnel .. | |
| 191 | | 2000 Junction Tower, Kfar Saba, Israel | |
| 192 | | 2001 Central Market commercial development, Tel Aviv, Israel | |
| 193 | | 2002 Transportation Center, Gili Yam, Israel | |
| 194 | | 2003 WTC new York, NY | |
| 195 | | 2007 RH New York, NY | |
| 196 | | 2007 Point Wells, Seattle WA | |
| 197 | | 2007 STB III | |
| 198 | | 2007 Engineered Architecture | |
| 199 | | 2008 Roundhouse Beverly Hills | |
| 200 | | 2008 Roundhouse Colony, Bridgehampton NY | |
| 201 | | 2008 RHTechnology | |
| 202 | | 2009 STB IV | |

Google Confidential

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Jamie L. Dupree (SBN 158105)
Futterman Dupree Dodd Croley Maier LLP
180 Sansome Street, 17th floor
San Francisco, CA 94104

TELEPHONE NO.: (415)399-3840   FAX NO.: (415)399-3838
ATTORNEY FOR *(Name):* Plaintiffs Max Sound Corporation, Eli Attia, and Eli Attia Architect PC

FOR COURT USE ONLY

FILED

2014 DEC -5 PM 1: 18

*(court stamp, partially illegible)*

BY FAX

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Clara
STREET ADDRESS: 191 North First Street
MAILING ADDRESS: SAME
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: Downtown Superior Court

CASE NAME: Max Sound Corporation, et al. v. Google, Inc., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 114CV274103 |
|---|---|---|
| [x] Unlimited  [ ] Limited (Amount demanded exceeds $25,000) (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:  DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[x] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more courts issues that will be time-consuming to resolve   in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action *(specify):* 10
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: December 5, 2014

Jamie L. Dupree (SBN 158105)
(TYPE OR PRINT NAME)

▶ *(signature)*
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Legal Solutions Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) (*if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto*)

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability (*not asbestos or
  toxic/environmental*) (24)
Medical Malpractice (45)
  Medical Malpractice—
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) (*not civil
  harassment*) (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract (*not unlawful detainer
      or wrongful eviction*)
  Contract/Warranty Breach—Seller
    Plaintiff (*not fraud or negligence*)
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case—Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage (*not provisionally
  complex*) (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property (*not eminent
    domain, landlord/tenant, or
    foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ—Administrative Mandamus
  Writ—Mandamus on Limited Court
    Case Matter
  Writ—Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal—Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  (*arising from provisionally complex
    case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment (*non-
    domestic relations*)
  Sister State Judgment
  Administrative Agency Award
    (*not unpaid taxes*)
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified
  above*) (42)
  Declaratory Relief Only
  Injunctive Relief Only (*non-
    harassment*)
  Mechanics Lien
  Other Commercial Complaint
    Case (*non-tort/non-complex*)
  Other Civil Complaint
    (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition (*not specified
  above*) (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late
    Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

# SUMMONS
## (CITACION JUDICIAL)

SUM-100

**NOTICE TO DEFENDANT:** Google, Inc., Flux Factory, Inc.,
*(AVISO AL DEMANDADO):* Larry Page, Sergey Brin,
Sebastian Thrun, Eric "Astro" Teller, Michelle
Kaufmann, Jennifer Carlile, Augusto Roman, Nicholas
Chim, and DOES 1-100



FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*
FILED

2014 DEC -5 PM 1:19

DAVID H. S. ACKARD Superior Court

**YOU ARE BEING SUED BY PLAINTIFF:** Max Sound Corporation,
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* Eli Attia and Eli
Attia Architect PC

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Santa Clara Superior Court – Downtown Superior Court<br>191 North First Street<br>San Jose, CA 95113 | CASE NUMBER:<br>*(Número del Caso):*<br>114CV274103 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Futterman Dupree Dodd Croley Maier LLP      Tel: 415 399 3840   Fax: 415 399-3838
Jamie L. Dupree
180 Sansome Street, 17th floor
San Francisco, CA 94104

DAVID H. YAMASAKI
Chief Executive Officer, Clerk S. ACKARD

DATE:   DEC 0 5 2014          Clerk, by _____, Deputy
*(Fecha)*                     *(Secretario)*               *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]
**SUMMONS**
Legal
Solutions
Plus
Code of Civil Procedure §§ 412.20, 465

# EXHIBIT B

**E-FILED**

Jul 31, 2015 1:50 PM
David H. Yamasaki
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
Case #1-14-CV-274103 Filing #G-75190
By R. Walker, Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| MAX SOUND CORPORATION; ELI ATTIA; and ELI ATTIA ARCHITECT PC, | Case No.: 1-14-CV-274103 |
| Plaintiffs, | **ORDER AFTER HEARING ON JULY 31, 2015** |
| vs. | |
| GOOGLE, INC.; FLUX FACTORY, INC.; LARRY PAGE; SERGEY BRIN; SEBASTIAN THRUN; ERIC "ASTRO" TELLER' MICHELLE KAUFMANN, JENNIFER CARLILE; AUGUSTO ROMAN; NICHOLAS CHIM; and DOES 1-100, | **(1) Demurrer by the Google Defendants (Google Inc., Larry Page, Sergey Brin, Sebastian Thrun, and Eric "Astro" Teller) to the Complaint AND Joinder to Same by Flux Factory (Flux Factory, Inc., Michelle Kaufmann, Jennifer Carlile, Augusto Roman and Nicholas Chim)** |
| Defendants. | **(2) Motion by the Google Defendants (Google Inc., Larry Page, Sergey Brin, Sebastian Thrun, and Eric "Astro" Teller) to Compel Compliance with CCP section 2019.210 AND Joinder to Same by Flux Factory (Flux Factory, Inc., Michelle Kaufmann, Jennifer Carlile, Augusto Roman and Nicholas Chim)** |
| | **(3) Motion by the Google Defendants (Google Inc., Larry Page, Sergey Brin, Sebastian Thrun, and Eric "Astro" Teller) to Seal Documents** |

The above-entitled matter came on regularly for hearing on Friday, July 31, 2015 at 9:00 a.m. in Department 1 (Complex Civil Litigation), the Honorable Peter H. Kirwan

*Max Sound Corporation, et al. v. Google, Inc., et al.*
*Superior Court of California, County of Santa Clara, Case No. 1-14-CV-274103*
*Order After Hearing on July 31, 2015 [Demurrer to Complaint and Joinder thereto; Motion to Compel Compliance with CCP section 2019.210 and Joinder thereto; Motion to Seal]*

presiding. The appearances are as stated in the record. The Court, having reviewed and considered the written submission of all parties, having heard and considered the oral argument of counsel, and being fully advised, orders that Exhibit A attached to and incorporated herein is the Order of the Court.

IT IS SO ORDERED.

Dated: ___7 | 31 | 15___

_____
Honorable Peter H. Kirwan
Judge of the Superior Court

Max Sound Corporation, et al. v. Google, Inc., et al.
Superior Court of California, County of Santa Clara, Case No. 1-14-CV-274103
Order After Hearing on July 31, 2015 [Demurrer to Complaint and Joinder thereto; Motion to Compel Compliance with CCP
section 2019.210 and Joinder thereto; Motion to Seal]

2

E-FILED: Jul 31, 2015 1:50 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-75190

# EXHIBIT A

**Calendar line 5**

- 00O00 -

**Case Name:** Max Sound Corporation, et al. v. Google, Inc.
**Case No.:** 1-14-CV-274103

This is an action for misappropriation of trade secrets and related causes of action. In the operative Complaint, filed December 5, 2014, plaintiffs Max Sound Corporation ("Max Sound"), Eli Attia ("Attia") and Eli Attia Architect PC ("Attia PC") (collectively "Plaintiffs") allege that Attia is a world renowned architect and majority owner and principal of Attia PC who developed a new technology called "Engineered Architecture" or "EA" which enables the creation of buildings that are more sustainable and of better quality in substantially less time and at greatly reduced costs compared to what is currently possible.[1] Plaintiffs allege that EA employs a method of utilizing intelligent "cells" and "supercells" that represent basic building blocks of architectural design to create buildings dramatically better, faster, with fewer resources, and with less energy and environmental impact than conventional methods.[2]

In 2009, Attia began looking for a partner, and on or about July 25, 2010, he was approached by "Google[x]", an affiliate of defendant Google, Inc. ("Google"), through defendant Eric "Astro" Teller.[3] Attia then introduced his EA technology to defendants and Google executives Larry Page, Sebastian Thrun, and Sergey Brin.[4] On or about August 8, 2010, Google proposed and executed with Attia a Non-Disclosure Agreement ("NDA") permitting Google to use confidential information received from Attia to facilitate technical discussions concerning existing or future product development efforts by the parties.[5] Google also induced Attia to relocate with his family to Palo Alto in late 2010 so that he could work directly at Google's Mountain View campus.[6]

After negotiations with Thrun and Teller on Google's behalf, on January 12, 2011, Attia entered into an Inbound Services Agreement ("ISA") with Google in which Attia agreed to share, for a limited time, his proprietary information and know-how and help Google translate this information into software, with Google providing software engineers and resources needed to prove the technology's viability and the industry's acceptance of it.[7] Based in the Google[x] development lab, the project was known as "Project Genie."[8] The ISA included a Statement of Work No. 1 ("SOW"), in which Google acknowledged that the "'Genie Project was inspired by [Mr. Atta's] experience and Pre-Existing Intellectual Property.'"[9] The SOW allegedly describes certain of Attia's proprietary information and identifies documents that contain Attia's proprietary information, including "All presentations & brochures," notes, emails, patents, and "other related intellectual property developed as of the SOW Effective Date."[10]

---

[1] Compl. ¶¶ 2, 11.
[2] Compl. ¶ 25.
[3] Compl. ¶ 27.
[4] Compl. ¶ 28.
[5] Compl. ¶ 30. A copy of the NDA is attached to the Complaint as Exhibit 1.
[6] Compl. ¶ 31.
[7] Compl. ¶¶ 3-4, 34, 86. A copy of the ISA is attached to the Complaint as Exhibit 2.
[8] Compl. ¶ 4.
[9] Compl. ¶ 36. A copy of the SOW is attached to the Complaint as Exhibit 3.
[10] Compl. ¶ 36.

Under the ISA, any "invention, improvement, development, concept, discovery or other proprietary information" that Attia had an interest in before January 12, 2011 remained his property.[11]

Knowing it would need to license Attia's proprietary information, Google made a request for a non-exclusive, royalty-free, perpetual, irrevocable, worldwide license, which was rejected, and then proposed to pay royalties for a non-exclusive license, which was rejected as well, and ultimately, Attia agreed to provide Google a "non-commercial" and nonexclusive license to use the proprietary information only up until June 31, 2011.[12]  Google also agreed that if the "proof of concept" for the Genie Project was successful, Google would need to obtain a license from Attia if it wanted to proceed with Genie.[13]

Plaintiffs allege that at the end of the proof of concept period, instead of compensating Attia for his proprietary information and know-how, Google and other defendants squeezed Attia out of his own project and continued to develop a product embodying Attia's proprietary information and know-how for their own benefit.[14]  Plaintiffs allege the defendants began implementing their plan to squeeze Attia out of the new venture in 2011, and that for about eight months, unbeknownst to Attia, Google was using Attia's proprietary information to develop products in a manner disapproved by Attia and behind his back.[15]  Plaintiffs allege that Google pretended to kill the Genie Project by informing the Genie team and Attia on December 7, 2011 that they would stop working on Genie.[16]  Plaintiffs allege that within a week of being informed by Teller that Genie would end, Attia learned that Chim had been speaking to potential partners and investors and was telling them that Attia was no longer involved with Genie, and that he, Chim, had the right to continue.[17]  On December 16, 2011, Chim stated to Attia, "'I've got the license and control of Genie's IP.'"[18]  On December 21, 2011, Teller sent an email to Attia containing a proposed agreement between Chim and Attia, stating that " 'The Genie team will continue.'"[19]

In 2012, Google allegedly spun-off Project Genie into a new company, defendant Flux Factory, Inc. ("Flux Factory"), which was co-founded and is headed by defendants and former Project Genie team members Michelle Kaufmann, Jennifer Carlile, Augusto Roman and Nicholas Chim (collectively the "Flux Factory Defendants").[20]  Flux Factory allegedly sells EA features embodied in the "Flux Metro Austin Preview" service on its website.[21]

Plaintiffs allege that on May 22, 2014, Attia entered into a "Representation Agreement" with Max Sound, granting Max Sound the exclusive rights to enforce EA intellectual property rights.[22]

---

[11] Compl. ¶ 37.
[12] Compl. ¶ 40.
[13] Compl. ¶ 40.
[14] Compl. ¶¶ 5-6.
[15] Compl. ¶¶ 52-53.
[16] Compl. ¶ 56.
[17] Compl. ¶ 57.
[18] Compl. ¶ 58.
[19] Compl. ¶ 59.
[20] Compl. ¶ 6.
[21] Compl. ¶ 7.
[22] Compl. ¶ 8.

The Complaint asserts ten causes of action for: (1) misappropriation of trade secrets; (2) breach of contract (NDA); (3) breach of contract (ISA); (4) breach of confidence; (5) breach of the covenant of good faith and fair dealing; (6) slander of title; (7) conversion; (8) unfair competition; (9) fraud/deceit; and (10) declaratory relief.

Google, Page, Brin, Thrun and Teller (the "Google Defendants") now demur to the Complaint and move to compel compliance with California Code of Civil Procedure section 2019.210. The Flux Factory Defendants join in both the demurrer and the motion to compel. The Google Defendants also move to seal various documents and portions thereof filed in connection with the demurrer and motion to compel.

Judicial Notice

In support of the demurrer, the Google Defendants request judicial notice of: (1) Certificate of Status regarding Attia PC issued by the California Secretary of State on March 10, 2015;[23] (2) listing for Attia PC in the California Secretary of State's Business Search online database as of May 13, 2015;[24] (3) Licensure Certification regarding the history of Attia's California architect license, issued by the California Architects Board on April 3, 2015;[25] and (4) the Representation Agreement between Attia and Max Sound produced by Plaintiffs on April 24, 2015.[26]

The Secretary of State documents are judicially-noticeable as official acts of a California state agency. (Cal. Evid. Code, § 452, subd. (c).) Plaintiffs do not oppose the request or dispute that Attia PC's corporate status was suspended during this lawsuit, and furthermore, they admit that Attia PC's corporate status was reinstated on May 12, 2015.[27] Thus, the request for judicial notice of Pfefferkorn Exhibits A and B is **GRANTED**.

The request is otherwise **DENIED**. The Licensure Certificate of Attia is not relevant to any of the issues raised in the instant demurrer. (See *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [only relevant material may be judicially noticed].) While the Representation Agreement is relevant to the issue of Max Sound's status as assignee of the intellectual property rights of Attia, on May 29, 2015, Plaintiffs filed a request for dismissal of the Complaint as to Max Sound.[28] Thus, consideration of the Representation Agreement is no longer relevant to any issues on the instant demurrer.

Demurrer

The Google Defendants argue that Attia PC's non-contract claims for misappropriation of trade secrets, breach of confidence, slander of title, conversion, and fraud are time-barred on the face of the Complaint because the respective statutes of limitations (either two or three years) began to run when Attia PC believed in mid-December of 2011 that the Google Defendants had cut Attia PC out of Project Genie and continued on it alone. Thus, the claims with two-year statutes of limitations (breach of confidence and slander of title) expired in December of 2013,

---

[23] Exh. A to Decl. Riana S. Pfefferkorn ISO Google Defs' RJN.
[24] Pfefferkorn RJN Exh. B.
[25] Pfefferkorn RJN Exh. C.
[26] Pfefferkorn RJN Exh. D.
[27] See Pltfs' Opp. to Google Defs' Dem. at 4:8-12.
[28] See docket no. 49.

and the claims with three-year statutes of limitations (misappropriation of trade secrets, conversion and fraud) expired in December of 2014 while Attia PC's corporate status was suspended in California, and the filing of the Complaint on December 5, 2014 did not toll the statute of limitations on these claims.[29]

As for Attia's and Max Sound's contract-based claims, the Google Defendants argue these Plaintiffs have no standing to sue under the NDA and ISA because they were not parties thereto. The Google Defendants argue the Court should disregard the Complaint's allegations that Attia was a party to the NDA and ISA because the agreements attached to the Complaint unambiguously contradict those allegations by showing that "Contractor" – defined as Attia PC, not Attia – executed the contracts with Google. The Google Defendants argue that Attia cannot claim third-party beneficiary or assignee status under Attia PC's contracts because the contracts do not name him as a third-party beneficiary or assignee. As for Max Sound, the Google Defendants argue that the judicially-noticeable Representation Agreement identified as the assignment contract does not mention Attia PC or assign any contractual or intellectual property rights from Attia PC to Attia or to Max Sound.

The Google Defendants argue that Attia's and Max Sound's trade secrets claims fail because they have no trade secret rights to assert. The Google Defendants argue that the Court should disregard the Complaint's allegations of trade secret ownership by Attia (and assignment to Max Sound) because the agreements attached to the Complaint contradict those allegations by showing that "Contractor" – Attia PC – holds the relevant intellectual property rights, and there are no allegations that Attia PC assigned ownership of its information to Attia or Max Sound.

Finally, the Google Defendants argue that Attia's and Max Sound's remaining claims for fraud, conversion, breach of confidence, slander of title, unfair competition, and declaratory relief similarly fail because they all rest on contract or intellectual property rights. According to the Google Defendants, the central allegation underlying these claims is that Google misused the alleged secrets it obtained from Attia PC under the NDA and ISA, but again, neither Attia nor Max Sound are parties to those agreements or owners of the alleged intellectual property that the agreements cover.

In opposition, Plaintiffs argue that Attia PC's non-contract claims are not untimely because the Google Defendants point to no allegations in the Complaint necessarily showing that Attia PC was aware of any actual misappropriation of its trade secrets before May 12, 2012, and the only purported wrongs that Attia PC was aware of in December of 2011 were the false representations that Google was stopping work on Project Genie, and the assertion by Chim that Google has "the license and control of Genie's IP," which only show Google's dishonesty about continuation of the Genie Project, not misappropriation of Attia trade secrets by Google. Alternatively, Plaintiffs seek leave to allege that the running of the statute of limitations was fraudulently concealed by Google, as shown in letters assuring Attia PC that Google was honoring its commitments under the NDA, ISA and SOW.

Plaintiffs further argue that the written agreements do not contradict the Complaint's allegations that Attia was a party to the NDA and ISA, but rather, a close analysis of the

---

[29] The Google Defendants do not presently demur to Attia PC's contract-based claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unfair competition, and declaratory judgment. (See Google Defs' Memo. Pts. & Auth. ISO Dem. at p. 7, fn. 6.)

contractual language supports the interpretation that Attia was a party. Alternatively, Plaintiffs seek leave to allege that Attia was an intended third party beneficiary.

Finally, Plaintiffs argue that Attia is alleged to be an owner of the alleged trade secrets, and nothing in the agreements contradicts this allegation.

**Analysis:** "A demurrer tests the sufficiency of the plaintiff's complaint, i.e., whether it states facts sufficient to constitute a cause of action upon which relief may be based. [Citations.] In determining whether the complaint states facts sufficient to constitute a cause of action, the trial court may consider all material facts pleaded in the complaint and those arising by reasonable implication therefrom; it may not consider contentions, deductions or conclusions of fact or law. [Citations.] The trial court also may consider matters of which it may take judicial notice. [Citations.] A demurrer should not be sustained without leave to amend if the complaint, liberally construed, can state a cause of action under any theory or if there is a reasonable possibility the defect can be cured by amendment. [Citations.]" (*Kong v. City of Hawaiian Gardens Redevelopment Agency* (2002) 108 Cal. App. 4th 1028, 1037-1038.) "[F]acts appearing in exhibits attached to the complaint will also be accepted as true and, if contrary to the allegations in the pleading, will be given precedence. [Citation.]" (*Dodd v. Citizens Bank of Costa Mesa* (1990) 222 Cal.App.3d 1624, 1627.) "A demurrer based on a statute of limitations will not lie where the action may be, but is not necessarily, barred. [Citation.] In order for the bar of the statute of limitations to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows that the action may be barred. [Citation.]" (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403.)

The demurrer is **MOOT** as to Max Sound. As discussed above, Plaintiffs have voluntarily dismissed Max Sound's claims.[30]

As the Google Defendants point out in their reply brief, Plaintiffs do not seem to oppose the demurrer on statute of limitations grounds as to the causes of action for breach of confidence and slander of title by Attia and Attia PC.[31] Regarding the statute of limitations issue, Plaintiffs argue that "*Attia PC's* Claim for Misappropriation of Trade Secrets and Other Claim are Not Barred as a Matter of Law by the Applicable Statutes of Limitation"[32] because the Complaint does not show that reasonable diligence would have revealed the basis for "these claims prior to May 12, 2012" – which is *three* years before the date of Attia PC's corporate reinstatement. It seems then that Plaintiffs are not defending the timeliness of either *Attia's* or Attia PC's claims that are subject to a *two-year* statute of limitations. The Court is inclined to agree with the Google Defendants that the demurrer is essentially unopposed as to the claims of breach of confidence and slander of title for Attia and Attia PC. Accordingly, the demurrer is **SUSTAINED WITHOUT LEAVE TO AMEND** as to the fourth and sixth causes of action.

---

[30] See docket no. 49.

[31] The two-year statute of limitations under California Code of Civil Procedure section 339 subdivision 1 applies to causes of action for breach of confidence and slander of title. (See *Davies v. Krasna* (1975) 14 Cal.3d 502, 510, fn. 6; *Truck Ins. Exch. v. Bennett* (1997) 53 Cal.App.4th 75, 85, fn. 4.)

[32] Pltfs' Opp. at p. 4:7-8, emphasis added.

As for Attia PC's first cause of action for misappropriation of trade secrets, seventh cause of action for conversion, and ninth cause of action for fraud, these claims are subject to three-year statutes of limitations. "An action for misappropriation [of trade secrets] must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." (Cal. Civ. Code, § 3426.6.) Three-year statutes of limitations also apply to actions "for taking, detaining, or injuring any goods or chattels, including actions for the specific recovery of personal property" must be brought within three years (Cal. Code Civ. Proc., § 338, subd. (c)(1)) and "for relief on the ground of fraud or mistake. The cause of action in that case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." (Cal. Code Civ. Proc., § 338, subd. (d).) "Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' [Citations.] An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. [Citation.] [¶] A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' [Citations.] . . . . The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806-807.)

The judicially-noticed exhibits establish that Attia PC's corporate status was suspended by the Secretary of State on November 14, 2014 and was not active again until on or about May 12, 2015. "[A] corporation's filing of a complaint at a time when the corporation's powers, rights, and privileges have been suspended does not operate to toll the running of the statute of limitations. [Citation.] '[I]f the statute runs prior to revival, the action is time barred.' [Citation.]" *V & P Trading Co., Inc. v. United Charter, LLC* (2012) 212 Cal.App.4th 126, 132.) Because Attia PC's corporate status was suspended on December 5, 2014 when this action was filed, and the filing of the Complaint did not toll the running of the statute of limitations, the issue is whether the Complaint shows on its face that the three-year statutes of limitations had run prior to Attia PC's revival on or about May 12, 2015.

In the Complaint, Plaintiffs allege that on December 7, 2011, Chim informed Attia and the Genie team that Google would stop work on Project Genie, yet within a week, Attia had learned that Chim was still speaking to the same potential investors they had previously visited and was telling them that he had the right to continue with the project.[33] Plaintiffs further allege that on December 16, 2011, Chim claimed, "I've got the license and control of Genie's IP" and on December 21, 2011, Teller sent an email to Attia stating that "'Eli will continue to pursue his path and the Genie team will continue with a different path.' 'The Genie team will continue.'"[34]

Plaintiffs discount the extent of Attia PC's awareness in December of 2011, arguing that at most, Attia PC discovered the Google Defendants' dishonesty about the continuation of Project Genie, not their misappropriation of proprietary information. This position is not persuasive. Under the California Uniform Trade Secret Act ("CUTSA"), "misappropriation" is defined in relevant part as "use of a trade secret of another without express or implied consent by a person who...[a]t the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was...[a]cquired under circumstances giving rise to a duty to...limit its use;

---

[33] Compl. ¶¶ 56-57.
[34] Compl. ¶ 59.

or [d]erived from or through a person who owed a duty to the person seeking relief to…limit its use[.]" (Cal. Civ. Code, § 3426.1, subd. (b)(2)(B)(ii), (iii).) Here, Attia PC's discovery that the Google Defendants continued with Project Genie after falsely telling Attia the project was terminated should have put Plaintiffs on inquiry notice of the improper use of their alleged trade secrets. The Complaint alleges that Project Genie was "inspired by" Attia's intellectual property;[35] that any intellectual property Attia brought to Genie would continue to belong to him, including "Pre-Existing Intellectual Property that Google admits inspired Genie";[36] that Google acknowledged it would need a license to continue Genie after the proof of concept period was over;[37] that Attia taught the Genie team "everything that was to become Project Genie" and disclosed his proprietary information with the Genie team;[38] that the "prototype" software application shown to industry leaders and investors consisted entirely of Attia's EA proprietary information and followed the blueprint of Attia's intellectual property;[39] that Google acknowledged Attia was the "creator of core Genie concepts" and the "creator of Genie technology."[40] Thus, given how integral Attia's intellectual property allegedly was to Project Genie, as well as Google's acknowledgment to Attia that Genie could only continue past the proof of concept stage by obtaining a license for Attia's intellectual property, Attia PC's discovery of the continuation of Project Genie after the Google Defendants had claimed it was terminated should have reasonably put Attia PC on notice that the proprietary information which formed the "core" of Genie was being used in an unauthorized manner, in breach of a duty to limit the use of such information. This constituted knowledge of potential misappropriation as defined under the CUTSA. It would have been unreasonable for Attia PC to assume in December of 2011 that Genie was proceeding in some manner that did not use Attia's intellectual property; at the very least, Attia PC had a duty to investigate further given the integral nature of Attia's intellectual property to the Genie venture. Thus, the Court finds that Attia PC's CUTSA claim appears time-barred on the face of the Complaint because the three-year statute of limitations expired prior to Attia PC's revival on or about May 12, 2015.

Attia PC's conversion claim is similarly based on the Google Defendants' exercise of dominion over the intellectual property by continuing to incorporate it in Project Genie after the end of the license period.[41] For the same reasons discussed above as to the CUTSA claim, the three-year statute of limitations on Attia PC's conversion claim expired to prior Attia PC's revival on or about May 12, 2015.

Attia PC's fraud claim is based on false representations about the Genie Project made to Mr. Attia to induce him to reveal his trade secrets, pre-existing IP rights, ideas, concepts and technology, including the representation that Attia's IP rights would be protected and not misused.[42] As discussed above with regard to the CUTSA claim, because the Complaint acknowledges that Attia PC discovered the unauthorized use of the "core" proprietary information in the continued operation of Project Genie in mid-December 2011, the three-year statute of limitations on Attia PC's fraud claim expired to prior Attia PC's revival on or about May 12, 2015.

---

[35] Compl. ¶ 36.
[36] Compl. ¶ 38.
[37] Compl. ¶ 40.
[38] Compl. ¶ 43.
[39] Compl. ¶¶ 48-49.
[40] Compl. ¶¶ 49-50.
[41] Compl. ¶ 122.
[42] Compl. ¶¶ 132-133.

In seeking leave to amend, Plaintiffs propose to add allegations that Google fraudulently concealed the running of the statute of limitations by providing assurances in letters dated January 2012 through June 2012 that Google was honoring its commitments under the NDA, ISA, and SOW.[43]  The Court sees no such false assurances or attempts to conceal the operative facts regarding the statute of limitations in the letters submitted by Plaintiffs.  That Google's counsel denied Plaintiffs' assertions and demanded further identification of the alleged trade secrets does not constitute concealment of operative facts, nor is it apparent how Google's letters caused Plaintiffs to fail to discover the operative facts for Attia PC's causes of action within the limitations period, particularly because the Complaint admits facts giving rise to inquiry notice in December of 2011.  (See *Sagehorn v. Engle* (2006) 141 Cal.App.4th 452, 460-461 [discussing elements of equitable tolling].)  The demurrer to Attia PC's first, seventh and ninth causes of action is **SUSTAINED WITHOUT LEAVE TO AMEND.**

As for Attia's claims for misappropriation of trade secrets, breach of contract, breach of the covenant of good faith and fair dealing, conversion, unfair competition, fraud, and declaratory relief, the issue raised on the demurrer is whether Attia has standing to enforce the terms of the contracts and to bring related causes of action that arise out of the contractual rights. "Someone who is not a party to the contract has no standing to enforce the contract or to recover extra-contract damages for wrongful withholding of benefits to the contracting party." (*Hatchwell v. Blue Shield of Cal.* (1988) 198 Cal.App.3d 1027, 1034.)  Here, the Complaint expressly alleges that Google entered into the NDA and ISA with Attia,[44] but the Google Defendants argue the actual terms of the NDA and ISA establish that Attia is not a party. Plaintiffs maintain the contract terms are ambiguous, and Attia is also potentially a third-party beneficiary.

Having reviewed the NDA, ISA, and SOW attached to the Complaint, the Court agrees with Plaintiffs that the contracts do not unambiguously contradict the allegation that Attia was a party to the contracts.  The NDA appears to have been sent from Google Legal to Attia at a personal email address, and it refers to both Attia PC as the "Company Name" and Attia as "Owner."  The NDA terms themselves refer only to the "Discloser" of confidential information, and there is nothing limiting the term "Discloser" to only Attia PC.  While the ISA and SOW refer only to Attia PC as the "Contractor," other parts of the ISA are ambiguous as to whether the terms apply to Attia individually.  For instance, on page 2, the ISA refers to "Contractor's spouse or spouse's lineal descendant" and the Contractor's license "to engage in his professional practice in a personal capacity[.]"  These terms could be interpreted as conflating Attia PC and its individual owner.  For purposes of testing the pleadings, the Court does not find such a clear inconsistency between the allegations and the exhibits so as to dispose of the issue as a matter of law at this early stage.

Nor do the NDA and ISA clearly contradict the allegation that Attia owns the trade secrets.[45] The Google Defendants argue that the contracts "plainly state that Contractor, not Mr. Attia, holds any purportedly relevant intellectual property rights" and that any claim of joint ownership by Attia and Attia PC "is contradicted by Contractor's representations of *sole*

---

[43] See Exhs. A-E to Decl. Eric W. Buether ISO Pltrs' Opp.

[44] Compl. ¶¶ 80, 86.

[45] See Compl. ¶71.

*ownership* in the integrated ISA attached to the Complaint[.]"[46]  However, there is no specific language in the ISA and SOW pertaining to Contractor's "sole ownership" of the proprietary information.  That the ISA attributes ownership to Contractor for purposes of providing the agreed-upon services does not necessarily imply there are no other owners.

For these reasons, the demurrer to Attia's first, second, third, fifth, seventh, eighth, ninth and tenth causes of action is **OVERRULED**.

Motion to Compel Compliance (Cal. Code Civ. Proc., § 2019.210)

On April 24, 2015, Plaintiffs served Defendants with a trade secret identification statement pursuant to California Code of Civil Procedure section 2019.210 ("2019 Statement").[47]  On May 17, 2015, Plaintiffs served an amended 2019 Statement.[48]  On May 27, 2015, Plaintiffs served an additional amendment clarifying a term used in the amended statement.[49]

The Google Defendants argue that Plaintiffs' amended 2019 Statement does not identify the trade secrets with reasonable particularity because of the statement's use of "catch-all" indicators of incompleteness (e.g., trade secrets "include..." while disclaiming the list is exhaustive), biological metaphors in place of concrete descriptions (e.g., cells, DNA), advertising-style puffery (e.g., "well suited", "greater efficiency"), and content-free descriptions of goals and outcomes that do not identify claimed trade secrets.  The Google Defendants argue that listing generalized high-level concepts, categories, or goals that do not identify specific trade secrets is insufficient.

Plaintiffs argue they have adequately identified seven separate trade secrets directed at the design of a computer-implemented system for the design of a building, the specific elements of each trade secret such as the architecture for the system, the components or features comprising each claimed trade secrets, and the functionality performed by the identified structure.  The seven trade secrets are summarized by Plaintiffs as: (1) Computer Implemented System for Designing a Building; (2) Building Systems and Components Database and Tool; (3) Site Specific Requirements and Constraints Database and Tool; (4) Design Development Tool; (5) Design Attributes Tool; (6) Design Optimization Tool; and (7) Collaboration Tool.  Plaintiffs argue that Google has filed several patent applications containing numerous claims reciting the same trade secrets as patentable inventions, and containing elements identical or virtually identical to the elements of the seven trade secrets identified in Plaintiffs' disclosures.[50]  Plaintiffs argue they are not required to identify implementing software because a design for a technological system can be trade secret by itself.

**Analysis:** "In any action alleging the misappropriation of a trade secret under the Uniform Trade Secrets Act..., before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity subject to any orders that may be appropriate under Section 3426.5 of the Civil Code."  (Cal. Code Civ. Proc., § 2019.210.)  A plaintiff alleging misappropriation of a trade secret "should

---

[46] See Google Defs' Memo. Pts. & Auth. ISO Dem. at p. 9:15-16, Reply at p. 9:3-4, original italics.

[47] Decl. Riana S. Pfefferkorn ISO Mot. to Compel Compl. with CCP 2019.210 ¶ 3.

[48] Decl. Pfefferkorn ISO Mot. to Compel. ¶ 2, Exh. A.

[49] See Exh. C to Decl. Eric W. Buether ISO Pltfs' Opp. to Defs' Mot. to Compel.

[50] See Buether Exhs. A ('727 Application), B ('307 Application).

describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." (*Diodes, Inc. v. Franzen* (1968) 260 Cal.App.2d 244, 253.) The main purpose of the rule is to give both the court and the defendant reasonable notice of the issues that must be met at the time of trial and provide reasonable guidance in ascertaining the scope of appropriate discovery. (*Id.*)

"'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Cal. Civ. Code, § 3426.1, subd. (d).) Here, Plaintiffs' amended 2019 Statement purports to describe a particular system for the automation of building design with particular core features and tools. As Plaintiffs state in their opposition brief, they identify seven different trade secrets: (1) Computer Implemented System for Designing a Building; (2) Building Systems and Components Database and Tool; (3) Site Specific Requirements and Constraints Database and Tool; (4) Design Development Tool; (5) Design Attributes Tool; (6) Design Optimization Tool; and (7) Collaboration Tool.[51]

Much of the Google Defendants' motion amounts to parsing out particular words and phrases of the amended 2019 Statement, rephrasing Plaintiffs' descriptions in the simplest possible way, and then claiming they are not sufficiently particularized. This is not a fair evaluation of the language of the statement itself. Regarding the issue of puffery, the Google Defendants criticize Plaintiffs' use of words like "well suited" and "greater efficiency" but ignore the context in which these phrases are used. The Court sees these phrases used in order to help describe the functionality of the alleged trade secret. For instance, the "well suited" language is used in connection with describing the how the "design management processor" trade secret uses specifically identified types of information about the structural and mechanical components of a building to help in the building's design. By fixating on what they feel is puffery, the Google Defendants ignore the more detailed content of the amended 2019 Statement for each identified trade secret. With regard to the biological metaphors, the amended 2019 Statement explains in fair detail how the metaphorical term "cell" applies to the objects for which Plaintiffs claim a trade secret and how those "cells" are used in building design.[52] Again, the Google Defendants fixate on what they feel is "flowery language" but ignore the more detailed content of the amended 2019 Statement explaining the actual functionality of the claimed trade secret. Portions of the amended 2019 Statement that the Google Defendants criticize as vague "goals or outcomes" are, in the Court's view, sufficient descriptions of how the claimed trade secrets function.

Regarding "catch-all" indicators of incompleteness, as the Google Defendants point out, the amended 2019 Statement's last paragraph expressly states that the document is a summary of the unique aspects of the claimed trade secrets and is not intended to be an exhaustive

---

[51] Given the sealing orders discussed below, the Court will attempt to use a "purposefully vague" description of the claimed trade secrets to avoid unintended disclosure. (See *Advanced Modular Sputtering, Inc. v. Superior Court* (2005) 132 Cal.App.4th 826, 831, fn. 2.)

[52] See Amended 2019 Statement at pp. 2-5.

description.[53]  In *Perlan Therapeutics, Inc. v. Superior Court* (2009) 178 Cal.App.4th 1333, the appellate court expressed concern over the ability of trade secrets plaintiffs to unilaterally alter their list of trade claims as the case proceeds using "broad, 'catch-all' language" in the 2019 statement.  (See *Perlan, supra*, 178 Cal.App.4th at p. 1344.)  However, the "'[r]easonable particularity' mandated by section 2019.210 does not mean that the party alleging misappropriation has to define every minute detail of its claimed trade secret at the outset of the litigation." (*Advanced Modular Sputtering, Inc. v. Superior Court* (2005) 132 Cal.App.4th 826, 835.)  Thus, to the extent Plaintiffs' amended 2019 Statement omits minute details of the claimed trade secrets, it does not run afoul of the reasonable particularity standard.  Any concerns that Plaintiffs are abusing the non-exhaustive nature of the disclosure can be addressed by Defendants in a motion for protective order.[54]

However, the Court identifies one critical shortcoming in Plaintiffs' amended section 2019 Statement.  "The degree of 'particularity' that is 'reasonable' will differ, depending on the alleged trade secrets at issue in each case.  Where…the alleged trade secrets consist of incremental variations on, or advances in the state of the art in a highly specialized technical field, a more exacting level of particularity may be required to distinguish the alleged trade secrets from matters already known to persons skilled in that field.  Nothing in section 2019.210 precludes the trial court from considering relevant evidence, including expert witness declarations, on the adequacy of a designation to describe the alleged trade secrets and distinguish them from prior art." (*Advanced Modular, supra*, 132 Cal.App.4th at pp. 835-836.)  Here, we are dealing with the specialized technical field of automated building design, but there is nothing in Plaintiffs' opposition papers or the amended 2019 Statement's description of the claimed trade secrets that references prior art.  To be clear, section 2019.210 "does not create a procedural device to litigate the ultimate merits of the case—that is, to determine as a matter of law on the basis of evidence presented whether the trade secret actually exists." (*Brescia v. Angelin* (2009) 172 Cal.App.4th 133, 149.)  Thus, Plaintiffs' need not put forward conclusive proof that the claimed trade secrets are distinguished from prior art.  However, in *Advanced Modular*, the trade secrets plaintiff not only "identified eight alleged trade secrets, each with several discreet features that, in combination with one another, form the alleged trade secrets[,]" but also "described how it believes the combination of these features distinguish the alleged trade secrets from the prior art, or matters within the general knowledge of persons in the sputtering industry." (*Advanced Modular, supra*, 132 Cal.App.4th at p. 836.)  A similar description here would help frame the issues for purposes of Defendants' defense and the appropriate scope of discovery.

For these reasons, the motion to compel is **GRANTED IN PART**.  Plaintiffs shall serve a further amended section 2019 Statement that addresses the shortcoming discussed above **within 30 days**.

Motion to Seal

The Google Defendants move to seal the following documents or portions of documents:

- Plaintiffs' entire amended 2019 Statement, served on May 17, 2015;

---

[53] Amended 2019 Statement at p. 8:11-15.

[54] Notably, provisions reserving the right to identify additional trade secrets are not expressly prohibited.  (See e.g., *Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 51.)

- Portions of Google's Memorandum of Points and Authorities in Support of their Motion to Compel Compliance with CCP Section 2019.210; and
- The Representation Agreement between Attia and Max Sound, entered May 22, 2014.

"Unless confidentiality is required by law, court records are presumed to be open." (Cal. Rules of Court, rule 2.550(c).) "A record must not be filed under seal without a court order. The court must not permit a record to be filed under seal based solely on the agreement or stipulation of the parties." (Cal. Rules of Court, rule 2.551(a).) "The court may order that a record be filed under seal only if it expressly finds facts that establish: [¶] (1) There exists an overriding interest that overcomes the right of public access to the record; [¶] (2) The overriding interest supports sealing the record; [¶] (3) A substantial probability exists that the overriding interest will be prejudiced if the record is not sealed; [¶] (4) The proposed sealing is narrowly tailored; and [¶] (5) No less restrictive means exist to achieve the overriding interest." (Cal. Rules of Court, rule 2.550(d).)

The sealed records rules "do not apply to records that are required to be kept confidential by law." (Cal. Rules of Court, rule 2.550(a)(2).) This exception applies to records containing claimed trade secrets in actions initiated pursuant to the CUTSA. (See *In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, 298-290; Cal. Civ. Code, § 3426.5 ["In an action under this title, a court shall preserve the secrecy of an alleged trade secret . . . ."].) Thus, Plaintiffs' amended 2019 Statement shall remain under seal. The redacted portions of the Google Defendants' memorandum supporting their motion to compel quotes from or describe the claimed trade secrets in Plaintiffs' 2019 Statement. Thus, the unredacted memorandum shall remain under seal as well. Even if the Sealed Records Rules were applied, the Court finds that there is a sufficient overriding interest that overcomes the right of public access to Plaintiffs' claimed trade secret information and supports sealing the 2019 Statement and the portions of the briefs quoting from it. (See *NBC Subsidiary (KNBC-TV) vs. Superior Court* (1999) 20 Cal.4th 1178, 1222, fn. 46 [recognizing trade secrets as overriding interest].) There is a substantial probability that Plaintiffs' overriding interest would be prejudiced by disclosure of the trade secret information contained in these documents, and the proposed sealing is narrowly tailored, as the redactions cover only the information disclosed in the 2019 Statement, and there is no less restrictive means to achieve the overriding interest.

The motion to seal is **GRANTED** as to Plaintiffs' entire amended 2019 Statement and the unredacted version of the Google Defendants' Memorandum of Points and Authorities in Support of their Motion to Compel Compliance with CCP Section 2019.210.

The motion is **MOOT** as to the Representation Agreement. Due to Max Sound's voluntary dismissal of its claims, the Court did not have to consider the Representation Agreement in connection with the Google Defendants' demurrer. The sealed copy of the Representation Agreement that was lodged under seal in connection with this motion shall be returned to the Google Defendants.

# EXHIBIT C

1  BUETHER JOE & CARPENTER, LLC
   ERIC W. BUETHER *(admitted pro hac vice)*
2  Eric.Buether@BJCIPLaw.com
   CHRISTOPHER M. JOE *(admitted pro hac vice)*
3  Chris.Joe@BJCIPLaw.com
   BRIAN A. CARPENTER (CA SBN 262349)
4  Brian.Carpenter@BJCIPLaw.com
   MARK D. PERANTIE *(admitted pro hac vice)*
5  Mark.Perantie@BJCIPLaw.com
   NIKY BUKOVCAN *(admitted pro hac vice)*
6  Niky.Bukovcan@BJCIPLaw.com
   MICHAEL D. RICKETTS *(admitted pro hac vice)*
7  Mickey.Ricketts@BJCIPLaw.com
   1700 Pacific Avenue, Suite 4750
8  Dallas, Texas 75201
   Telephone:  (214) 466-1271
9  Facsimile:  (214) 635-1827

10 *Attorneys for Plaintiffs*
   ELI ATTIA AND ELI ATTIA ARCHITECT PC

11
   FUTTERMAN DUPREE DODD CROLEY MAIER LLP
12 JAMIE L. DUPREE (158105)
   180 Sansome Street, 17th Floor
   San Francisco, California 94104
13 Telephone:  (415) 399-3840
   Facsimile:  (415) 399-3838
14 jdupree@fddcm.com

15 *Local Counsel for Plaintiffs*
   ELI ATTIA AND ELI ATTIA ARCHITECT PC

16         **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**
                   **FOR THE COUNTY OF SANTA CLARA**
17                      **UNLIMITED JURISDICTION**

**E-FILED**
Nov 2, 2015 12:35 PM
David H. Yamasaki
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
Case #1-14-CV-274103 Filing #G-78088
By R. Walker, Deputy

| | |
|---|---|
| 18  Eli Attia and Eli Attia Architect PC, | Case No. 1:14-cv-274103 |
| 19           Plaintiffs, | Honorable Peter H. Kirwan |
| 20      v. | **FIRST AMENDED COMPLAINT FOR** |
| Google, Inc., Flux Factory, Inc., Larry Page, Sergey Brin, Sebastian Thrun, Eric "Astro" Teller, Michelle Kaufmann, Jennifer Carlile, Augusto Roman, Nicholas Chim, and DOES 1-100, | 1.  **MISAPPROPTIATION OF TRADE SECRETS** |
| 21 | 2.  **BREACH OF CONTRACT (NDA)** |
| 22 | 3.  **BREACH OF CONTRACT (ISA/SOW)** |
| 23           Defendants. | 4.  **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING** |
| | 5.  **DECLARATORY RELIEF** |

24

25
                                    1

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

Plaintiffs Eli Attia ("Mr. Attia") and Eli Attia Architect PC ("Attia PC") (collectively, "Plaintiffs") file this First Amended Complaint against Defendants Google, Inc., Flux Factory, Inc., Larry Page, Sergey Brin, Sebastian Thrun, Eric "Astro" Teller, Michelle Kaufmann, Jennifer Carlile, Augusto Roman, Nicholas Chim, and DOES 1-100 (collectively, the "Google Defendants"):

## INTRODUCTION

1.      Eli Attia is one of the world's leading and most innovative architects.  Mr. Attia has spent the last 50 years creating a game-changing new technology that can fundamentally change the way buildings are created.   He has named this revolutionary technology "Engineered Architecture" or "EA."   Mr. Attia's EA proprietary technology enables the creation of buildings of all types and sizes, that are more sustainable and of better quality, in substantially less time and at a greatly reduced cost compared to what is currently possible.

2.      Defendant Google, Inc. ("Google"), through its secretive research arm Google X, stole and exploited for its own benefit Mr. Attia's trade secrets and other proprietary information regarding the revolutionary Engineered Architecture process.   Google learned about Mr. Attia's Engineered Architecture concept and recognized the enormous value inherent in it.  A senior Google executive approached Mr. Attia about working with Google to develop the technology. Google induced Mr. Attia to describe to Google personnel his trade secrets and precious know-how regarding the Engineered Architecture technology by agreeing to a non-disclosure agreement.   Google, after deciding that Mr. Attia's Engineered Architecture proprietary technology had substantial potential, agreed to engage Mr. Attia for a period of months during which Google would provide to him the software engineers and the resources he needed to prove the technology's viability and the industry's likelihood of acceptance of the technology.  In exchange, Mr. Attia agreed to consult with Google personnel

and share further details regarding his proprietary Engineered Architecture technology for limited purpose of validating the viability of his invention.  Based out of Google's secretive Google X development lab, this project became known as "Project Genie."

3.      Mr. Attia then worked with Google on Project Genie to incorporate his proprietary ideas into a working proof of concept and introduced Google to industry leaders to gauge the industry's acceptance of the technology.  Google promised Mr. Attia that, if the proof of the concept of Engineered Architecture were successful, Google would compensate Mr. Attia for its use of Mr. Attia's trade secrets and other proprietary technology, and would negotiate a new agreement with Mr. Attia for him to continue to provide consulting services for the development of Project Genie.

4.      Then, making a mockery of its professed "Don't be evil" code of conduct, Google reneged on its promises to Mr. Attia and stole his Engineered Architecture trade secrets and other proprietary technology.  The Google Defendants pumped Mr. Attia for his trade secrets and other proprietary technology regarding the Engineered Architecture technology and then, after validating the viability of the technology, they squeezed Mr. Attia out of the project that Google acknowledged he inspired.  The Google Defendants then proceeded to develop and exploit Mr. Attia's trade secrets and other proprietary technology for their own benefit, picking for themselves the fruit of Mr. Attia's life work.

5.      Realizing that the trade secrets and proprietary information they had taken from Mr. Attia were sure to yield unprecedented results, Google decided that Project Genie could be successful enough to operate as its own company.  Thus, Google spun-off Project Genie into a new company, Flux Factory, Inc.  Flux Factory was co-founded and is operated by former Project Genie team members Astro Teller, Nicholas Chim, Michelle Kaufmann, Jennifer Carlile, and Augusto Roman, with whom Mr. Attia had entrusted his valuable Engineered

FIRST AMENDED COMPLAINT
CASE NO. 1-14-cv-274103

1    Architecture trade secrets.  Defendant Teller now sits as chairman of the board of Flux Factory.

2    Defendant Chim commands Flux Factory as its CEO.  Flux Factory, Inc. currently sells

3    Engineered Architecture features embodied in the Flux Metro Austin Preview service on its

4    website, profiting from Mr. Attia's innovation and Google's betrayal of his trust.

5         6.       The Google Defendants callously consumed years of Mr. Attia's life, drastically

6    inhibiting his ability to develop the Engineered Architecture technology on his own and risking

7    that its full potential will be lost forever.  In the process, the Google Defendants have

8    undermined Mr. Attia's goal of providing humanity with the efficient, sustainable structural

9    design technology it urgently needs.  The decisions to misappropriate and exploit Mr. Attia's

10   trade secrets and other proprietary technology were made at Google's highest echelons,

11   involving Google's founders Sergey Brin and Larry Page.

12        7.       Plaintiffs bring this Complaint against the Google Defendants to seek redress

13   for their misappropriation of Mr. Attia's life's work.

14                        **PARTIES, JURISDICTION, AND VENUE**

15        8.       Plaintiff Eli Attia is an individual who resides in Cold Springs, New York.

16        9.       Plaintiff Eli Attia Architect PC is a California Professional Corporation with its

17   principal place of business located at 927 Industrial Avenue, Palo Alto, CA, 94303.  Eli Attia is

18   the majority owner and principal of Eli Attia Architect PC.

19        10.      Defendant Google, Inc. ("Google") is a corporation organized under the laws of

20   the State of Delaware with its principal place of business at 1600 Amphitheatre Parkway,

21   Mountain View, California 94043.

22        11.      Defendant Flux Factory, Inc. ("Flux" or "Flux Factory") is a corporation

23   organized under the laws of the State of Delaware with its principal place of business at 15456

24   Ventura Boulevard, Suite 500, Sherman Oaks, California 91403.

25                                            4

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

12.     Defendant Larry Page is an individual and an executive, agent, and representative of Google.  Plaintiffs do not know where Larry Page resides, but are informed and believe it is in the State of California.

13.     Defendant Sebastian Thrun is an individual and an executive, agent, and representative of Google.  Plaintiffs do not know where Sebastian Thrun resides, but are informed and believe it is in the State of California.

14.     Defendant Sergey Brin is an individual and an executive, agent, and representative of Google.  Plaintiffs do not know where Sergey Brin resides, but are informed and believe it is in the State of California.

15.     Eric "Astro" Teller is an individual and an executive, agent, and representative of Google and an executive, agent, and representative of Flux Factory.  Plaintiffs do not know where Eric "Astro" Teller resides, but are informed and believe it is in the State of California.

16.     Defendant Nicholas Chim is an individual and is or was an executive, agent, and representative of Google.  Chim is also an executive, agent, and representative of Flux Factory.  Plaintiffs do not know where Nicholas Chim resides, but are informed and believe it is in the State of California.

17.     Defendant Michelle Kaufmann is an individual and is or was an executive, agent and representative of Google.  Kaufmann is also an executive, agent, and representative of Flux Factory.  Plaintiffs do not know where Michelle Kaufmann resides, but are informed and believe it is in the State of California.

18.     Defendant Jennifer Carlile is an individual and was or is an executive, agent, and representative of Google.  Carlile is also an executive, agent, and representative of Flux Factory.  Plaintiffs do not know where Jennifer Carlile resides, but are informed and believe it is in the State of California.

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

19.     Defendant Augusto Roman is an individual and is or was an executive, agent, and representative of Google.  Roman is also an executive, agent, and representative of Flux Factory.  Plaintiffs do not know where Augusto Roman resides, but are informed and believe it is in the State of California.

20.     Does 1-100 are individuals or entities that were responsible in whole or in part for the matters alleged in this complaint, and whose identities are currently unknown to Mr. Attia.

21.     Because the obligations and liabilities resulting from Defendants' unlawful and improper acts arose in the County of Santa Clara, venue in this Court is proper under California Code of Civil Procedure Section 395.5.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### 1.     Attia's Development of the Engineered Architecture Technology

22.     For more than four decades Mr. Attia has established his reputation as one of America's leading and most innovative architects.  His award-winning skyscrapers, from New York's 101 Park Avenue to San Francisco's 101 California Street, have proved to be both commercially and aesthetically successful.

23.     During the course of his professional work, Mr. Attia isolated the "DNA" of all buildings and invented a revolutionary set of technologies that apply to their design and construction, with particular application for tall and large buildings.  He termed certain of his technologies "Engineered Architecture."   Among other things, Engineered Architecture employs a method of utilizing intelligent "cells" and "supercells" that represent basic building blocks of architectural design to create buildings dramatically better, faster, with fewer resources, and with less energy and environmental impact than conventional methods.  This technology enables the creation of buildings of limitless types and sizes, buildings that are

environmentally sustainable and of better quality, in substantially less time and at a greatly reduced cost than ever before possible.

24.     In 2009, Mr. Attia began searching for a partner to help him achieve broad adoption of his techniques within the construction industry.  Recognizing the value of his proprietary technology, Mr. Attia did not discuss the details of Engineered Architecture with third parties outside of the context of expressly confidential business communications.

**2.      Defendants Induced Mr. Attia to Share His Proprietary Information and Know-How Under a Non-Disclosure Agreement and an Inbound Services Agreement**

25.     At about the same time Mr. Attia began searching for a partner to develop his Engineered Architecture technology, Defendants Brin and Page conceived of what was to become Google X.  In particular, around 2009, Brin and Page conceived of a position at Google called Director of Other.  This person would oversee ideas far from Google's core search business.  This notion evolved into Google X around 2010, when Defendant Sebastian Thrun formed the unit and began to run it.  Thrun chose Defendant Astro (Eric) Teller, a Google computer engineer, as one of his co-directors.  Page remained the ultimate head of Google X until he was appointed Google CEO and Brin took over ultimate responsibility of Google X.  Later Teller assumed day-to-day responsibilities at Google X from Thrun.

26.     Thrun and Teller learned about Attia's Engineered Architecture concept in the summer of 2010 and recognized the substantial value inherent in the invention.  On or about July 25, 2010, Teller approached Mr. Attia stating that he heard that Mr. Attia had "an idea to change the world" and claimed that he wanted to discuss Google partnering with Mr. Attia to develop his invention.  After Mr. Attia provided Teller and Thrun a general overview of his Engineered Architecture concept, Google became even more interested in the technology.

FIRST AMENDED COMPLAINT
CASE NO. 1-14-cv-274103

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

27.     To induce Mr. Attia to divulge to Google his trade secrets and other proprietary information regarding Engineered Architecture, Google agreed to enter into a non-disclosure agreement.  On or about August 8, 2010, Google and Mr. Attia executed a Non-Disclosure Agreement ("NDA") attached as Exhibit 1.  Under the NDA, Google was permitted to use confidential information received from Mr. Attia only "to facilitate technical discussions concerning existing or future product development efforts by the parties."  The NDA expires five years from disclosure unless the parties agree otherwise in writing.  The NDA has not been terminated and it continues to be in effect.

28.     As part of Google's plan to learn as much as it could about Mr. Attia's Engineered Architecture proprietary technology, Google persuaded Mr. Attia and his family to relocate to Palo Alto in late 2010, so that he and Google personnel could work directly together at Google's Mountain View headquarters.

29.     In August 2010, Mr. Attia presented his Engineered Architecture technology to a group of approximately 30 Google executives, including Page, Thrun and Teller at Google's headquarters in Mountain View, California.  Page had an extensive discussion with Mr. Attia after the presentation about his technology and the building and construction industry – a subject about which Google knew very little.  Mr. Attia later answered several detailed written questions from Google executives, including Page and Thrun, about the details of Engineered Architecture.  Brin also was actively involved in the process of extracting as much information as possible from Mr. Attia about the Engineered Architecture technology.  On information and belief, all of the Google executives who were present during Mr. Attia's presentation were aware of the NDA and of the fact that Mr. Attia was revealing his trade secrets and other proprietary information in confidence.

8

30.     In September 2010, Page and Brin authorized Google X to proceed with development of a software system implementing the Engineered Architecture technology. Google and Mr. Attia negotiated an arrangement pursuant to which Google agreed to engage Mr. Attia for a period of months during which Google would provide to him the software engineers and the resources he needed to prove the technology's viability and the industry's acceptance of it.  In exchange, Mr. Attia would share, for a limited time and for the limited purpose of validating his invention, his trade secrets and other proprietary technology to help Google develop his invention by essentially helping Google build a software system capable of implementing the Engineered Architecture technology.  This project this became known as "Project Genie."  Project Genie was one of the first projects undertaken by the Google X team.

31.     On January 12, 2011, Google and its affiliates entered into an Inbound Services Agreement ("ISA") (attached as Exhibit 2) and an associated Statement of Work agreement ("SOW") (attached as Exhibit 3) with Mr. Attia and Attia PC to develop Project Genie.  Teller was appointed head of Project Genie and Defendant Nicholas Chim was appointed the team leader for the project.  Google acknowledged in the Statement of Work that "[t]he Genie Project was inspired by [Mr. Attia's] experience and Pre-existing Intellectual Property."  To induce Mr. Attia to enter the ISA and SOW, Google, through Teller, specifically affirmed and represented to Mr. Attia that Google's confidentiality obligations under the NDA would continue to be in force and in effect and that Google would continue to abide by the NDA after execution of the ISA and SOW.

32.     In the SOW, Google acknowledges that the "Genie Project was inspired by [Mr. Attia's] experience and Pre-Existing Intellectual Property."  Exhibit A to the SOW describes the bulk of Mr. Attia's proprietary information regarding Engineered Architecture, including his idea of "revolutionizing the global building industry by dramatically changing the

9

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

1   way in which buildings are designed, fabricated and constructed. . . ."   The SOW identifies

2   documents that contain Mr. Attia's proprietary information, including, without limitation, "All

3   presentations & brochures," notes, emails, patents, and "other related intellectual property

4   developed as of the SOW Effective Date."   Under the ISA, any "invention, improvement,

5   development, concept, discovery or other proprietary information" that Mr. Attia had an

6   interest in before January 12, 2011, remain the property of Mr. Attia. During the negotiation of

7   the ISA, Google, through defendant Thrun, specifically told Mr. Attia that "any IP/know how"

8   Mr. Attia brought to the Genie Project, including all the knowledge, information, and Pre-

9   Existing Intellectual Property that Google admits inspired Genie, would continue to belong to

10   Mr. Attia.

11       33.       During the negotiations between Google and Mr. Attia regarding the ISA and

12   SOW, Google first asked for a non-exclusive, royalty free, perpetual, irrevocable, worldwide

13   license from Mr. Attia to use his proprietary information.   Attia rejected that request.   Google

14   then proposed to pay royalties for to obtain a non-exclusive license, which Attia rejected as

15   well.   Ultimately, the parties agreed in the ISA that Mr. Attia would provide to Google a "non-

16   commercial" and nonexclusive license to use his proprietary information only until June 31

17   [sic], 2011.

18       34.       The SOW contained the following provision regarding the proof of concept

19   program in Phase One of Project Genie:   "If the proof of concept program In Phase One is

20   successful and to the extent any Pre-existing Property is used to develop Genie, (ii) Google, in

21   its sole discretion, will consider seeking an exclusive license and will make reasonable efforts

22   to negotiate for a license to a portion or all of the Pre-existing Property at mutually agreed

23   upon price and terms, and (ii) both parties intend to negotiate in  good faith appropriate new

24

25                                                    10

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

terms and conditions in a separate SOW under the ISA pursuant to which Contractor will provide consulting services as to the development of Genie."

35.     Defendant Chim was put in charge of the Genie project.  Neither defendant Chim nor Google had any knowledge of the construction industry before working with Mr. Attia.  Mr. Attia proceeded to work with Google extensively on Project Genie for the next five months so the Google software engineers and others working on the project thoroughly understood his Engineered Architecture invention and could automate as many of the steps of the invention as possible to develop a proof of concept software system for the project.

36.     Pursuant to the NDA and the ISA/SOW, Mr. Attia began teaching the fundamentals of the construction industry and building design to the members of the Project Genie team based upon his 50 years of experience.  Mr. Attia disclosed and made available to the Project Genie team at Google his original written works describing the Engineered Architecture technology, including core concepts, details, and refinements of Engineered Architecture invention that were not in the public domain.  The materials shared with Google included, among other things, five booklets that describe in detail the Engineered Architecture technology.  Mr. Attia personally sat down with every member of the Project Genie team and taught them everything about the Engineered Architecture technology.

37.     The Project Genie team grew from ten computer and software engineers to more than 30 people including Defendants Carlile and Roman and Defendant Kaufmann, who acted as Mr. Attia's assistant during his time at Google.  Mr. Attia also introduced Google to building design and construction industry leaders to demonstrate the concept and gauge industry support for it.

FIRST AMENDED COMPLAINT
CASE NO. 1-14-cv-274103

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

### 3.    The Success of the Phase One Proof of Concept Stage

38.    At the conclusion of Phase One of Project Genie in June 2011, Google determined that the proof of concept program was successful.  In a June 2011 confidential report provided by Defendant Thrun to Defendants Page and Brin, the Project Genie team estimated that the Engineered Architecture technology could halve construction costs of large buildings and skyscrapers, and that the technology had the potential of generating $120 billion in annual income for Google.  Google's revenue in 2011 was approximately $37.9 billion, meaning that Project Genie stood to provide more than three times Google's current revenue.

39.    The confidential report states that "[e]arly this year, a small team at Google X began working with Eli Attia, an architect, the creator of Genie technology, to explore opportunities in the building construction industry."  It adds, "Eli's work led him to the creation of 'Engineered Architecture,' which provided key concepts and technology behind Genie."   Genie, the development team told Google's management, "is a platform with a web-based design application that assists the design architect through the design process, and is mainly intended for the construction of large and tall buildings.  The application incorporates design rules from expert architects and engineers, and advanced analysis and simulation tools. Genie enables the standardization and automation of design and construction processes, with unlimited design options, which allow an architect to preserve the uniqueness of the building in the urban environment."

40.    The development team's report to Google's management described Genie as "revolutionary technology for creating sustainable and environmentally friendly buildings, at a quality exceeding anything known.  The technology was presented as technology that can change the conservative global construction industry through a fundamental and revolutionary change in the way buildings are designed, built, and maintained, saving trillions of dollars."  In

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

the report, the Google X team estimated that the Engineered Architecture technology would cut current direct construction costs by 30%, and the current time from the start of design to market by more than 30%.

41.     Google was so satisfied with the viability of Mr. Attia's Engineered Architecture technology that it applied to the United States Patent and Trademark Office for patents containing numerous claims reciting Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.  Moreover, the specifications of the Google patent applications and patents describe these claim elements in language identical or virtually identical to the language in Mr. Attia's disclosures.

42.     For example, on May 20, 2011, Google filed a patent application entitled "System and Methods for Structure, Design, Analysis, and Implementation" listing Mr. Attia as one of the inventors (the `727 Application").  The `727 application was based, in large part, on Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.  On June 11, 2011, Google filed another patent application entitled "System and Methods Facilitating Collaboration in the Design, Analysis, and Implementation of a Structure" again listing Mr. Attia as one of the inventors (the "`307 Application").  The `307 application also was based, in large part, on Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW, and stated that it was "related to and claims priority from" the `727 Application.  Google filed several other patent applications based on Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

43.     Mr. Attia and Defendant Chim also presented Genie to several industry leaders, among them renowned architect Richard Meier, major developers, construction companies, and potential investors.  During presentations, Defendants and Mr. Attia used a video to show a "prototype" software application which consisted entirely of Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.  The response was uniformly enthusiastic.  Mr. Meier indicated that he would use the product if it were available at that moment.  Another potential investor almost immediately began negotiations with Google to partner in Genie's development.

44.     The "prototype" used not only the core concept that Mr. Attia developed, but also many of the details of Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.  The prototype shows Engineered Architecture in action, including the use of the specific "super cells" and "cells" that Mr. Attia invented.  In essence, the "prototype" followed the blueprint of Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.  In the documentary presentation that Defendants Teller and Chim showed along with the "prototype" video, Google described Mr. Attia as the "creator of core Genie concepts."

45.     Google internally acknowledged in a "Fact Sheet" that Mr. Attia is "the creator of Genie technology."  Google admitted that the "key technical insights" of Genie came from Mr. Attia and that Mr. Attia's "work led him to the creation of [Engineered Architecture] which provided key concepts and technology behind Genie."  The "Fact Sheet" described "key insights" that match directly with Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.

FIRST AMENDED COMPLAINT
Case No. 1-14-cv-274103

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

46.     Google, seeing the potential in Mr. Attia's Engineered Architecture technology, extended Project Genie an additional seven months and planned to spin-off Project Genie into a separate company.  The Google and Mr. Attia engaged in a de facto joint venture to create a separate company to develop and to bring to market products employing Mr. Attia's Engineered Architecture proprietary technology.

47.     In the course of discussing the creation of a new company, Google offered Mr. Attia a seven percent (7%) interest in the new company specifically to compensate Mr. Attia for his proprietary information.  Google's draft "Cap Tables" identify shares for "Google IP" and shares for "Eli IP," admitting that "Genie" employed Mr. Attia's proprietary information and that Google should pay for it.  Google offered Mr. Attia an additional eight percent (8%) as a co-founder of the new venture in addition to a percentage for his proprietary information.

**4.      Google's Scheme to Squeeze Out Mr. Attia Out of the Genie Project and Misappropriate his Trade Secrets**

48.     While Google was pumping Mr. Attia for all his Engineered Architecture trade secrets, Defendants Google, Page, Brin, Thrun, Teller, Kaufmann, Carlile, Roman, and Chim were plotting to squeeze Mr. Attia out of his own project and misappropriate Mr. Attia's Engineered Architecture Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.

49.     Google and members of the Project Genie team went to considerable lengths to conceal their intent to squeeze out Mr. Attia and misappropriate his proprietary Engineered Architecture technology.  For example, when Mr. Attia unexpectedly walked into a conference room where members of the Project Genie team were meeting, the participants immediately stopped all conversation, each staring at the others like a fox caught in the henhouse, until defendant Chim ordered everyone to disperse.

15

FIRST AMENDED COMPLAINT
CASE No. 1-14-cv-274103

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

50.     While Defendants were meeting secretly, they slashed Mr. Attia's compensation and then proceeded to completely purge him from the project and joint venture.

51.     Even while squeezing Mr. Attia out of the project, Defendant Teller asked Mr. Attia for a "license for [his] pre-existing IP," again acknowledging that "Genie" employed Mr. Attia's proprietary information and know-how.  Google, Page, Brin, Thrun, and the other Defendants fully understood "Genie" was essentially a manifestation of Mr. Attia's proprietary information and know-how.

52.     Google then pretended to kill the Genie Project to give Mr. Attia the false impression that Google was not planning to misappropriate Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.  On December 7, 2011, another date that will live in infamy, Defendant Chim informed the Genie team by e-mail that he was torpedoing Project Genie. "We learned a new industry," he wrote, "solved very interesting technical problems and wowed the industry with the ambitiousness of our vision."  He stated flatly, "Effective Friday, we'll stop working on Genie."  That very same day, defendant Teller wrote to Mr. Attia, "I'm very sorry Genie will end.  It would have been a great thing to make for the world."  Chim and Teller were creating a cover story to mask their plan to steal and exploit Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.

53.     Within a week, however, Mr. Attia learned that Google, rather than shutting down Project Genie, was surreptitiously taking steps to develop and promote Genie further. For example, Defendant Chim resumed speaking to the same potential partners and investors he had previously visited with Mr. Attia, this time telling them that Mr. Attia was no longer involved with Genie, but that Google had the right to continue with the project.

FIRST AMENDED COMPLAINT
CASE NO. 1-14-cv-274103

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

54.     On December 16th, only nine days after Google informed Mr. Attia that Google was shutting down Project Genie, Mr. Attia informed Defendant Thrun, "I've just heard the fourth version of Nick's pitch to industry leaders.  And [Defendant Chim stated], 'I've got the license and control of Genie's IP.'"

55.     On December 21st, exactly two weeks after acknowledging "with regret" the end of Genie, Defendant Teller sent an e-mail to Mr. Attia containing a proposed agreement between Defendant Chim and Mr. Attia ending with the words, "Eli will continue to pursue his path and the Genie team will continue with a different path."  "The Genie team will continue."

### 5.     Google's Breach of the NDA and ISA/SOW, Misappropriation of Mr. Attia's Trade Secrets and Bad Faith

56.     After Google and the Google X leadership team squeezed Mr. Attia out of Project Genie, they continued to make presentations to investors showing the "prototype" video utilizing Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.  These Defendants did not obtain any license from Mr. Attia to use his proprietary information.  By using Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW without obtaining a license from Mr. Attia, these Defendants misappropriated this proprietary information.  By failing to compensate Mr. Attia for the use of this proprietary information, Google also breached its express obligations under the ISA/SOW.

57.     Upon information and belief, Defendants Google and Chim have falsely represented to third parties that they owned rights to Mr. Attia's proprietary information, including his trade secrets.

58.     In July 2012, the `307 patent application filed by Google was issued and published as United States Patent No. 8,229,715.   Google also allowed its `727 patent

17

application to be published by the United States Patent and Trademark Office in November 2012. As discussed above, the `715 patent and the `727 patent application were based, in large part, on Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW. Google, by allowing this to happen, extinguished Mr. Attia's trade secrets disclosed in the `715 patent and the `727 patent application and used Mr. Attia's trade proprietary information without his permission for its own exclusive benefit, and to the substantial detriment of Mr. Attia. The same is true for other patent applications filed by Google based, at least in part, on Mr. Attia's secret Engineered Architecture technology.

59.     In late 2011 through at least June 2012, Mr. Attia's counsel sent letters to Google inquiring about whether Google was improperly using any of Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW after Google squeezed Mr. Attia out of Project Genie. Google's counsel sent Attia PC's counsel several letters falsely providing assurances to Mr. Attia that Google was complying with its commitments under the NDA and ISA/SOW, and that it had not done anything wrong or in violation of those agreements. Google, through its counsel, feigned ignorance of any proprietary information provided by Mr. Attia to Google, even though Google acknowledged the nature and scope of such proprietary information in Exhibit A to the SOW and repeatedly referred to such proprietary information in the ISA/SOW and other documents. Google's counsel specifically misrepresented to Mr. Attia that "[t]here is no basis for your assertion regarding Google's supposedly improper use of undefined intellectual property," that "Google has no interest in using any intellectual property to which it does not have rights," that Google "has no reason to believe any such use has occurred here," and that "Google has done nothing wrong."

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

60.     In 2011, while Defendant Teller was telling Mr. Attia that "Genie will end," Teller along with Defendants Google, Page, Brin, Thrun and Carlile, formed a new company to continue to develop the Genie technology based upon Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW using approximately one million dollars of Google's money. This company was called Vannevar Technology.  The company's name was changed to Flux Factory, Inc., in 2014 (Vannevar Technology and Flux Factory shall be referred to collectively as "Flux Factory").

61.     On information and belief, the Google Defendants raised $2.2 million in capital when Flux factory was established, and later raised at least an additional $8 million from additional investors.  The Google Defendants improperly used Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW to promote the Project Genie technology to investors to obtain that capital.

62.     Flux Factory is simply a reconstitution of the Project Genie project under a different name.  Flux Factory employs several individuals who worked at Google on the project, including Defendants Kaufmann, Carlile, and Roman, with defendant Chim acting as CEO.  Defendant Teller sits as chairman of the board of directors for defendant Flux Factory. Being nothing more than a spin-off of Google's Project Genie, Flux Factory inherited from Google all of its contractual duties under the NDA and ISA/SOW.

63.     Since 2014, Flux Factory has offered for sale an automated building design system called the Flux Metro Austin Preview.  The Flux Metro Austin Preview is design software for the building design and construction industry.  This software uses trade secrets and proprietary information that Mr. Attia developed as part of his Engineered Architecture

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

1  invention.  In fact, most, if not all, of the Flux Metro Austin Preview features embody the trade

2  secrets and proprietary information stolen from Mr. Attia.

3     64. On information and belief, Flux Factory currently employs individuals,

4  including Defendants Carlile, Roman, Teller, Chim, and Kaufmann, who are fully aware that

5  Flux Factory's products and services incorporate Mr. Attia's stolen trade secrets and

6  proprietary information.

7     65. As a result of Defendants' misappropriation of Mr. Attia's trade secrets and

8  other proprietary information and their misrepresentations that they own the technology, other

9  potential development partners have shunned Mr. Attia's attempts to further develop and

10  commercialize the Engineered Architecture technology.  His reputation within the architectural

11  community and the global construction industry has consequently been tarnished.

12     66. In September 2013, Mr. Attia sent Page a letter informing him that "the Genie

13  project that was being pursued under GoogleX was an implementation of my life's work - EA

14  technology," and that, after he had been removed from the project, the project was converted to

15  "Project Vannevar" also "based on my inventions."  Mr. Attia informed Mr. Page that "[o]n

16  December 30, 2011 Sebastian [Thrun] called me and said: 'Genie is spinning out, it's spinning

17  out without you unfortunately, and that is that.  It's a miserable situation because it's true that

18  you got to Google with your life's vision to implement what's happening, and the fact that you

19  are not part of it is the worst part of all.  But there is nothing I can do about it. So you have to

20  take it.'"  Mr. Attia told Page that "I've been treated unjustly" and requested a chance to speak

21  with Page.  Page never responded to Mr. Attia.

22     67. In view of Page's refusal to respond to Mr. Attia's letter, in October 2013 Mr.

23  Attia sent letters members of Google's Board of Directors and to Google Senior Advisors,

24  including Defendant Brin, alerting them to the theft of his Engineered Architecture trade

25

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

secrets by Page, Brin and the members of the Project Genie team at Google X, and requested Google to acknowledge that Genie is based on Mr. Attia's proprietary technology and to compensate him fairly for Google's use of his proprietary technology.  No one from Google responded to Mr. Attia.

68.     On information and belief, Defendants Kaufmann, Chim, Carlile, Roman, Teller, and Flux Factory continue to publicly claim that the work done at Genie and being done a Flux Factory stem from their original ideas.  They continue to refuse to acknowledge Mr. Attia's hard work in the development of his trade secrets and other proprietary information that comprise Flux Factory's services.

69.     In short, Google and the other Defendants had express and implied obligations to Mr. Attia to use his proprietary and confidential information only in support of a joint effort with Mr. Attia to develop technologies.  The Google Defendants had the obligation to negotiate a license to use Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW and fairly compensate Mr. Attia if it wanted to continue using it.  The Google Defendants refused to do so and simply intentionally misappropriated for its own benefit Mr. Attia's proprietary Engineered Architecture invention.

### FIRST CAUSE OF ACTION
### (Misappropriation of Trade Secrets by Eli Attia Against All Defendants)

70.     Plaintiffs reallege, and incorporate herein by reference, as though fully set forth, paragraphs 1-69 above.

71.     Mr. Attia owns trade secrets, including confidential and proprietary information that can be used to create buildings dramatically better, faster, with fewer resources, and with less energy and environmental impact than conventional methods.

72.     Mr. Attia has made reasonable efforts to maintain the secrecy of his trade secrets and other confidential and proprietary information.  Mr. Attia has not shared this information with third parties except in the course of confidential business communications.

73.     At all material times, Mr. Attia fully and clearly identified to Google the pre-existing trade secret information he was disclosing to Google, as set forth in Exhibit A to the SOW, and Google acknowledged that such the use and disclosure of such information was limited as set forth in the NDA.

74.     Mr. Attia's trade secrets derive independent economic value and competitive advantages from not being generally known.

75.     As detailed above, the Google Defendants were subject to both express and implied contractual obligations to maintain the secrecy of Mr. Attia's confidential and proprietary information, including his trade secrets.

76.     The Google Defendants willfully and maliciously misappropriated Mr. Attia's trade secrets by, among other acts, continuing to incorporate and use them in "Genie," or otherwise, after the end of the limited license period, by sharing Mr. Attia's trade secrets with third parties in an attempt to gain support for "Genie," and by using them in conducting the business of Flux Factory.

77.     Google misappropriated Mr. Attia's trade secrets by, among other things, using those trade secrets to develop the "Genie" software system without making a reasonable effort to negotiate with Mr. Attia for a license for such use of his trade secrets.  Google did not have any right to use Mr. Attia's trade secrets to develop the Genie software without a license from Mr. Attia to do so and without reasonably compensating Mr. Attia for such use.  Google's use of Mr. Attia's trade secrets to develop Genie includes using those trade secrets to build the Genie software system, applying for and obtaining patents covering the Genie software system,

FIRST AMENDED COMPLAINT
CASE NO. 1-14-cv-274103

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

thereby resulting in the public disclosure of Mr. Attia's trade secrets, promoting the Genie software system to potential customers and investors, and disclosing Mr. Attia's trade secrets to Flux Factory and acting in concert with Flux Factory to make further developments to the Genie system and market that system.  Thus, Google willfully misappropriated Mr. Attia's trade secrets by using and disclosing to third persons those trade secrets without Mr. Attia's express or implied consent.

78.     Flux Factory willfully misappropriated Mr. Attia's trade secrets by, among other things, largely continuing Google's conduct of misappropriation.  Flux Factory has misappropriated Mr. Attia's trade secrets by using those trade secrets to continue the development of the Genie software system now controlled by Flux Factory and, in particular, to build the Flux Metro Austin Preview product based on Mr. Attia's trade secrets as well as promoting the Genie software system to potential customers and investors.  At the time of Flux Factory's use and disclosure of Mr. Attia's trade secrets, Flux Factory officers and other personnel knew or had reason to know that its knowledge of Mr. Attia's trade secrets was derived from or through Google and the members of the Project Genie team at Google X – many of whom were now working at Flux Factory – who used improper means to acquire those trade secrets and acquired the trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit its use of the trade secrets, and was derived from or through Google and the members of the Project Genie team at Google X who owed a duty to Mr. Attia to maintain its secrecy or limit its use.

79.     Defendants Page and Brin willfully misappropriated Mr. Attia's trade secrets by directly and knowingly participating in, facilitating, authorizing and/or consenting to Google's scheme to induce Mr. Attia to disclose his Engineered Architecture trade secrets to Google and then squeeze Mr. Attia out of the Genie project and unlawfully use his trade secrets to develop

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

and market the Genie software system for Google's own exclusive benefit.  Defendants Page and Brin were directly involved in the establishment and management of the Google X unit, the review of Mr. Attia's Engineered Architecture trade secrets pursuant to the NDA, the decision to initiate Project Genie at Google X based upon Mr. Attia's trade secrets, the use and disclosure of those trade secrets to develop and promote the Genie software system without a license to do so from Mr. Attia, Google's refusal to compensate Mr. Attia for its use of his trade secrets, and the decision to form and invest in Flux Factory to continue the unauthorized use of those trade secrets.  Thus, Defendants Page and Brin personally authorized, directed and/or participated in the misappropriation of Mr. Attia's trade secrets by Google and Flux Factory.     Defendants Page and Brin knowingly consented to and approved the acts of misappropriation committed by the members of the Project Genie team, including the acts of misappropriation committed by Sebastian Thrun, Eric "Astro" Teller, Michelle Kaufmann, Jennifer Carlile, Augusto Roman, and Nicholas Chim.  Indeed, as alleged above, Mr. Attia notified Defendants Page and Brin in writing in September and October of 2013 that Google and Flux Factory had misappropriated his trade secrets, but neither of them took any action to rectify the situation.  Thus, Defendants Page and Brin specifically knew or reasonably should have known that Google was using and disclosing Mr. Attia's trade secrets without a license from Mr. Attia to do so and not only failed to take any appropriate action to prevent such misappropriation of those trade secrets but actively encouraged these Google personnel to unlawfully use and disclose the trade secrets. An ordinarily prudent person, knowing what Page and Brin knew, would not have acted similarly under the circumstances.

80.     Defendant Thrun willfully misappropriated Mr. Attia's trade secrets by directly and knowingly participating in, facilitating, authorizing and/or consenting to Google's scheme to misappropriate Mr. Attia's trade secrets.  Defendant Thrun was involved in the formation of

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

the Google X unit and initially ran it.  Defendant Thrun directly participated in the review of Mr. Attia's Engineered Architecture trade secrets pursuant to the NDA, the decision to initiate Project Genie at Google X based upon Mr. Attia's trade secrets, the use and disclosure of those trade secrets to develop and promote the Genie software system without a license to do so from Mr. Attia, the decision to squeeze Mr. Attia out of Project Genie, Google's refusal to compensate Mr. Attia for its use of his trade secrets, and the decision to form Flux Factory to continue the unauthorized use of those trade secrets, and the management of Flux Factory's continued misappropriation of Mr. Attia's trade secrets.

81.    Defendant Teller willfully misappropriated Mr. Attia's trade secrets by directly and knowingly participating in, facilitating, authorizing and/or consenting to Google's scheme to misappropriate Mr. Attia's trade secrets.  As with Defendant Thrun, Defendant Teller was involved in the management of Google X unit since its formation and succeeded Thrun as the head of the unit.  Defendant Teller also directly participated in the review of Mr. Attia's Engineered Architecture trade secrets pursuant to the NDA, the decision to initiate Project Genie at Google X based upon Mr. Attia's trade secrets, the use and disclosure of those trade secrets to develop and promote the Genie software system without a license to do so from Mr. Attia, the decision to squeeze Mr. Attia out of Project Genie, Google's refusal to compensate Mr. Attia for its use of his trade secrets, and the decision to form Flux Factory to continue the unauthorized use of those trade secrets, and the management of Flux Factory's continued misappropriation of Mr. Attia's trade secrets.

82.    Defendant Chim willfully misappropriated Mr. Attia's trade secrets by directly and knowingly participating in, facilitating, authorizing and/or consenting to Google's scheme to misappropriate Mr. Attia's trade secrets.  Defendant Chim was in charge of the Genie project.  He directly and knowingly participated in the unauthorized use and disclosure of Mr.

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

Attia's trade secrets to develop and promote the Genie software system without a license to do so from Mr. Attia, the decision to squeeze Mr. Attia out of Project Genie, Google's refusal to compensate Mr. Attia for its use of his trade secrets, and the decision to form Flux Factory to continue the unauthorized use of those trade secrets, and the management of Flux Factory's continued misappropriation of Mr. Attia's trade secrets.

83.    Defendants Kaufmann, Carlile and Roman willfully misappropriated Mr. Attia's trade secrets by directly and knowingly participating in and facilitating Google's scheme to misappropriate Mr. Attia's trade secrets.   These Defendants directly and knowingly participated in the unauthorized use and disclosure of Mr. Attia's trade secrets to develop and promote the Genie software system without a license to do so from Mr. Attia, the decision to squeeze Mr. Attia out of Project Genie, and the decision to form Flux Factory to continue the unauthorized use of those trade secrets, and the continued misappropriation of Mr. Attia's trade secrets at Flux Factory.

84.    By reason of the Google Defendants' unlawful conduct described above, Mr. Attia will suffer great and irreparable harm and damage, which damage will be difficult to ascertain, and Mr. Attia is without an adequate remedy at law.   Mr. Attia is entitled to an injunction restraining Google from further misappropriation.

85.    As a result of the Google Defendants' misappropriation of Mr. Attia's trade secrets, Mr. Attia has been damaged and Defendants have been unjustly enriched in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Breach of Contract by Eli Attia and Attia PC Against Google and Flux Factory – NDA)**

86.    Plaintiffs reallege, and incorporate herein by reference, as though fully set forth, paragraphs 1-85 above.

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

87.     On or about August 13, 2010, Google entered into the NDA with Mr. Attia, and Attia PC.  The NDA is an enforceable contract between the parties.

88.     In the alternative, if Mr. Attia is not deemed an actual party to the NDA Mr. Attia is a third party beneficiary under that agreement.  The NDA was entered into expressly for the benefit of Mr. Attia.  A main purpose of the NDA is to protect and maintain the confidentiality of trade secrets relating to Engineered Architecture developed and owned by Mr. Attia.  Many aspects of these trade secrets were developed by Mr. Attia even before Attia PC was formed and came into existence.  The NDA was sent to Mr. Attia at his personal e-mail address for him to sign.  The NDA, therefore, was made expressly for the benefit of Mr. Attia as well as the professional corporation owned and operated by him.

89.     Pursuant to the NDA, Google agreed that any confidential information disclosed by Mr. Attia to Google could be used by Google only to facilitate technical discussions concerning existing or future product development efforts by the parties.  Google also agreed to use a reasonable degree of care to protect any confidential information disclosed to it by Mr. Attia and to prevent any unauthorized use or disclosure of such confidential information.  Google also agreed that it would share any disclosed confidential information with its personnel who need to know it only if they have agreed in writing to keep the information confidential.

90.     As alleged above, pursuant to the NDA, Mr. Attia disclosed to Google confidential information relating to his Engineered Architecture invention, including trade secrets and other proprietary information.

91.     Mr. Attia and Attia PC have performed all conditions, covenants and promises required on his behalf to be performed in accordance with the terms and conditions of the NDA, or its performance has been excused by virtue of Google or Flux's conduct.

FIRST AMENDED COMPLAINT
CASE NO. 1-14-cv-274103

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

92.     Google and Flux Factory breached the NDA by engaging in the conduct alleged herein, including, without limitation, disclosing and using Mr. Attia's trade secrets protected by the NDA for purposes other than to facilitate technical discussions concerning existing or future product development efforts by the parties and without the permission or consent of Mr. Attia and Attia PC.

93.     As a result of Google and Flux's breaches of their agreement with Mr. Attia, he has suffered damages in an amount to be proven at trial.

94.     In addition, Mr. Attia has suffered and will suffer harm that cannot be remedied in damages, and that will require equitable relief.

### THIRD CAUSE OF ACTION
### (Breach of Contract by Eli Attia and Attia PC Against Google and Flux – ISA/SOW)

95.     Plaintiffs reallege, and incorporate herein by reference, as though fully set forth, paragraphs 1-94 above.

96.     On or about January 12, 2011, Google entered into a contractual relationship with Mr. Attia and Attia PC referred to as an Inbound Services Agreement ("ISA").  The parties' ISA is an enforceable contract between the parties.

97.     On January 12, 2011, Google also entered into a contractual relationship with Mr. Attia and Attia PC referred to as a Statement of Work ("SOW").

98.     In the alternative, if Mr. Attia is not deemed an actual party to the ISA/SOW, Mr. Attia is a third party beneficiary under those agreements.  Paragraph 3 of the ISA contains a provision granting "Contractor and Contractor's spouse or spouse's lineal descendant" a limited license to certain patent rights "to permit Contractor or Contractor's spouse or spouse's lineal descendant . . . to engage in his professional practice in a personal capacity, . . ."  The ISA also provides for Google to provide compensation for the express benefit of Mr. Attia in return for Mr. Attia's personal consulting services.  The ISA also contains provisions limiting

28

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

the scope of the non-commercial license of the Engineered Architecture trade secrets granted to Google by Mr. Attia, as an owner of those trade secrets and protecting Mr. Attia's ownership and rights to those trade secrets.  The SOW also provides for compensation by Google to Mr. Attia for Google's use of any of Mr. Attia's trade secrets in Project Genie, and for Google to negotiate a new SOW providing for compensation to Mr. Attia.  This clearly shows that ISA/SOW was made expressly for the benefit of Mr. Attia as well as the professional corporation owned and operated by him.

99.    The SOW contains the following provision regarding the proof of concept program in Phase One of Project Genie:  "If the proof of concept program In Phase One is successful and to the extent any Pre-existing Property is used to develop Genie, (ii) Google, in its sole discretion, will consider seeking an exclusive license and will make reasonable efforts to negotiate for a license to a portion or all of the Pre-existing Property at mutually agreed upon price and terms, and (ii) both parties intend to negotiate in good faith appropriate new terms and conditions in a separate SOW under the ISA pursuant to which Contractor will provide consulting services as to the development of Genie."

100.    As alleged above, the proof of concept program In Phase One of the SOW was deemed successful by Google, and Google used Mr. Attia's "Pre-existing Property" to develop Genie.  Google, however, breached this provision of the ISA/SOW by failing and refusing to make reasonable efforts to negotiate for a license to the Pre-existing Property it used to develop Genie at mutually agreed upon price and terms.

101.    Google also breached this provision of the ISA/SOW by failing and refusing to negotiate in good faith appropriate new terms and conditions in a separate SOW under the ISA pursuant to which Mr. Attia would provide consulting services as to the development of Genie.

FIRST AMENDED COMPLAINT
CASE NO. 1-14-cv-274103

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

102.   Flux Factory, as the successor to the contractual obligations of Google pursuant to the ISA/SOW, has breached the ISA/SOW also by failing and refusing to make reasonable efforts to negotiate for a license to the Pre-existing Property it used to develop Genie at mutually agreed upon price and terms.

103.   Mr. Attia has performed all conditions, covenants and promises required on his behalf to be performed in accordance with the terms and conditions of the ISA, or his performance has been excused by virtue of Google or Flux's conduct.

104.   Google and Flux also have breached the ISA/SOW by engaging in the conduct alleged herein, including, without limitation, using Mr. Attia's Pre-existing Property for commercial purposes and doing so beyond the termination date recited in the ISA/SOW without the permission of Mr. Attia or Attia PC.

105.   As a result of Google and Flux's breaches of their agreements with Mr. Attia, he has suffered damages in an amount to be proven at trial.

106.   In addition, Mr. Attia has suffered and will suffer harm that cannot be remedied in damages, and that will require equitable relief.

### FOURTH CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing
### by Eli Attia and Attia PC Against Google and Flux Factory)

107.   Plaintiffs reallege, and incorporate herein by reference, as though fully set forth, paragraphs 1-106 above.

108.   The parties' NDA and ISA/SOW are enforceable contracts between the parties. Under California law, every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.  The implied covenant of good faith and fair dealing is that neither party will do anything that will injure the right of the other to receive the benefits of the agreement.

30

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

109.    Mr. Attia has performed all conditions, covenants and promises required on his behalf to be performed in accordance with the terms and conditions of the NDA and ISA/SOW, or his performance has been excused by virtue of Google's or Flux Factory's conduct.  All the conditions required by the agreements for Defendants' performance have occurred.

110.    The NDA and ISA/SOW were intended to protect several interests of Mr. Attia and Attia PC.  They were intended to preserve the confidentiality of Mr. Attia's Engineered Architecture trade secrets and other proprietary information disclosed to Google, including, without limitation, confidential and proprietary information that can be used to create buildings dramatically better, faster, with fewer resources, and with less energy and environmental impact than conventional methods.  The agreements were also intended to safeguard Mr. Attia's and Attia PC's exclusive rights and ownership over Mr. Attia's pre-existing intellectual property and to facilitate technical discussions between Mr. Attia and Google concerning existing or future product development efforts by the parties.  The agreements were also intended to protect Mr. Attia and Attia PC against Google's commercial use of Mr. Attia's trade secrets in developing the Genie software system without compensation to Mr. Attia and Attia PC and without Mr. Attia's continued involvement in the Genie project.

111.    Defendants Google and Flux Factory breached the implied covenant of good faith and fair dealing embodied in its agreements with Mr. Attia by engaging in the deceptive and malicious conduct alleged above.  Google, through the members of Project Genie, devised a scheme to extract from Mr. Attia his proprietary and confidential information about his Engineered Architecture invention for the improper purpose of using that information to develop and market the Genie software system for its own benefit and to the exclusion of Mr. Attia.  As part of this scheme, Google secretly planned to squeeze Mr. Attia out of Project

FIRST AMENDED COMPLAINT
CASE NO. 1-14-cv-274103

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

Genie.  Google misrepresented to Mr. Attia that the Genie project was being terminated when, in fact, Google was planning to continue the project without Mr. Attia and formed a new company to carry out its scheme to continue to use Mr. Attia's trade secrets without his permission or knowledge.   When Mr. Attia discovered Google's illicit scheme, Google's lawyers repeatedly and falsely denied that Google had used any of Mr. Attia's trade secrets and falsely stated that Google had no desire to use such proprietary and confidential information. Google perpetrated this cover up to prevent Mr. Attia from discovering that it was using Mr. Attia's trade secrets without his permission in order to evade its contractual obligation to compensate him for using those trade secrets and negotiate an additional SOW.  Flux Factory breached the implied covenant of good faith and fair dealing embodied in its agreements by continuing Google's unauthorized use and disclosure of Mr. Attia's trade secrets.

112.    The bad faith actions by Google and Flux Factory alleged above have impaired and frustrated the right of Mr. Attia and Attia PC to receive the benefits of the agreements. These bad faith actions reflect unfair dealing extraneous to the agreements with the motive of intentionally frustrating Mr. Attia's and Attia PC's enjoyment of their rights under the agreements, including the specific contractual provisions discussed above.  Google's and Flux Factory's bad faith conduct also reflects Google's effort to acquire an unrestricted license to use Mr. Attia's trade secrets – a right Mr. Attia refused to grant Google when the parties negotiated the ISA/SOW.

113.    As a result of the Defendants Google and Flux Factory's breaches of the covenant of good faith and fair dealing, the Defendants have been unjustly enriched and Mr. Attia has been damaged in an amount to be proven at trial.

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

### FIFTH CAUSE OF ACTION
### (Declaratory Relief Against All Defendants)

114.    Plaintiffs reallege, and incorporate herein by reference, as though fully set forth, paragraphs 1-113 above.

115.    Mr. Attia has an interest in certain pre-existing intellectual property rights under the ISA and SOW.  Specifically, Mr. Attia owns certain trade secrets, other proprietary information, and know-how that he brought to the "Genie Project" and which now make up the services being sold by Flux Factory.

116.    Defendants have created a controversy regarding Mr. Attia's pre-existing intellectual property by continuing to incorporate this intellectual property in "Genie" and Flux Factory after the end of Google's license period with Mr. Attia.  Defendants have also disclosed Mr. Attia's intellectual property to third parties in an attempt to gain support for Genie and Flux Factory.

117.    Plaintiffs seek a declaration that Mr. Attia owns certain trade secrets, proprietary information and know-how that he brought to the "Genie Project," and has the exclusive right to license his intellectual property.

118.    Plaintiffs seek a declaration that the Defendants had express and implied obligations to Mr. Attia to use his proprietary and confidential information only in support of a joint effort with Mr. Attia to develop technologies.

### PRAYER FOR RELIEF

119.    WHEREFORE, Plaintiffs pray for judgment as follows:

120.    That Defendants be enjoined temporarily and permanently from misappropriating Plaintiffs' confidential and proprietary information and know-how, including, without limitation, any development, use, or manipulation of Genie-related materials;

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

121.     Actual, incidental, and consequential damages from Defendants, together with interest, in an amount to be proven at trial;

122.     Recovery of amounts by which Defendants were unjustly enriched;

123.     For an order requiring that any funds and all profits that Google acquires or has already acquired by wrongful conduct and any funds and all profits that Flux Factory acquires or has already acquired by wrongful conduct be placed into a constructive trust for the sole benefit of Plaintiff;

124.     For restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of such unfair, unlawful and/or fraudulent business acts and practices;

125.     For punitive damages in an appropriate amount to be determined by the Court;

126.     Declaratory relief clarifying the parties' rights under the NDA, ISA, and SOW;

127.     For Plaintiffs' attorneys' fees and costs in this matter; and

128.     For such other and further relief as the Court may deem just and proper.

FIRST AMENDED COMPLAINT
CASE NO. 1-14-cv-274103

E-FILED: Nov 2, 2015 12:35 PM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-78088

Dated:  August 28, 2015                    **BUETHER JOE & CARPENTER, LLC**


                                           */s/ Eric W. Buether*
                                           Eric W. Buether
                                           Christopher M. Joe
                                           Brian A. Carpenter
                                           Mark A. Perantie
                                           Niky Bukovcan
                                           Michael D. Ricketts
                                           1700 Pacific Avenue, Suite 4750
                                           Dallas, TX  75201
                                           (214) 466-1271
                                           (214) 635-1827 – Fax


                                           Jamie L. Dupree (#158105)
                                           **FUTTERMAN DUPREE DODD CROLEY MAIER LLP**
                                           180 Sansome Street, 17th Floor
                                           San Francisco, CA  94104
                                           (415) 399-3840
                                           (415) 399-3838 – Fax


                                           **Attorneys for Plaintiffs**
                                           **Eli Attia and Eli Attia Architect PC**

# EXHIBIT D

**E-FILED**

Feb 1, 2016 10:22 AM
David H. Yamasaki
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
Case #1-14-CV-274103 Filing #G-80441
By R. Walker, Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| ELI ATTIA; and ELI ATTIA ARCHITECT PC, | Case No.: 1-14-CV-274103 |
| Plaintiffs, | |
| vs. | **ORDER AFTER HEARING ON JANUARY 29, 2016** |
| GOOGLE, INC.; FLUX FACTORY, INC.; LARRY PAGE; SERGEY BRIN; SEBASTIAN THRUN; ERIC "ASTRO" TELLER' MICHELLE KAUFMANN, JENNIFER CARLILE; AUGUSTO ROMAN; NICHOLAS CHIM; and DOES 1-100, | **(1) Demurrer by the Google Defendants to the First Amended Complaint and Joinder to same by Defendants Flux Factory, Inc., Michelle Kaufmann, Jennifer Carlile, Augusto Roman and Nicholas Chim; (2) Motion by the Google Defendants to Strike Prayer of Relief from the First Amended Complaint and Joinder to same by Defendants Flux Factory, Inc., Michelle Kaufmann, Jennifer Carlile, Augusto Roman and Nicholas Chim** |
| Defendants. | |

The above-entitled matter came on regularly for hearing on Friday, January 29, 2016 at 9:00 a.m. in Department 1 (Complex Civil Litigation), the Honorable Peter H. Kirwan presiding. A tentative ruling was issued by the Court on January 28, 2016. The appearances are as stated in the record. The Court, having reviewed and considered the written submission of all parties, having heard and considered the oral argument of counsel, and being fully

---

*Max Sound Corporation, et al. v. Google, Inc., et al.*
*Superior Court of California, County of Santa Clara, Case No. 1-14-CV-274103*
*Order After Hearing on January 29, 2016 [(1) Demurrer by the Google Defendants to the First Amended Complaint and Joinder to same by Defendants Flux Factory, Inc., Michelle Kaufmann, Jennifer Carlile, Augusto Roman and Nicholas Chim; (2) Motion by the Google Defendants to Strike Prayer of Relief from the First Amended Complaint and Joinder to same by Defendants Flux Factory, Inc., Michelle Kaufmann, Jennifer Carlile, Augusto Roman and Nicholas Chim]*

advised, orders that the tentative ruling, attached as Exhibit A, shall be adopted and incorporated herein as the Order of the Court.

      IT IS SO ORDERED.

Dated:   FEB - 1 2016

Honorable Peter H. Kirwan
Judge of the Superior Court

Max Sound Corporation, et al. v. Google, Inc., et al.
Superior Court of California, County of Santa Clara, Case No. 1-14-CV-274103
Order After Hearing on January 29, 2016 [(1) Demurrer by the Google Defendants to the First Amended Complaint and Joinder to same by Defendants Flux Factory, Inc., Michelle Kaufmann, Jennifer Carlile, Augusto Roman and Nicholas Chim; (2) Motion by the Google Defendants to Strike Prayer of Relief from the First Amended Complaint and Joinder to same by Defendants Flux Factory, Inc., Michelle Kaufmann, Jennifer Carlile, Augusto Roman and Nicholas Chim]

E-FILED: Feb 1, 2016 10:22 AM, Superior Court of CA, County of Santa Clara, Case #1-14-CV-274103 Filing #G-80441

# EXHIBIT A

**Calendar Line 6**

**Case Name:**  *Attia, et al. v. Google, Inc., et al.*
**Case No.:**   2014-1-CV-274103

This is an action for misappropriation of trade secrets and related causes of action. In the operative First Amended Complaint ("FAC"), filed November 2, 2015, plaintiffs Eli Attia ("Attia") and Eli Attia Architect PC ("Attia PC") (collectively "Plaintiffs") allege that Attia is one of the world's leading and most innovative architects. (FAC, ¶ 1.) Attia has spent the last 50 years creating a game-changing new technology that can fundamentally change the way buildings are created, which is called "Engineered Architecture" or "EA." (*Ibid.*)

In 2009, Attia began looking for a partner, and on or about July 25, 2010, he was approached by Google X, an affiliate of defendant Google, Inc. ("Google"), through defendant Eric "Astro" Teller. (FAC, ¶¶ 24-26.) On or about August 8, 2010, Google proposed and executed with Attia a Non-Disclosure Agreement ("NDA") permitting Google to use confidential information received from Attia to facilitate technical discussions concerning existing or future product development efforts by the parties. (*Id.* at ¶ 27.) Google also induced Attia to relocate with his family to Palo Alto in late 2010 so that he could work directly at Google's Mountain View campus. (*Id.* at ¶ 28.)

On January 12, 2011, Attia entered into an Inbound Services Agreement ("ISA") and an associated Statement of Work ("SOW"), in which Google acknowledged that the "'Genie Project was inspired by [Mr. Attia's] experience and Pre-Existing Intellectual Property.'" (FAC, ¶¶ 31-32.) The SOW allegedly describes certain of Attia's proprietary information and identifies documents that contain Attia's proprietary information, including "All presentations & brochures," notes, emails, patents, and "other related intellectual property developed as of the SOW Effective Date." (*Id.* at ¶ 32.) Under the ISA, any "invention, improvement, development, concept, discovery or other proprietary information" that Attia had an interest in before January 12, 2011 remained his property. (*Ibid.*)

Google made a request for a non-exclusive, royalty-free, perpetual, irrevocable, worldwide license, which was rejected, and then proposed to pay royalties for a non-exclusive license, which was rejected as well, and ultimately, Attia agreed to provide Google a "non-commercial" and nonexclusive license to use the proprietary information only up until June 31, 2011. (FAC, ¶ 33.) Google was so satisfied with the viability of Attia's Engineered Architecture technology that it applied to the United States Patent and Trademark Office for patents containing numerous claims reciting Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Attia to Google pursuant to the NDA and the ISA/SOW. (*Id.* at ¶ 41.)

Google pretended to kill the Genie Project to give Attia the false impression that Google was not planning to misappropriate Attia's Pre-existing Property. (FAC, ¶ 52.) Rather than shutting down Project Genie, however, Google was surreptitiously taking steps to develop and promote Genie further. (*Id.*, at ¶ 53.)

In 2011, Google allegedly spun-off Project Genie into a new company, defendant Flux Factory, Inc. ("Flux Factory"), which was co-founded and is headed by defendants and former

Project Genie team members Michelle Kaufmann, Jennifer Carlile, Augusto Roman and Nicholas Chim (collectively the "Flux Factory Defendants"). (FAC, ¶¶ 60, 62.) Flux Factory is simply a reconstitution of Project Genie under a different name. (*Id.* at ¶ 62.)

The Google Defendants had the obligation to negotiate a license to use Attia's Pre-existing Property, including his Engineered Architecture trade secrets, and fairly compensate Attia if they wanted to continue using it. (FAC, ¶ 69.) The Google Defendants refused to do so and intentionally misappropriated Attia's proprietary Engineered Architecture invention. (*Ibid.*)

The FAC sets forth the following causes of action: [1] Misappropriation of Trade Secrets; [2] Breach of Contract; [3] Breach of Contract; [4] Breach of Covenant of Good Faith and Fair Dealing; and [5] Declaratory Relief. Google now demurs to causes of action two, three, and four in the FAC on the ground that they fail to state facts sufficient to constitute a cause of action. Defendants Google, Inc., Larry Page, Sergey Brin, Sebastian Thrun, and Eric "Astro" Teller (collectively, the "Google Defendants") demur to causes of action one and five on the ground that they fail to state facts sufficient to constitute a cause of action. The Google Defendants also move to strike the request for punitive damages from the FAC. The Flux Factory Defendants join in the demurrer and the motion to strike.

## I.    Demurrer

### a.    The Google Defendants' Request for Judicial Notice

The Google Defendants request that the Court take judicial notice of the following:

(1) Declaration (37 CFR 1.63) for Utility or Design Application Using and Application Data Sheet (37 CFR 1.76) filed with the United States Patent and Trademark Office by Google on May 20, 2011 in connection with U.S. Patent Application No. 13112727;

(2) Declaration (37 CFR 1.63) for Utility or Design Application Using and Application Data Sheet (37 CFR 1.76) filed with the United States Patent and Trademark Office by Google on June 16, 2011 in connection with U.S. Patent Application No. 13163307;

(3) The assignment record for U.S. Patent Application No. 13112727, showing plaintiff Attia executed the assignment on May 17, 2011, and that the assignment was recorded by the United States Patent and Trademark Office on May 20, 2011;

(4) The "Patent Assignment" recorded by the United States Patent and Trademark Office on May 20, 2011, in connection with U.S. Patent Application 13112727;

(5) The assignment record for U.S. Patent Application No. 13163307, showing plaintiff Attia executed the assignment on June 16, 2011, and that the assignment was recorded by the United States Patent and Trademark Office on June 17, 2011; and

(6) The "Patent Assignment" recorded by the United States Patent and Trademark Office on June 17, 2011, in connection with U.S. Patent Application 13163307.

The request for judicial notice is GRANTED. (Evid. Code, § 452, subds. (c), (h).)

### b. Substantive Analysis

#### i. First Cause of Action (Misappropriation of Trade Secrets)

The Google Defendants argue that the first cause of action is time-barred. Among the conduct that Plaintiffs allege constitutes misappropriation stemming from Google's use of Attia's trade secrets to develop Genie is the application for patents covering the Genie software system. (FAC, ¶ 77.) One such patent application (the "'727 Application") was filed on May 20, 2011. (FAC, ¶ 42.) The '727 Application was signed by Attia. (Declaration of Kevin L. Spark in Support of Google Defendants' Request for Judicial Notice, Exhibits A and C.) Therefore, Plaintiffs had knowledge of the filing of the patent application at least by May 20, 2011.

Plaintiffs argue that the filing of the patent application does not start the running of the statute of limitations because the disclosure of trade secrets in a patent application is not a public disclosure of the trade secrets until the application is published by the U.S. Patent and Trademark Office or issued as a patent. Plaintiffs argue further that Attia's agreement to allow Google to use his trade secrets in a patent application was a conditional agreement, conditioned on Google's compensation of Attia for such use. Plaintiffs contend therefore that there was no misappropriation until Google failed to compensate Attia.

With regard to Plaintiffs' first argument, Plaintiffs allege that the use of Plaintiffs' trade secrets in applying for patents was a misappropriation. Therefore, Plaintiffs' pertaining to disclosure is inapposite. As for Plaintiffs' argument that Attia conditionally allowed Google to use his trade secrets, that is not alleged in the FAC and cannot be considered on demurrer.

An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. (Civ. Code, § 3426.6.) A continuing misappropriation constitutes a single claim. (*Ibid.*) Plaintiffs' allegations show that they knew of the alleged misappropriation by May 20, 2011. Therefore Plaintiffs had until May 20, 2014 to bring suit on the misappropriation claim. This action was filed on December 5, 2014. Consequently, the first cause of action is time-barred. Accordingly, the demurrer to the first cause of action is SUSTAINED WITH 10 DAYS' LEAVE TO AMEND.

#### ii. Second Cause of Action (Breach of Contract)

The second cause of action is a breach of contract claim based on an alleged breach of the NDA. The Google Defendants argue that the demurrer to this claim should be sustained because the second contract, the ISA, expressly superseded the NDA. Generally, an integrated contract supersedes any prior agreement. (See *Grey v. American Management Services* (2012) 204 Cal.App.4th 803, 807-809.) The ISA, which is attached to the FAC, states, in relevant part: "This agreement supersedes any prior agreements or understandings between the parties. This Agreement, including any SOWs or POs, constitutes the entire Agreement between the parties related to this subject matter, and any change to its terms must be in writing and signed by the parties." (FAC, Exhibit 2, § 12.E.) Therefore, the language of the ISA demonstrates that it supersedes the NDA (i.e. the prior agreement).

Plaintiffs argue that when several contracts relating to the same subject matter are executed by the same parties, all the contracts are considered together with the same effect as if they had been incorporated in one document. The problem with this argument is that the ISA specifically states that it "constitutes the entire Agreement between the parties related to this subject matter" and that it "supersedes any prior agreements." The only reasonable interpretation of that language is that the ISA was intended to supersede the NDA.

In light of the language of the ISA, there does not appear to be any way that this cause of action can be amended and Plaintiffs have made no attempt to show that they can cure the defect. Accordingly, the demurrer to the second cause of action is SUSTAINED WITHOUT LEAVE TO AMEND.

### iii. Third Cause of Action (Breach of Contract)

The third cause of action is a breach of contract claim based on an alleged breach of the ISA. Plaintiffs allege that Google used Attia's "Pre-existing Property" to develop Genie, but breached the ISA/SOW by failing to negotiate for a license to the Pre-existing Property and failing to negotiate in good faith new terms and conditions in a separate SOW under the ISA pursuant to which Attia would provide consulting services as to the development of Genie. (FAC, ¶¶ 100-101.)

The Google Defendants argue that Plaintiffs fail to plead that they satisfied the ISA Notice Requirement, a condition precedent under the contract. The Google Defendants assert that the ISA Notice Requirement mandated that Plaintiffs notify Google and obtain Google's prior written permission before any Pre-existing Property was incorporated into Genie. Plaintiffs dispute this assertion, arguing that the identification of Pre-existing Property was only required upon request by Google and there is no allegation that Google made any such request.

There are two relevant portions of the ISA. The first states: "To the extent Contractor plans to or does incorporate any . . . [Pre-existing Property] . . . into any Deliverable, Contractor will identify such Pre-existing Property upon request by Google to the extent such Pre-existing Property is incorporated into any Deliverable." (FAC, Exhibit 2, § 3.) The second relevant portion of the ISA states: "Contractor will not incorporate any proprietary information owned by Contractor or any third party into any Deliverable without Google's prior written permission." (*Ibid.*)

With regard to the first provision, Plaintiffs point out that the identification of Pre-existing Property was only required "upon request by Google." Plaintiffs do not allege that any such request was made. Therefore, the notification provision was not triggered.

With regard to the second provision, which concerns incorporation of proprietary information, the SOW stated that "Contractor will utilize the following to complete the Services and deliver Deliverables pursuant to this SOW: . . . Contractor's Pre-existing Property." (FAC, Exhibit 3.) The Pre-existing Property to be used is listed in Exhibit A to the SOW. (*Ibid.*) This demonstrates that Plaintiffs had written permission from Google to incorporate Pre-existing Property. Consequently, Plaintiffs did not fail to plead that they satisfied the ISA Notice Requirement. Accordingly, the demurrer to the third cause of action is OVERRULED.

### iv.  Fourth Cause of Action (Breach of Covenant of Good Faith and Fair Dealing)

The Google Defendants argue that Plaintiffs fail to state a claim for breach of the implied covenant of good faith and fair dealing because that cause of action improperly duplicates the claims for breach of written contract (second and third causes of action).  The Google Defendants are correct that the fourth cause of action essentially just alleges a bad faith breach of the same contracts.  This is insufficient to state a claim.  "[W]here breach of an actual term is alleged, a separate implied covenant claim, based on the same breach, is superfluous."  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 317.)  Accordingly, the demurrer to the fourth cause of action is SUSTAINED WITH 10 DAYS' LEAVE TO AMEND.

### v.  Fifth Cause of Action (Declaratory Relief)

The Google Defendants' demurrer to the declaratory relief cause of action is based entirely on their contention that this cause of action relies on the other causes of action and must be dismissed because the other causes of action are without merit.  The third cause of action is being overruled.  Accordingly, the demurrer to the fifth cause of action is OVERRULED.

## II.    Motion to Strike

The Google Defendants move to strike the prayer for punitive damages from the FAC, arguing that none of the causes of action authorize punitive damages.  Plaintiffs do not oppose the motion.  Accordingly, the motion to strike is GRANTED WITHOUT LEAVE TO AMEND.

- ooOoo -