# EXHIBIT I

KAREN I. BOYD, State Bar No. 189808
ESHA BANDYOPADHYAY, State Bar No. 212249
JOSHUA M. MASUR, State Bar No. 203510
TURNER BOYD LLP
702 Marshall Street, Suite 640
Redwood City, CA 94063
Telephone: (650) 521-5930
Facsimile: (650) 521-5931
Email: boyd@turnerboyd.com
        bandyopadhyay@turnerboyd.com
        masur@turnerboyd.com

Attorneys for Defendants
FLUX FACTORY, INC., MICHELLE KAUFMANN,
JENNIFER CARLILE, AUGUSTO ROMAN, AND
NICHOLAS CHIM

E-FILED
9/26/2016 4:24:21 PM
David H. Yamasaki
Chief Executive Officer/Clerk
Superior Court of CA,
County of Santa Clara
2014-1-CV-274103
Reviewed By:Rowena Walker

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

UNLIMITED JURISDICTION

| | |
|---|---|
| MAX SOUND CORPORATION, ELI ATTIA, and ELI ATTIA ARCHITECT PC,<br><br>                    *Plaintiffs,*<br><br>        *v.*<br><br>GOOGLE INC., FLUX FACTORY, INC., LARRY PAGE, SERGEY BRIN, SEBASTIAN THRUN, ERIC "ASTRO" TELLER, MICHELLE KAUFMANN, JENNIFER CARLILE, AUGUSTO ROMAN, NICHOLAS CHIM, and DOES 1-100,<br><br>                    *Defendants.* | CASE NO.:  114CV274103<br><br>Complaint Filed: December 5, 2014<br><br>**FLUX FACTORY DEFENDANTS' ANSWER TO THIRD AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Dept.:   1<br>Judge:   Hon. Peter H. Kirwan<br><br>Trial Date:  None Set |

Defendants Flux Factory, Inc., Michelle Kaufmann, Jennifer Carlile, Augusto Roman, and Nicholas Chim (collectively "Flux Factory Defendants") hereby answer the allegations of Plaintiffs Eli Attia and Eli Attia Architect PC's Third Amended Complaint filed August 26, 2016 (the "TAC"). Except to the extent explicitly admitted herein, each and every allegation of the TAC is denied.

## GENERAL DENIAL

Pursuant to Section 431.30 of the Code of Civil Procedure, the Flux Factory Defendants generally and specifically deny each and every material allegation contained in the TAC; deny that Plaintiffs have been damaged in any amount, by reason of any act or omission on the part of the Flux Factory Defendants; and further deny that Plaintiffs are entitled to any relief whatsoever.

## AFFIRMATIVE DEFENSES

The recitation of any defense as an "affirmative" defense does not mean that the Flux Factory Defendants contend that the defense is in fact an affirmative defense under California law, or that the Flux Factory Defendants bear the burden of proof.

## FIRST AFFIRMATIVE DEFENSE

### (Statute of Limitations)

Plaintiff Eli Attia is barred from claiming trade secret misappropriation by the statute of limitations. Among other things, on information and belief, more than three years before filing the complaint in December 2014, Mr. Attia had actually consented to and approved Google filing – or at very least, was aware of facts such that he knew or should have known, that Google was filing – for patents containing information Mr. Attia contends constitute his trade secrets.

## SECOND AFFIRMATIVE DEFENSE

### (Ready Ascertainability)

To the extent that ready ascertainability is deemed an affirmative defense rather than an ordinary defense, Plaintiff Eli Attia is barred from claiming trade secret misappropriation as to any items of information that were readily ascertainable within the meaning of that defense under California's Uniform Trade Secrets Act at the time of the alleged misappropriation.

**THIRD AFFIRMATIVE DEFENSE**

(Estoppel)

Plaintiffs' TAC, and each cause of action asserted therein, is barred in whole or in part by the equitable doctrine of estoppel. Among other things, on information and belief, one or more Plaintiffs identified the information now alleged to be trade secrets as publicly available information and facilitated the publication of the alleged trade secrets.  On information and belief, Plaintiff Eli Attia Architect PC also agreed not to incorporate third party trade secrets into any Google products or services without Google's permission, and on information and belief, never obtained such permission from Google.  The Flux Factory Defendants deny that either Plaintiff owned trade secrets or that any defendant engaged in any wrongdoing.  To the extent Plaintiff Eli Attia Architect PC brought any purported intellectual property of Mr. Attia into Google and/or incorporated it into services provided to Google, Defendants relied on Plaintiff Eli Attia Architect PC's agreement to obtain permission and/or Plaintiff Eli Attia's knowledge of that requirement, directly or indirectly, to their detriment.

**FOURTH AFFIRMATIVE DEFENSE**

(Waiver)

Plaintiffs' TAC, and each cause of action asserted therein, is barred in whole or in part by the equitable doctrine of waiver. Among other things, on information and belief, one or both Plaintiffs knowingly and intentionally relinquished any purported trade secrets and any other intellectual property rights by identifying such information as publicly available, by facilitating the publication of such information in patent applications, and by assigning ownership to Google. Plaintiffs therefore waived any claims brought by one or both of them that the Flux Factory Defendants misappropriated trade secrets.

**FIFTH AFFIRMATIVE DEFENSE**

(Laches)

Plaintiffs' TAC, and each cause of action asserted therein, is barred in whole or in part by the equitable doctrine of laches. Plaintiffs unreasonably and inexcusably delayed bringing each of

their claims despite being, on information and belief, in possession long ago of all material facts upon which they base their claims.  This delay has prejudiced the Flux Factory Defendants.

## SIXTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

Plaintiffs' TAC, and each cause of action asserted therein, is barred in whole or in part by the equitable doctrine of unclean hands.  Plaintiffs' hands are unclean because, on information and belief, they intentionally misrepresented and/or concealed the fact that Mr. Attia (including in connection with Eli Attia Architect PC) was not a licensed architect at the time in 2010-2011 when Mr. Attia gave a presentation at Google, and when Eli Attia Architect PC entered into agreements with Google.   Plaintiffs' conduct is, on information and belief, in conflict with their representations to Google.  On information and belief, they acted to Google's detriment by using their purported status as architects so that Eli Attia Architect PC could enter into agreements with Google and pursue Project Genie at Google's expense, costing Google time and money.  This conduct so infects the misappropriation and declaratory judgment causes of action brought by one or both Plaintiffs that to permit Plaintiffs to take action against any of the Defendants given their unclean hands would be inequitable.

## SEVENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

Plaintiffs' TAC, and each cause of action asserted therein, is barred by Plaintiffs' failure to take reasonable efforts to mitigate damages or injury, if any, that would have prevented (or at a minimum, substantially reduced) their alleged injury or damage.  By way of example, Mr. Attia contends that Google wrongfully filed patent applications containing purported trade secrets in May and June 2011, but, on information and belief, even though Plaintiffs knew about these pending applications, Plaintiffs took no action to prevent them from being filed or from being published.  In addition, on information and belief, as of January 2012, Plaintiffs refused to identify their alleged trade secrets or other allegedly protectable information in response to requests from Google. Although the Flux Factory Defendants deny that Plaintiffs suffered any damage, any recovery by Plaintiffs must be reduced or barred for this reason.

**ADDITIONAL AFFIRMATIVE DEFENSES**

(Reservation of Right to Assert Additional Defenses)

The Flux Factory Defendants may have additional, as yet unidentified, defenses available. The Flux Factory Defendants reserve the right to assert additional defenses that are revealed by the Flux Factory Defendants' investigation of this action or through discovery.

**STATEMENT OF INTENTION TO PURSUE SECTION 3426.4 REMEDIES**

Because the Flux Factory Defendants believe that Plaintiffs have acted in bad faith within the meaning of Civil Code section 3426.4—specifically because, among other things, Plaintiffs subjectively and objectively know that Mr. Attia has no valid trade secrets and that the Flux Factory Defendants did not misappropriate any such purported trade secrets—the Flux Factory Defendants will seek all fees and costs permitted under that statute.

**PRAYER FOR RELIEF**

The Flux Factory Defendants request that the Court enter judgment as follows:

(1)     That Plaintiffs take nothing from the Flux Factory Defendants by their TAC;

(2)     For judgment in favor of the Flux Factory Defendants;

(3)     For a finding that Plaintiffs initiated and/or maintained their current and former trade secret causes of action in bad faith pursuant to Civil Code Section 3426.4;

(4)     For costs and attorneys' fees and expert witness fees and court hearing costs; and

(5)     For such other and further relief as this Court deems just and proper.


Dated:  September 26, 2016                TURNER BOYD LLP

                                          By: /s/ Karen Boyd
                                             Karen I. Boyd (SBN 189808)
                                             boyd@turnerboyd.com
                                             TURNER BOYD LLP
                                             702 Marshall Street, Suite 640
                                             Redwood City, CA 94063
                                             Telephone: (650) 521-5930
                                             Facsimile: (650) 521-5931

                                          *Attorneys for Defendants*
                                          Flux Factory, Inc., Michelle Kaufmann, Jennifer
                                          Carlile, Augusto Roman, and Nicholas Chim

**PROOF OF SERVICE**
*Eli Attia v. Google Inc., et al.*
**Santa Clara County Superior Court Case No. 1-14-cv-274103**

I, Jennie Newman, am employed in the County of San Mateo, in the State of California.  I am over the age of 18 years and not a party to the within action.  My business address is Turner Boyd LLP, 702 Marshall Street, Suite 640, Redwood City, CA 94063.

On September 26, 2016, I served **FLUX FACTORY DEFENDANTS' ANSWER TO THIRD AMENDED COMPLAINT** on the person(s) listed below by e-filing using Odyssey, the electronic filing service provider of the of Santa Clara Superior Court to provide e-service.

David H. Kramer
dkramer@wsgr.com
Charles T. Graves
tgraves@wsgr.com
Joshua A. Baskin
jbaskin@wsgr.com
Brianna C. Kohr
bkohr@wsgr.com
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 493-6811

*Attorneys for Defendants*
*GOOGLE INC., LARRY PAGE,*
*SERGEY BRIN, SEBASTIAN*
*THRUN, and ERIC "ASTRO" TELLER*

ERIC W. BUETHER
Eric.Buether@BJCIPLaw.com
CHRISTOPHER M. JOE
Chris.Joe@BJCIPLaw.com
BRIAN A. CARPENTER
Brian.Carpenter@BJCIPLaw.com
MARK D. PERANTIE
Mark.Perantie@BJCIPLaw.com
NIKY BUKOVCAN
Niky.Bukovcan@BJCIPLaw.com
MICHAEL D. RICKETTS
Mickey.Ricketts@BJCIPLaw.com
BUETHER JOE & CARPENTER, LLC
1700 Pacific Avenue, Suite 4750
Dallas, TX 75021
Telephone: (214) 466-1272
Facsimile: (214) 635-1828

*Attorneys for Plaintiffs*
*ELI ATTIA & ELI ATTIA ARCHITECT P.C.*

Rowena Walker
191 N. First Street
San Jose, CA 95110
rwalker@scscourt.org

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.  Executed on September 26, 2016 in Redwood City, California.

Jennie Newman
Jennie Newman

# EXHIBIT J

DAVID H. KRAMER, State Bar No. 168452
CHARLES T. GRAVES, State Bar No. 197923
JOSHUA A. BASKIN, State Bar No. 294971
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 493-6811
Email: dkramer@wsgr.com
        tgraves@wsgr.com
        jbaskin@wsgr.com

Attorneys for Cross-Complainant
GOOGLE INC.

E-FILED
9/26/2016 3:27:37 PM
David H. Yamasaki
Chief Executive Officer/Clerk
Superior Court of CA,
County of Santa Clara
2014-1-CV-274103
Reviewed By:Rowena Walker

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

UNLIMITED JURISDICTION

| | |
|---|---|
| ELI ATTIA and ELI ATTIA ARCHITECT PC,<br><br>  Plaintiffs,<br><br>  v.<br><br>GOOGLE INC., FLUX FACTORY, INC., LARRY PAGE, SERGEY BRIN, SEBASTIAN THRUN, ERIC "ASTRO" TELLER, MICHELLE KAUFMANN, JENNIFER CARLILE, AUGUSTO ROMAN, NICHOLAS CHIM, and DOES 1-100,<br><br>  Defendants.<br>_____<br>GOOGLE INC.,<br><br>  Cross-Complainant,<br><br>  v.<br><br>ELI ATTIA ARCHITECT PC,<br><br>  Cross-Defendant.<br>_____ | CASE NO.:  114CV274103<br><br>Complaint Filed: December 5, 2014<br><br>**GOOGLE INC.'S CROSS-COMPLAINT AGAINST ELI ATTIA ARCHITECT PC**<br><br>**JURY TRIAL DEMANDED**<br><br>Dept.:   1<br>Judge:   Honorable Peter H. Kirwan |

For its Cross-Complaint against Plaintiff and Cross-Defendant Eli Attia Architect PC ("Contractor"), Defendant and Cross-Complainant Google Inc. ("Google") hereby alleges on personal knowledge as to itself and on information and belief as to others, as follows:

## INTRODUCTION

1. In their suit against Google and several of Google's current and former employees, Plaintiffs allege that Mr. Attia and Contractor created technology known as "Engineered Architecture," or "EA." After trying to work with Contractor for several months, Google realized that EA did not have a future.

2. Now, years later and with the backing of a litigation financing entity, Plaintiffs are using allegations about EA to pursue meritless trade secret and contract claims against Google and other defendants. Google brings this Cross-Complaint to protect its rights.

## PARTIES

3. Defendant and Cross-Complainant Google Inc. is a corporation organized under the laws of Delaware, and is headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

4. Plaintiff and Cross-Defendant Eli Attia Architect PC is a California Professional Corporation with its principal place of business located at 927 Industrial Avenue, Palo Alto, CA 94303. Plaintiff Eli Attia is the majority owner and principal of Eli Attia Architect PC.

## JURISDICTION AND VENUE

5. Jurisdiction over Contractor is proper because Contractor submitted itself to the jurisdiction of this Court with the filing of its complaint. Contractor is also a California Professional Corporation. In addition, the contract at issue in this case—to which Contractor is a party—was negotiated and executed in California. Contractor is therefore subject to at least specific jurisdiction in California.

6. Venue is proper in Santa Clara County because, pursuant to Code of Civil Procedure Section 428.10, this cross-complaint is brought in an action Plaintiffs filed against Google in this County.

7.    Venue is proper in this Court pursuant to California Code of Civil Procedure Section 395 because the contract at issue was made or to be performed in Santa Clara County; the parties either transact business, have an agent, or are found within the State of California, and more particularly, within Santa Clara County, and are within the jurisdiction of this Court; and the unlawful conduct alleged herein was carried out and/or had effects in the State of California, including Santa Clara County.

8.    Venue is proper in Santa Clara County because the contract at issue – specifically, Section 12.D of the Inbound Services Agreement between Google and Eli Attia Architect P.C. – states that the exclusive venue for any dispute related to the contract is Santa Clara County.

## BACKGROUND

### Google and Contractor Begin Discussions About a Potential Project

9.    In or about August 2010, Google began having discussions with Mr. Attia regarding his architecture work and the alleged "EA" concept.

10.    Google decided to explore potential development opportunities for a technology that, according to Mr. Attia, had the potential to significantly impact the world. This project was given the name "Genie."

### The Executed Inbound Services Agreement

11.    On January 12, 2011, Google and Contractor executed the Inbound Services Agreement ("ISA").   The ISA incorporated Statement of Work No. 1 for Project Genie ("SOW").  Mr. Attia signed the ISA and SOW on behalf of Contractor.  The ISA and SOW are valid and enforceable agreements between Google and Contractor.  Plaintiffs attached a copy of the ISA and the SOW as Exhibits 2 and 3 to their complaint in this action.

12.    Plaintiff Mr. Eli Attia is not a party to the ISA or SOW.

13.    The ISA states that it "supersedes any prior agreements or understandings between the parties" and "constitutes the entire Agreement between the parties related to this subject matter."

14.    The ISA addresses rights and obligations regarding certain categories of information, including:  (1) Contractor's information that already existed before the ISA was

executed; (2) information that is created for the first time after the ISA was executed; and (3) third party intellectual property.

15.     As to the first category—information that Contractor purportedly possessed before the ISA was executed—Contractor would continue to maintain any rights, if any, it held in such so-called "Pre-existing property." At the same time, however, Contractor was required to identify all such information to Google in the SOW which accompanied the ISA. Emphasizing this pre-identification requirement, the ISA insulated Google from liability for any such information that Contractor failed to identify in the SOW.

16.     To accomplish the identification requirement, Contractor provided an "Exhibit A" to the SOW which set forth all of the information Contractor claimed at the time the ISA was executed. That Exhibit A, a multi-page document listing various construction projects around the world, patent applications, and other materials, states that its contents constitute "Publicly available Pre-existing Property."  The SOW referred to this document as "Contractor's Pre-existing Property."

17.     As to the second category—new intellectual property created during performance of the ISA—Contractor agreed that anything it conceived (including by "any of its employees and agents") in connection with the services it was providing under the SOW would be owned by Google.  Contractor irrevocably assigned all such intellectual property rights to Google.

18.     As to the third category, the ISA placed strict limits on Contractor's ability to use any information owned by any third party when providing services to Google.   Contractor promised that it "will not bring to Google or use in providing the Services any materials or documents of another party considered confidential or proprietary without the written authorization of such party and Google."   The ISA likewise prohibited Contractor from "incorporat[ing] any proprietary information owned by Contractor or any third party into any Deliverable without Google's prior written permission."  "Deliverable" was broadly defined in the SOW as "any material(s) which Contractor provided, contributed to, collaborated on, or was involved with, while engaged by Google during the course of performing Services," and expressly included a proof of concept software system for Genie.

19.     The ISA states that "Contractor will defend and indemnify Google, its officers, directors, and employees from any claims and liabilities (i) related to any third party claim that the Services or any Deliverables infringe or misappropriate any third-party Intellectual Property Rights, (ii) arising from Contractor's breach of warranty, negligence, willful misconduct, fraud, misrepresentation, or violation of law . . . ."

## FIRST CROSS-CLAIM FOR RELIEF

### (Breach of Indemnity Clause by Google Against Eli Attia Architect PC)

20.     Google hereby incorporates Paragraphs 1 through 19, as alleged above.

21.     On or about January 12, 2011, Google and Eli Attia Architect, PC (Contractor) entered into the Inbound Services Agreement (ISA) with its related Statement of Work (SOW). Google has performed all conditions, covenants, and promises of the ISA and SOW, and/or its performance has been excused by the conduct of Contractor.

22.     The ISA states that "Contractor will defend and indemnify Google, its officers, directors, and employees from any claims and liabilities (i) related to any third party claim that the Services or any Deliverables infringe or misappropriate any third-party Intellectual Property Rights, (ii) arising from Contractor's breach of warranty, negligence, willful misconduct, fraud, misrepresentation, or violation of law. . . ."

23.     In the Third Amended Complaint, Plaintiff Attia, who is not a party to the ISA or SOW, alleges that the Google Defendants misappropriated Mr. Attia's trade secrets by using said trade secrets to continue Project Genie and by incorporating them into patent applications. This claim is "related to any third party claim that the Services or any Deliverables infringe or misappropriate any third-party Intellectual Property Rights," and Contractor must therefore defend and indemnify Google, its officers, directors, and employees.

24.     Additionally, and while Google disagrees that either Plaintiff owned trade secrets or that Google engaged in any wrongdoing, to the extent Contractor brought into Google and/or incorporated any intellectual property owned by Mr. Attia, in whole or in part, into any contract Deliverable or otherwise used such intellectual property in providing the Services, Contractor breached its representation and warranty in Section 6.C of the ISA that it would "not bring to

Google or use in providing the Services any materials or documents of another party considered confidential or proprietary without the written authorization of such party and Google." Contractor must therefore defend and indemnify Google, its officers, directors, and employees for any liabilities resulting from Contractor's breach of warranty.

25.     Google made a formal indemnity demand on Contractor on February 20, 2015. Contractor did not respond to this demand.  Contractor therefore has breached the indemnity requirement of the ISA, and thereby damaged Google in an amount that will be proven at trial.

### SECOND CROSS-CLAIM FOR RELIEF

### (Breach of Contract by Google Against Eli Attia Architect PC)

26.     Google hereby incorporates Paragraphs 1 through 25, as alleged above.

27.     Contractor represented and warranted in Section 6.C of the ISA that it would "not bring to Google or use in providing the Services any materials or documents of another party considered confidential or proprietary without the written authorization of such party and Google."  Contractor also represented and warranted in Section 6.B of the ISA that "[t]here exists no actual or potential conflict of interest concerning the Services."  Contractor also promised in Section 3 of the ISA that it would not incorporate any third party proprietary information into any Deliverable without Google's written authorization.

28.     Despite that promise, Plaintiffs allege that Mr. Attia, who is not a party to the ISA or SOW, incorporated his alleged trade secrets into the Genie proof-of-concept software. Plaintiffs additionally allege that the Google Defendants misappropriated Mr. Attia's trade secrets by using said trade secrets to continue Project Genie and by incorporating them into patent applications.  That is, Plaintiffs allege that Mr. Attia himself owns trade secrets, separate and apart from Contractor, they allege that Contractor brought into Google and incorporated Mr. Attia's alleged secrets into work for Google, and they allege that Google misappropriated Mr. Attia's alleged secrets.

29.     While Google disagrees that either Plaintiff owned trade secrets or other protectable information or that Google engaged in any wrongdoing, to the extent Contractor brought into Google and/or incorporated any intellectual property owned by Mr. Attia, in whole

or in part, into any contract Deliverable  or otherwise used such intellectual property in providing the Services, Contractor breached the ISA by bringing such materials into Google, by failing to request and receive Google's prior written permission for such commingling and/or incorporation of third party intellectual property, and on information and belief by failing to obtain a written authorization between Contractor and Mr. Attia.  Any such breach was material.

30.    Also to the extent Contractor brought into Google and/or incorporated any intellectual property owned by Mr. Attia, in whole or in part, into any contract Deliverable or otherwise used such intellectual property in providing the Services, Contractor breached the ISA by failing to report, identify, and/or mitigate the conflict of interest between its duties to Google under the ISA and its alleged use of intellectual property in which its principal had any separate interest.

31.    Also to that extent, Contractor's breach thereby injured Google by, among other things, forcing Google to needlessly incur costs to defend against claims for misappropriation of a third party's alleged trade secrets.  Google has suffered damages constituting the money it paid Contractor, to be proven at trial.

## **PRAYER FOR RELIEF**

Google request that the Court enter judgment as follows:

(1)    For judgment in favor of the Google;

(2)    For a determination that Contractor must indemnify Google and its officers, directors, and employees for all costs and fees associated with the defense of claims brought by Eli Attia, and an award of all such costs and fees;

(3)    For damages, together with pre-judgment and post-judgment interest;

(4)    For such other and further relief as this Court deems just and proper.

Dated:  September 26, 2016                Respectfully submitted,

                                                        WILSON SONSINI GOODRICH & ROSATI, P.C.

                                                        By: */s/ Charles T. Graves*
                                                        Charles T. Graves
                                                        *Attorneys for Cross-Complainant*
                                                        Google Inc.

**PROOF OF SERVICE**
*Eli Attia v. Google Inc., et al.*
**Santa Clara County Superior Court Case No. 1-14-cv-274103**

I, Regina C. Glynn, declare:

I am employed in the City and County of San Francisco, in the State of California.  I am over the age of 18 years and not a party to the within action.  My business address is Wilson Sonsini Goodrich & Rosati, P.C., One Market Plaza, Spear Tower, Suite 3300, San Francisco, CA  94105-1126.

On this date, I served the following document:

**GOOGLE INC.'S CROSS-COMPLAINT AGAINST ELI ATTIA ARCHITECT PC**

☑      By e-serving the above document through the Court's electronic service via selected vendor, One Legal:

| | |
|---|---|
| ERIC W. BUETHER | JAMIE L. DUPREE |
| Eric.Buether@BJCIPLaw.com | Email: jdupree@fddcm.com |
| CHRISTOPHER M. JOE | FUTTERMAN DUPREE DODD CROLEY |
| Chris.Joe@BJCIPLaw.com | MAIER LLP |
| BRIAN A. CARPENTER | 180 Sansome Street, 17th Floor |
| Brian.Carpenter@BJCIPLaw.com | San Francisco, CA  94104 |
| MARK D. PERANTIE | Telephone: (415) 399-3840 |
| Mark.Perantie@BJCIPLaw.com | Facsimile:  (415) 399-3838 |
| NIKY BUKOVCAN | |
| Niky.Bukovcan@BJCIPLaw.com | *Local Counsel for Plaintiffs* |
| MICHAEL D. RICKETTS | ELI ATTIA and ELI ATTIA ARCHITECT |
| Mickey.Ricketts@BJCIPLaw.com | P.C. |
| BUETHER JOE & CARPENTER, LLC | |
| 1700 Pacific Avenue, Suite 4750 | |
| Dallas, TX  75021 | |
| Telephone: (214) 466-1272 | |
| Facsimile:  (214) 635-1828 | |

*Attorneys for Plaintiffs*
ELI ATTIA and ELI ATTIA ARCHITECT
P.C.

KAREN I. BOYD
ESHA BANDYOPADHYAY
TURNER BOYD LLP
702 Marshall Street, Suite 640
Redwood City, CA  94063
Telephone: (650) 521-5930
Facsimile:  (650) 521-5931
Email: boyd@turnerboyd.com
        bandy@turnerboyd.com

*Attorneys for Defendants*
FLUX FACTORY, INC., MICHELLE
KAUFMANN, JENNIFER CARLILE,
AUGUSTO ROMAN, and NICHOLAS CHIM

ROWENA WALKER
Clerk, Complex Division
191 N. First Street
San Jose, CA  95113
Email:  rwalker@scscourt.org

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at San Francisco, California on September 26, 2016.

_____
Regina C. Glynn

# EXHIBIT K

1   BUETHER JOE & CARPENTER, LLC
    ERIC W. BUETHER (*Pro Hac Vice Admitted*)
2   Eric.Buether@BJCIPLaw.com
    CHRISTOPHER M. JOE (*Pro Hac Vice Admitted*)
3   Chris.Joe@BJCIPLaw.com
    BRIAN A. CARPENTER (CA SBN 262349)
4   Brian.Carpenter@BJCIPLaw.com
    MARK D. PERANTIE (*Pro Hac Vice Admitted*)
5   Mark.Perantie@BJCIPLaw.com
    NIKY BUKOVCAN (*Pro Hac Vice Admitted*)
6   Niky.Bukovcan@BJCIPLaw.com
    MICHAEL D. RICKETTS (*Pro Hac Vice Admitted*)
7   Mickey.Ricketts@BJCIPLaw.com
    1700 Pacific Avenue, Suite 4750
8   Dallas, Texas 75201
    Telephone:  (214) 466-1272
9   Facsimile:  (214) 635-1828
    *Attorneys for Plaintiffs*
10  ELI ATTIA AND ELI ATTIA ARCHITECT PC

11  FUTTERMAN DUPREE DODD CROLEY MAIER LLP
    JAMIE L. DUPREE (158105)
12  180 Sansome Street, 17th Floor
    San Francisco, California 94104
13  Telephone:  (415) 399-3840
    Facsimile:  (415) 399-3838
14  jdupree@fddcm.com
    *Local Counsel for Plaintiffs*
15  ELI ATTIA AND ELI ATTIA ARCHITECT PC

16               **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

17                   **FOR THE COUNTY OF SANTA CLARA**

18  MAX SOUND CORPORATION, ELI ATTIA,          Case No. 1:14-cv-274103
    AND ELI ATTIA ARCHITECT PC,
19
                    Plaintiffs,                **PLAINTIFF'S ANSWER TO GOOGLE**
20                                             **INC.'S CROSS-COMPLAINT AGAINST**
            v.                                 **ELI ATTIA ARCHITECT PC**
21  GOOGLE, INC., FLUX FACTORY, INC.,
    LARRY PAGE, SERGEY BRIN,
22  SEBASTIAN THRUN, ERIC "ASTRO"              Department:        1
    TELLER, MICHELLE KAUFMANN,                 Hearing Judge:     Hon. Peter H. Kirwan
23  JENNIFER CARLILE, AUGUSTO ROMAN,           Trial Date:        None set
    NICHOLAS CHIM, AND DOES 1-100,
24
                    Defendants.
25  GOOGLE INC.,

                    Cross-Complainant,
26
            v.
27  ELI ATTIA ARCHITECT PC,

28                  Cross-Defendant.

E-FILED
10/26/2016 12:27:25 PM
David H. Yamasaki
Chief Executive Officer/Clerk
Superior Court of CA,
County of Santa Clara
2014-1-CV-274103
Reviewed By:Rowena Walker

Plaintiff/Cross-Defendant Eli Attia Architect PC ("Attia") answers the allegations of Defendant/Cross-Complainant Google Inc.'s ("Google") Cross-Complaint against it filed on September 26, 2016 (the "Cross-Complaint").  Except to the extent explicitly admitted herein, each and every allegation of the Cross-Complaint is denied.

## GENERAL DENIAL

Pursuant to Code of Civil Procedure section 431.30, Attia generally and specifically denies each and every allegation contained in the Cross-Complaint, denies that Google has been damaged in any amount, by reason of any act or omission by Attia, and further denies that Google is entitled to any relief whatsoever.

## AFFIRMATIVE DEFENSES

The recitation of any defense as an "affirmative" defense does not mean that Attia contends that the defense is in fact an affirmative defense under California law or that Attia bears the burden of proof.

### FIRST AFFIRMATIVE DEFENSE
### (Unclean Hands)

The Cross-Complaint and each cause of action asserted therein, are barred in whole or in part by the equitable doctrine of unclean hands.  Google's hands are unclean because it materially breached the underlying agreements with Plaintiffs first and cannot now claim the benefit of any term of the agreements after its material breaches.  Google's conduct so infects its cross-claims that to permit Google to take action against Attia given its unclean hands would be inequitable.

### SECOND AFFIRMATIVE DEFENSE
### (Excuse, Discharge and Cancellation due to Prior Material Breach)

The Cross-Complaint and each cause of action asserted therein, are barred by the doctrines of excuse, discharge and cancellation due to Google's prior material breach of its agreements with Plaintiffs.  Google materially breached its agreements with Attia.  Attia had substantially complied with its obligations under the agreements.  Due to such breaches, Google can no longer claim that Attia is obligated to it under any term of the agreements.

///

1

### THIRD AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

The Cross-Complaint and each cause of action asserted therein, are barred by Google's failure to take reasonable efforts to mitigate damages or injury, if any, that would have prevented (or at a minimum, substantially reduced) its alleged injury.  By way of example, Google breached its agreements with Plaintiffs, thus causing damage and injury to Plaintiffs.  Had Google not breached its agreements with Plaintiffs, Plaintiffs would have had no cause of action against Google, and Google could not assert any cause of action whatsoever against Attia.

### FOURTH AFFIRMATIVE DEFENSE
### (Limited Liability/Damages Cap)

The Cross-Complaint and each cause of action asserted therein, are barred by a contractual limitation on liability.

### FIFTH AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

The Cross-Complaint and each cause of action asserted therein, are barred by the doctrine of unjust enrichment.  Google breached its agreements with Plaintiffs.  To permit Google to avoid the consequence of paying damages for its breaches by permitting it to allege that Attia should reimburse Google for the damages and injury caused by Google on Plaintiffs, would unjustly reward Google for its breaches and is not a remedy to which Google is entitled.

### SIXTH AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

Neither the Cross-Complaint, nor the causes of action alleged therein, state facts sufficient to constitute a cause of action upon which relief can be granted against Attia.

### SEVENTH AFFIRMATIVE DEFENSE
### (Frustration of Purpose)

The Cross-Complaint and each cause of action asserted therein, are barred by the doctrine of frustration of purpose.  Google's desired determination of indemnification by Attia would frustrate the very purpose of the agreements at issue.

## EIGHTH AFFIRMATIVE DEFENSE
### (Set Off and Recoupment)

Any damages which Google suffered, which damages are specifically denied, must be reduced by virtue of set-off and recoupment as a result of Google's dishonesty, willful conduct or negligence that caused damage to Attia.

## NINTH AFFIRMATIVE DEFENSE
### (Waiver and Estoppel)

The Cross-Complaint and each cause of action asserted therein, are barred by the doctrines of waiver and estoppel.  Google made representations to Attia, upon which Attia relied, and Google has failed to honor those representations and is suing Attia.

## TENTH AFFIRMATIVE DEFENSE
### (Reservation of Defenses)

Attia may have additional, as yet unidentified, defenses available.  Attia reserves the right to assert additional applicable defenses that are revealed by further discovery and investigation in this action.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Attia requests that the Court enter judgment on Google' Cross-Complaint as follows:

1.      That Google take nothing from Attia by its Cross-Complaint;

2.      That judgment be rendered in favor of Attia;

//
//
//
//
//
//
//

3.      That Attia be awarded its costs, attorneys' fees, expert witness fees, and court hearing costs to the fullest extent allowed by law; and

4.      For such other and further relief as this Court deems just and proper.

Dated:  October 26, 2016

**BUETHER JOE & CARPENTER, LLC**

*/s/ Eric W. Buether*
Eric W. Buether
Christopher M. Joe
Brian A. Carpenter
Mark A. Perantie
Niky Bukovcan
Michael D. Ricketts
1700 Pacific Avenue, Suite 4750
Dallas, TX  75201
(214) 466-1271
(214) 635-1827 – Fax

Jamie L. Dupree (#158105)
**FUTTERMAN DUPREE DODD CROLEY MAIER LLP**
180 Sansome Street, 17th Floor
San Francisco, CA  94104
(415) 399-3840
(415) 399-3838 – Fax

*Attorneys for Plaintiffs*
ELI ATTIA AND ELI ATTIA ARCHITECT PC

**PROOF OF SERVICE**

The undersigned hereby certifies as follows:

I am an employee of the law firm of Futterman Dupree Dodd Croley Maier LLP, 180 Sansome Street, 17th Floor, San Francisco, CA  94104.  I am over the age of 18 and not a party to the within action.

I am readily familiar with the business practice of Futterman Dupree Dodd Croley Maier LLP for the collection and processing of correspondence.

On October 26, 2016, I served a copy of the following document(s):

**PLAINTIFF'S ANSWER TO GOOGLE INC.'S CROSS-COMPLAINT AGAINST ELI ATTIA ARCHITECT PC**

Pursuant to the ordinary business practice of this office in the manner and/or manners described below to each of the parties herein and addressed as follows:

 X    BY ELECTRONIC SERVICE:  In the ordinary course of business, the foregoing document(s) were electronically served on all parties and counsel registered with Odyssey eFile CA as designated on the Transaction Receipt available on the Odyssey eFile CA website.

| | |
|---|---|
| David H. Kramer | Esha Bandyopadhyay |
| dkramer@wsgr.com | bandy@turnerboyd.com |
| Charles T. Graves | Karen I. Boyd |
| tgraves@wsgr.com | boyd@turnerboyd.com |
| Wilson Sonsini Goodrich & Rosati | Joshua Masur |
| Professional Corporation | masur@turnerboyd.com |
| 650 Page Mill Road | Turner Boyd LLP |
| Palo Alto, CA  84304-1050 | 702 Marshall Street, Suite 640 |
| Telephone:  (650) 493-9300 | Redwood City, CA  94063 |
| Facsimile:  (650)493-6811 | Telephone:  (650) 521-5930 |
| *Attorneys for Defendants Google, Inc.; Larry Page; Sergey Brin; Sebastian Thrun; and Eric "Astro" Teller* | Facsimile:  (650) 521-5931 |
| | *Attorneys for Defendants Flux Factory, Inc.; Michelle Kaufmann; Jennifer Carlile; Augusto Roman; and Nicholas Chim* |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on October 26, 2016 at San Francisco, California.

/s/ Gabrielle Barnett
Gabrielle Barnett

# EXHIBIT L

**E-FILED**
**10/4/2017 3:46 PM**
**Clerk of Court**
**Superior Court of CA,**
**County of Santa Clara**
**2014-1-CV-274103**
**Reviewed By: R. Walker**

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| ELI ATTIA, et al., | Case No.: 2014-1-CV-274103 |
| Plaintiffs, | **ORDER AFTER HEARING ON** |
| | **SEPTEMBER 15, 2017** |
| vs. | |
| | **Plaintiffs' Motion for Leave to File a** |
| GOOGLE, INC., et al., | **Fourth Amended Complaint** |
| Defendants. | |

The above-entitled matter came on regularly for hearing on Friday, September 15, 2017 at 9:00 a.m. in Department 19 (Complex Civil Litigation), the Honorable Peter H. Kirwan presiding. A tentative ruling was issued by the Court on September 14, 2017. The appearances are as stated in the record. Following the hearing, the Court directed the parties to submit supplemental briefing addressing certain issues, which they filed on September 29 and October 2, 2017. Having now reviewed and considered all of the written submissions of all parties, having heard and considered the oral argument of counsel, and being fully advised, the Court orders as follows:

This is an action for misappropriation of trade secrets and related causes of action. Currently before the Court is a motion by plaintiffs Eli Attia ("Attia") and Eli Attia Architect

*Eli Attia, et al. v. Google, Inc., et al.,* Superior Court of California, County of Santa Clara, Case No. 2014-1-CV-274103
*Order After Hearing On September 15, 2017 [Plaintiffs' Motion for Leave to File a Fourth Amended Complaint]*

1

1   PC to file a fourth amended complaint ("4AC"), which would assert new claims under the

2   federal Racketeer Influenced and Corrupt Organizations Act ("RICO") based on an alleged

3   pattern of trade secret misappropriation by defendants. Defendants Google, Inc., Larry Page,

4   Sergey Brin, Sebastian Thrun, and Eric "Astro" Teller (collectively, the "Google Defendants")

5   oppose the motion.

6   Defendants Flux Factory, Inc., Michelle Kaufmann, Jennifer Carlile, Augusto Roman,

7   and Nicholas Chim (collectively the "Flux Factory Defendants") move to join in the Google

8   Defendants' opposition, and their request for joinder is GRANTED.

9

10   I. Factual and Procedural Background

11   In the operative third amended complaint ("TAC"), plaintiffs allege that Attia is one of

12   the world's leading and most innovative architects. (TAC, ¶ 1.) Attia has spent the last 50

13   years creating a game-changing new technology that can fundamentally impact the way

14   buildings are created, which is called "Engineered Architecture" or "EA." (*Ibid.*)

15   In 2009, Attia began looking for a partner, and on or about July 25, 2010, he was

16   approached by Google X, an affiliate of defendant Google, Inc. ("Google"), through defendant

17   Teller. (TAC, ¶¶ 24-26.) On or about August 8, 2010, Google proposed and executed with

18   Attia a Non-Disclosure Agreement ("NDA") permitting Google to use confidential information

19   received from Attia to facilitate technical discussions concerning existing or future product

20   development efforts by the parties. (*Id*. at ¶ 27.) Google also induced Attia to relocate with

21   his family to Palo Alto in late 2010 so that he could work at Google's Mountain View

22   headquarters. (*Id*. at ¶ 28.)

23   On January 12, 2011, Attia entered into an Inbound Services Agreement ("ISA") and an

24   associated Statement of Work ("SOW"), in which Google acknowledged that its efforts to

25   develop a software system implementing EA, dubbed the "Genie Project," "was inspired by

26   [Attia's] experience and Pre-Existing Intellectual Property." (TAC, ¶¶ 30, 36-37.) Exhibit A

27   to the SOW describes certain of Attia's proprietary information and identifies documents that

28   contain his proprietary information, including "[a]ll presentations & brochures," notes, emails,

*Eli Attia, et al. v. Google, Inc., et al., Superior Court of California, County of Santa Clara, Case No. 2014-1-CV-274103
Order After Hearing On September 15, 2017 [Plaintiffs' Motion for Leave to File a Fourth Amended Complaint]*

2

1  patents, and "other related intellectual property developed as of the SOW Effective Date." (*Id.*

2  at ¶ 37.) Under the ISA, any "invention, improvement, development, concept, discovery or

3  other proprietary information" that Attia had an interest in before January 12, 2011 remained

4  his property. (*Ibid.*)

5        During the negotiations regarding the ISA and SOW, Google made a request for a non-

6  exclusive, royalty-free, perpetual, irrevocable, worldwide license, which was rejected, and then

7  proposed a royalty for a non-exclusive license, which was also rejected; ultimately, Attia

8  agreed to provide a "non-commercial" and nonexclusive license to use the proprietary

9  information only until "June 31 [*sic*], 2011." (TAC, ¶ 38.) The SOW provided that if the

10 program was successful and any of Attia's Pre-Existing Property was used to develop Genie,

11 "Google, in its sole discretion, will consider seeking an exclusive license and will make

12 reasonable efforts to negotiate for a license to a portion or all of the Pre-existing Property at

13 mutually agreed upon price and terms." (*Id.* at ¶ 39.)

14       Google was so satisfied with the viability of Attia's Engineered Architecture

15 technology that it applied to the United States Patent and Trademark Office for patents

16 containing numerous claims reciting Attia's Pre-existing Property, including his Engineered

17 Architecture trade secrets disclosed pursuant to the NDA and the ISA/SOW. (TAC at ¶ 46.)

18 However, defendants plotted to squeeze Attia out of the project and misappropriate his Pre-

19 existing Property, including his EA secrets. (*Id.* at ¶ 53.) Google pretended to kill the Genie

20 Project to give Attia the false impression that it was not planning to misappropriate his Pre-

21 existing Property. (*Id.* at ¶ 57.) But rather than shutting down Project Genie, Google was

22 surreptitiously taking steps to develop and promote Genie further, which Attia discovered in

23 mid-December of 2011. (*Id.* at ¶¶ 58-60.) Google spun off Project Genie into a new company,

24 defendant Flux Factory, Inc. ("Flux Factory"), which was co-founded and is headed by

25 defendants and former Project Genie team members Kaufmann, Carlile, Roman, and Chim.

26 (*Id.* at ¶¶ 67, 69.) Flux Factory is simply a reconstitution of Project Genie under a different

27 name. (*Id.* at ¶ 69.)

28 / / /

*Eli Attia, et al. v. Google, Inc., et al., Superior Court of California, County of Santa Clara, Case No. 2014-1-CV-274103 Order After Hearing On September 15, 2017 [Plaintiffs' Motion for Leave to File a Fourth Amended Complaint]*

3

The Google Defendants had the obligation to negotiate a license to use Attia's Pre-existing Property, including his Engineered Architecture trade secrets, and fairly compensate Attia if they wanted to continue using it. (TAC, ¶ 76.) But they refused to do so and intentionally misappropriated Attia's proprietary Engineered Architecture invention. (*Ibid.*)

Based on these allegations, the TAC sets forth the following causes of action: (1) misappropriation of trade secrets (by Attia against all defendants); (2) breach of the ISA/SOW (by plaintiffs against Google); and (3) declaratory relief (by plaintiffs against all defendants).

Plaintiffs filed this action on December 5, 2014. After the Court granted plaintiffs' unopposed motion to file a first amended complaint, the Google Defendants demurred to each cause of action asserted in that pleading and moved to strike plaintiffs' request for punitive damages. On February 1, 2016, the Court issued an order sustaining the demurrer with leave to amend as to the claim for trade secret misappropriation and without leave to amend as to a claim for breach of the NDA; overruling the demurrer as to the claims for breach of the ISA and declaratory relief; and granting the motion to strike without leave to amend. Plaintiffs filed a second amended complaint, and on August 22, 2016, the Court overruled defendants' demurrer to that pleading and granted in part their motion to strike certain allegations from it. Plaintiffs subsequently filed the TAC, and defendants answered.

Fact discovery opened on May 12, 2017. The parties stipulated to a case schedule, which was adopted by order of the Court on June 9, 2017. The scheduling order provides that September 15, 2017—the date of the hearing on this matter—is the deadline for "substantial completion of document production," as well as for amending the pleadings. February 16, 2018 is the deadline to complete fact discovery, and May 18, 2018 is the deadline to complete expert discovery. Trial is scheduled for September 2018.

## II. Legal Standard

Section 473, subdivision (a)(1) of the Code of Civil Procedure states in pertinent part: "[t]he court may ... , in its discretion after notice to the adverse party, allow, upon any terms as

*Eli Attia, et al. v. Google, Inc., et al., Superior Court of California, County of Santa Clara, Case No. 2014-1-CV-274103 Order After Hearing On September 15, 2017 [Plaintiffs' Motion for Leave to File a Fourth Amended Complaint]*

4

may be just, an amendment to any pleading or proceeding in other particulars ...." (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 76.) In considering a motion for leave to amend, "courts are bound to apply a policy of great liberality in permitting amendments to the complaint at any stage of the proceedings, up to and including trial." (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761.) "[I]t is a rare case" in which a court will be justified in denying a party leave to amend his pleadings. (*Morgan v. Superior Court (Morgan)* (1959) 172 Cal.App.2d 527, 530.) "If the motion to amend is timely made and the granting of the motion will not prejudice the opposing party, it is error to refuse permission to amend and where the refusal also results in a party being deprived of the right to assert a meritorious cause of action or a meritorious defense, it is not only error but an abuse of discretion." (*Ibid.*)

While often paramount, the policy of liberality in permitting amendments should be applied only where no prejudice is shown to the adverse party. (*Atkinson v. Elk Corp.*, *supra*, 109 Cal.App.4th at p. 761.) Where an amendment would require substantial delay in the trial date and substantial additional discovery; would change not only the specific facts and causes of action pled, but the tenor and complexity of the complaint as a whole; and where no reason for the delay in seeking leave to amend is given, refusal of leave to amend is not an abuse of discretion. (See *Magpali v. Farmers Group* (1996) 48 Cal.App.4th 471, 486-488 [affirming denial of request to amend made during trial].) "Even if a good amendment is proposed in proper form, unwarranted delay in presenting it may – of itself – be a valid reason for denial," which "may rest upon the element of lack of diligence in offering the amendment after knowledge of the facts, or the effect of the delay on the adverse party." (*Roemer v. Retail Credit Co.* (1975) 44 Cal.App.3d 926, 939-940 [trial court appropriately denied request to amend answer made during trial]; see also *P & D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1345 [plaintiff did not seek leave to amend until after the trial readiness conference, amendment would require additional discovery and might prompt a demurrer or other pretrial motion, and plaintiff's explanation for the delay was inadequate].)

/ / /

/ / /

*Eli Attia, et al. v. Google, Inc., et al., Superior Court of California, County of Santa Clara, Case No. 2014-1-CV-274103 Order After Hearing On September 15, 2017 [Plaintiffs' Motion for Leave to File a Fourth Amended Complaint]*

5

III. Analysis

Plaintiffs seek to add several pages of allegations regarding other instances where defendants were accused of trade secret misappropriation, in order to support proposed claims for racketeering against Google, Larry Page, and Sergey Brin (18 U.S.C. § 1962(b) and (c)) and associated claims for conspiracy against all defendants (18 U.S.C. § 1962(d)). The proposed allegations pertain to technologies unrelated to those involved in this action, to which plaintiffs have no connection. The events at issue gave rise to six other lawsuits against Google, dating from 2004 to the present. Five of these lawsuits were resolved in Google's favor (although not necessarily on the merits), while one is ongoing in the United States District Court for the Northern District of California.[1]

A. Plaintiffs' Investigation and the Timing of Their Request to Amend

In his original declaration filed in support of plaintiffs' motion, plaintiffs' counsel stated that the investigation into these new claims "began after the Court entered its order on August 22, 2016, denying Defendants' third demurrer" and "took approximately four to five months."[2] Plaintiffs consulted with Professor Robert G. Blakely, who was involved in drafting RICO. After completing their investigation, which involved searching publicly-available materials "including publications, court records, other lawsuits against Google and the results of various government investigations relating to Google's misappropriation of intellectual property," plaintiffs determined that there was "a pattern of conduct by Defendants that was substantially similar to the facts underlying the Attias' claim for misappropriation of trade secrets." Counsel indicated that plaintiffs waited to develop their potential RICO claims until the pleadings on their original claims were resolved: "Before asserting the proposed RICO claims, Plaintiffs needed the Court to dispose of Defendants' multiple demurrers challenging

---

[1] In addition, plaintiffs propose allegations regarding regulatory investigations of Google for antitrust and other potential violations, concerning technologies unrelated either to this action or to the six other actions discussed in the 4AC. The relevance of these allegations to the proposed RICO claims is not apparent to the Court.

[2] According to defendants, the federal Defend Trade Secrets Act ("DTSA") took effect on May 11, 2016; at this time, criminal trade secret theft became a RICO predicate act. Plaintiffs did not discuss this new law or indicate when they became aware of it and its potential impact on this case in their moving or reply papers. At the hearing on this matter, plaintiffs' counsel indicated that, while counsel was aware of the DTSA, they did not believe it would impact the case until they learned of an alleged pattern and practice of trade secret misappropriation by Google.

1 | the legal validity of their claims ... for misappropriation of Plaintiffs' trade secrets," since the
2 | viability of plaintiffs' own trade secret claims is "a key predicate" to any RICO causes of
3 | action.

4 | In their opposition, defendants noted that four to five months after August 2016 is, at
5 | the latest, January 2017, but plaintiffs did not file the instant motion until July 25, 2017.
6 | Plaintiffs did not address this gap in their timeline in either their moving or reply papers. At
7 | the hearing, counsel offered a different account of the events surrounding plaintiffs'
8 | investigation, stating that the investigation actually did not begin until April of 2017 and
9 | concluded in or around June of 2017. Counsel stated that plaintiffs were unaware of their
10 | potential RICO claims until attorneys not associated with this case raised this possibility to
11 | plaintiffs' representative in light of similarities to another case involving Google.

12 | The Court is unable to reconcile these descriptions of plaintiffs' investigation.
13 | Counsel's declaration indicated that plaintiffs intentionally waited until defendants' challenges
14 | to their original claims were resolved to begin to investigate potential RICO claims. But at the
15 | hearing, counsel stated that plaintiffs were not even aware of the potential to allege RICO
16 | claims until sometime around April of 2017—eight months after the motions challenging the
17 | original claims were resolved. Counsel's declaration stated that the investigation took four or
18 | five months, but at the hearing he stated that the investigation lasted from April to June of this
19 | year—three months, at most. Further, counsel never addressed another of the Court's
20 | concerns: why plaintiffs did not inform defendants and the Court of their potential RICO
21 | claims when the scheduling order for this action was negotiated and entered earlier this year.
22 | Even if the Court were to accept plaintiffs' new timeline, the scheduling order was entered in
23 | June. By then, plaintiffs must have known that the scheduling order would be rendered
24 | obsolete if they were permitted to file their amendment, but they failed to give defendants or
25 | the Court notice of their plan.

26 | "The law is well settled that a long deferred presentation of the proposed amendment
27 | without a showing of excuse for the delay is itself a significant factor to uphold the trial court's
28 | denial of the amendment." (*Leader v. Health Industries of America, Inc.* (2001) 89

Cal.App.4th 603, 613, internal citations and quotations omitted.) "The law is also clear that even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial." (*Ibid.*) While it is unusual to deny leave to amend a year before trial, the Court does have discretion in this situation, and plaintiffs' unwarranted delay in seeking leave to amend weighs in favor of exercising it. (See *Fisher v. Larsen* (1982) 138 Cal.App.3d 627, 649 [court was within its discretion to deny leave to amend following summary judgment where a five-month delay in offering the amendment was unexplained]; *Leader v. Health Industries of America, Inc., supra,* 89 Cal.App.4th at p. 614 [leave to amend was appropriately denied where action had been pending for nearly six years, demurrers to third amended complaint had been sustained, and plaintiffs sought leave to amend a month after the deadline to amend had passed].)

### B. Prejudice to Defendants

In its tentative ruling and at the hearing on this matter, the Court expressed its concerns regarding plaintiffs' delay in seeking leave to amend and the prejudice that defendants would inevitably experience in conducting and providing new, expansive discovery on the proposed RICO claims while preparing the original claims for trial in September 2018. In addition, defendants maintain that the proposed RICO claims do not state a cause of action, and indicate that they will challenge these claims by demurrer if amendment is permitted.

To address these concerns, plaintiffs have proposed that the Court bifurcate the trial in this action so that the RICO claims are tried after the other claims, and stay all discovery on the RICO claims until the original claims are resolved. This proposal eliminates most of the prejudice that defendants would experience if amendment is permitted. While defendants would still have to engage in motion practice on the RICO pleadings, issue litigation holds, and begin some internal investigation of the RICO claims, this is relatively minor prejudice in the context of a complex action like this one.[3] Defendants also contend that they will be

---

[3] In their supplemental opposition papers, defendants make no attempt to quantify the time or cost involved in these specific efforts, instead focusing on the burden they would incur in conducting discovery and taking the RICO claims to trial. The Flux Factory Defendants argue in their supplemental opposition papers that they are experiencing a range of financial, business, and reputational harms as a result of this litigation, and that these harms

1   prejudiced by the further passage of time since the predicate events alleged in support of the

2   RICO claims.  While the Court acknowledges this point, the passage of time will impact

3   plaintiffs as well.  On balance, the Court finds that the prejudice to defendants will be

4   relatively limited by plaintiffs' proposal.

5        C.  Conclusion

6        While the Court is unsatisfied by plaintiffs' explanation for the delay in offering their

7   proposed amendment and sensitive to the impact on defendants, "courts are bound to apply a

8   policy of great liberality in permitting amendments to the complaint at any stage of the

9   proceedings, up to and including trial." (*Atkinson v. Elk Corp.*, *supra,* 109 Cal.App.4th at

10   p. 761.)  Because plaintiffs' proposal to bifurcate trial and stay discovery on the RICO claims

11   until the other claims are resolved minimizes the prejudice to defendants, the Court will

12   exercise its discretion to permit the amendment on this condition.

13

14   IV.  Order

15        The motion for leave to file the 4AC is GRANTED, and the 4AC is deemed filed and

16   served.  Discovery on plaintiffs' RICO claims is stayed.  The parties shall appear for a case

17   management conference on OCTOBER 27, 2017 at 9 a.m. in Department 19 to address the

18   bifurcation and scheduling of the trial on the RICO claims and the briefing schedule for

19   demurrers to the 4AC.

20

21   Dated: _____

                                            Honorable Peter H. Kirwan

22                                               Judge of the Superior Court

23

24

25

26

27

28   would increase as a result of adding RICO claims to the case.  While the Court is sympathetic to these issues, they are often inherent in the litigation process and do not constitute the type of unfair prejudice that would support denying plaintiffs' motion.

# EXHIBIT M

1   BUETHER JOE & CARPENTER, LLC
    ERIC W. BUETHER *(admitted pro hac vice)*
2   Eric.Buether@BJCIPLaw.com
    CHRISTOPHER M. JOE *(admitted pro hac vice)*
3   Chris.Joe@BJCIPLaw.com
    BRIAN A. CARPENTER (CA SBN 262349)
4   Brian.Carpenter@BJCIPLaw.com
    NIKY BUKOVCAN *(admitted pro hac vice)*
5   Niky.Bukovcan@BJCIPLaw.com
    MICHAEL D. RICKETTS *(admitted pro hac vice)*
6   Mickey.Ricketts@BJCIPLaw.com
    1700 Pacific Avenue, Suite 4750
7   Dallas, Texas 75201
    Telephone:  (214) 466-1271
8   Facsimile:  (214) 635-1827

9   *Attorneys for Plaintiffs*
    ELI ATTIA AND ELI ATTIA ARCHITECT PC
10

    FUTTERMAN DUPREE DODD CROLEY MAIER LLP
11  JAMIE L. DUPREE (158105)
    180 Sansome Street, 17th Floor
12  San Francisco, California 94104
    Telephone:  (415) 399-3840
13  Facsimile:  (415) 399-3838
    jdupree@fddcm.com
14

    *Local Counsel for Plaintiffs*
15  ELI ATTIA AND ELI ATTIA ARCHITECT PC

16              SUPERIOR COURT FOR THE STATE OF CALIFORNIA

17                 FOR THE COUNTY OF SANTA CLARA

18                      UNLIMITED JURISDICTION

| | |
|---|---|
| 19   Eli Attia and Eli Attia Architect PC, | Case No. 1:14-cv-274103 |
| 20                       Plaintiffs, | **FOURTH AMENDED COMPLAINT**<br>**1.  MISAPPROPRIATION OF TRADE** |
| 21            v. | **SECRETS**<br>**2.  BREACH OF CONTRACT (ISA/SOW)** |
| 22   Google, Inc., Flux Factory, Inc., Larry Page,<br>Sergey Brin, Sebastian Thrun, Eric "Astro" | **3.  DECLARATORY RELIEF**<br>**4.  RACKETEERING (18 U.S.C. §§ 1961, *ET*** |
| 23   Teller, Michelle Kaufmann, Jennifer Carlile,<br>Augusto Roman, Nicholas Chim, and DOES | ***SEQ.*)** |
| 24   1-100,<br>                       Defendants. | |
| 25 | |
| 26 | |

27

28

Plaintiffs Eli Attia ("Mr. Attia") and Eli Attia Architect PC ("Attia PC") (collectively, "Plaintiffs") file this Fourth Amended Complaint against Defendants Google, Inc., Flux Factory, Inc., Larry Page, Sergey Brin, Sebastian Thrun, Eric "Astro" Teller, Michelle Kaufmann, Jennifer Carlile, Augusto Roman, Nicholas Chim, and DOES 1-100 (collectively, the "Google Defendants" or "Individual Google Defendants", as appropriate):

## I.    INTRODUCTION

1.     Eli Attia is one of the world's leading and most innovative architects.  Mr. Attia has spent the last 50 years creating a game-changing new technology that can fundamentally change the way buildings are created.  He has named this revolutionary technology "Engineered Architecture" or "EA."  Mr. Attia's EA proprietary technology enables the creation of buildings of all types and sizes, that are more sustainable and of better quality, in substantially less time and at a greatly reduced cost compared to what is currently possible.

2.     Defendant Google, Inc. ("Google"), through its secretive research arm Google X, stole and exploited for its own benefit Mr. Attia's trade secrets and other proprietary information regarding the revolutionary Engineered Architecture process.  In 2010, Google learned about Mr. Attia's Engineered Architecture concept and recognized the enormous value inherent in it. A senior Google executive approached Mr. Attia about working with Google to develop the technology.  Google induced Mr. Attia to describe to Google personnel his trade secrets and valuable know-how regarding the Engineered Architecture technology by agreeing to a non-disclosure agreement.   Google, after deciding that Mr. Attia's Engineered Architecture proprietary technology had substantial potential, agreed to engage Mr. Attia for a period of months during which Google would provide to him the software engineers and the resources he needed to prove the technology's viability and the industry's likelihood of acceptance of the technology.  In exchange, Mr. Attia agreed to consult with Google personnel and share further details regarding his proprietary Engineered Architecture technology for limited purpose of validating the viability of his invention.  Based out of Google's secretive Google X development lab, this project became known as "Project Genie."

///

3.     Mr. Attia then worked with Google on Project Genie to educate Google about his proprietary ideas and techniques so they could develop a working proof of concept of his Engineered Architecture technology, and introduced Google to industry leaders so Google could gauge the industry's acceptance of the technology.  Google promised Mr. Attia that, if Google determined that proof of the concept of Engineered Architecture was successful, Google would compensate Mr. Attia for its use of Mr. Attia's trade secrets and other proprietary technology, and would negotiate a new agreement with Mr. Attia for him to continue to provide consulting services for the development of Project Genie.

4.     Then, making a mockery of its professed "Don't be evil" code of conduct, Google reneged on its promises to Mr. Attia and stole his Engineered Architecture trade secrets and other proprietary technology.  The Google Defendants pumped Mr. Attia for his trade secrets and other proprietary technology regarding the Engineered Architecture technology and then, after validating the viability of the technology, they squeezed Mr. Attia out of the project that Google acknowledged he inspired.  The Google Defendants then proceeded to develop and exploit Mr. Attia's trade secrets and other proprietary technology for their own benefit, picking for themselves the fruit of Mr. Attia's life work.

5.     Google, realizing that the trade secrets and proprietary information they had taken from Mr. Attia were sure to yield unprecedented results, decided that Project Genie could be successful enough to operate as its own company.  Google prepared an Executive Summary of its positive assessment of the Engineering Architecture technology stating that Google could build a business that would yield $120 billion a year and distributed the document to induce the world's largest venture capital firms to invest at least 39.3 million dollars of investment capital in the commercialization of the Engineering Architecture technology.  These venture capital investors included Borealis Ventures, Andreesen Horowitz, Obvious Ventures, South Park Ventures, Far East Ventures, Sj, DFJ and Google Ventures. Google spun-off Project Genie into a new company initially called Vannevar Technology and then renamed Flux Factory, Inc. Flux Factory was co-founded and is operated by former Project Genie team members Astro Teller, Nicholas Chim, Michelle Kaufmann, Jennifer Carlile, and Augusto Roman, with whom Mr.

Attia had entrusted his valuable Engineered Architecture trade secrets and proprietary information.  Defendant Teller now sits as chairman of the board of Flux Factory. Flux Factory currently sells the Flux Metro Austin Preview service on its website, embodying features of the Engineered Architecture technology, thereby profiting from Mr. Attia's trade secrets and proprietary information and Google's betrayal of his trust.  Flux Factory is now reported to have at least 800 employees and has been growing rapidly.

6.      The Google Defendants callously consumed years of Mr. Attia's life, preventing him from developing the Engineered Architecture technology on his own or with others.  In the process, the Google Defendants have undermined Mr. Attia's goal of providing humanity with the efficient, sustainable structural design technology it urgently needs.  Google's scheme to misappropriate and exploit Mr. Attia's trade secrets and other proprietary technology was implemented and approved by those serving at Google's highest echelons, including Google's founders Larry Page and Sergey Brin.

7.      Plaintiffs bring this action against the Google Defendants to seek redress for their misappropriation of Mr. Attia's life's work.

## II.     PARTIES, JURISDICTION, AND VENUE

8.      Plaintiff Eli Attia is an individual who resides in Cold Springs, New York.

9.      Plaintiff Eli Attia Architect PC is a California Professional Corporation with its principal place of business located at 927 Industrial Avenue, Palo Alto, CA, 94303.  Eli Attia is the majority owner and principal of Eli Attia Architect PC.

10.     Defendant Google, Inc. ("Google") is a corporation organized under the laws of the State of Delaware with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

11.     Defendant Flux Factory, Inc. ("Flux" or "Flux Factory") is a corporation organized under the laws of the State of Delaware with its principal place of business at 15456 Ventura Boulevard, Suite 500, Sherman Oaks, California 91403.

12.     Defendant Larry Page is an individual and an executive, agent, and representative of Google.  Larry Page has been served and made an appearance in this action.

13.     Defendant Sebastian Thrun is an individual and an executive, agent, and representative of Google. Sebastian Thrun has been served and made an appearance in this action.

14.     Defendant Sergey Brin is an individual and an executive, agent, and representative of Google.  Sergey Brin has been served and made an appearance in this action.

15.     Eric "Astro" Teller is an individual and an executive, agent, and representative of Google and an executive, agent, and representative of Flux Factory.  Eric "Astro" Teller has been served and made an appearance in this action.

16.     Defendant Nicholas Chim is an individual and is or was an executive, agent, and representative of Google.  Chim is also an executive, agent, and representative of Flux Factory. Plaintiffs do not know where Nicholas Chim has been served and made an appearance in this action.

17.     Defendant Michelle Kaufmann is an individual and is or was an executive, agent and representative of Google.  Kaufmann is also an executive, agent, and representative of Flux Factory.  Michelle Kaufmann has been served and made an appearance in this action.

18.     Defendant Jennifer Carlile is an individual and was or is an executive, agent, and representative of Google.  Carlile is also an executive, agent, and representative of Flux Factory. Jennifer Carlile has been served and made an appearance in this action.

19.     Defendant Augusto Roman is an individual and is or was an executive, agent, and representative of Google.  Roman is also an executive, agent, and representative of Flux Factory. Augusto Roman has been served and made an appearance in this action.

20.     Does 1-100 are individuals or entities that were responsible in whole or in part for the matters alleged in this complaint, and whose identities are currently unknown to Mr. Attia.

21.     Because the obligations and liabilities resulting from Defendants' unlawful and improper acts arose in the County of Santa Clara, venue in this Court is proper under California Code of Civil Procedure Section 395.5.

///

### III.   FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**1.   Attia's Development of the Engineered Architecture Technology**

22.     For more than four decades Mr. Attia has established his reputation as one of America's leading and most innovative architects.  His award-winning skyscrapers, from New York's 101 Park Avenue to San Francisco's 101 California Street, to the Crystal Cathedral have proved to be both commercially and aesthetically successful.

23.     During the course of his professional work, Mr. Attia isolated the "DNA" of all buildings and invented a revolutionary set of technologies that apply to their design and construction, with particular application for tall and large buildings.  He termed certain of his technologies "Engineered Architecture."  Among other things, Engineered Architecture employs a method of utilizing intelligent "cells" and "supercells" that represent basic building blocks of architectural design to create buildings dramatically better, faster, with fewer resources, and with less energy and environmental impact than conventional methods.  This technology enables the creation of buildings of limitless types and sizes, buildings that are environmentally sustainable and of better quality, in substantially less time and at a greatly reduced cost than ever before possible.

24.     In 2009, Mr. Attia began searching for a partner to help him achieve broad adoption of his techniques within the construction industry.  Recognizing the value of his proprietary technology, Mr. Attia did not discuss the details of Engineered Architecture with third parties outside of the context of expressly confidential business communications.

**2.   Defendants Induced Mr. Attia to Share His Proprietary Information and Know-How Under a Non-Disclosure Agreement and an Inbound Services Agreement**

25.     At about the same time Mr. Attia began searching for a partner to develop his Engineered Architecture technology, Defendants Brin and Page conceived of what was to become Google X – a secretive research and development facility at Google.  In particular, around 2009, Brin and Page conceived of a position at Google called Director of Other.  This person would oversee ideas far from Google's core search business.  This notion evolved into Google X around 2010, when Defendant Sebastian Thrun formed the unit and began to run it.

1    Thrun chose Defendant Astro (Eric) Teller, a Google computer engineer, as one of his co-

2    directors.  Page remained the ultimate head of Google X until he was appointed Google CEO

3    and Brin took over ultimate responsibility of Google X.  Later Teller assumed day-to-day

4    responsibilities at Google X from Thrun.

5         26.    Thrun and Teller learned about Attia's Engineered Architecture concept in the

6    summer of 2010 and recognized the substantial value inherent in the invention.  On or about July

7    25, 2010, Teller approached Mr. Attia stating that he heard that Mr. Attia had "an idea to change

8    the world" and claimed that he wanted to discuss Google partnering with Mr. Attia to develop

9    his invention.  After Mr. Attia provided Teller and Thrun a general overview of his Engineered

10   Architecture concept, Google became even more interested in the technology.

11        27.    To induce Mr. Attia to divulge to Google his trade secrets and other proprietary

12   information regarding Engineered Architecture, Google agreed to enter into a non-disclosure

13   agreement.  On or about August 8, 2010, Google and Mr. Attia executed a Non-Disclosure

14   Agreement ("NDA") attached as Exhibit 1.  Under the NDA, Google was permitted to use

15   confidential information received from Mr. Attia only "to facilitate technical discussions

16   concerning existing or future product development efforts by the parties."  The NDA provides

17   that it expires five years from disclosure unless the parties agree otherwise in writing.

18        28.    As part of Google's plan to learn as much as it could about Mr. Attia's

19   Engineered Architecture proprietary technology, Google persuaded Mr. Attia and his family to

20   relocate to Palo Alto in late 2010, so that he and Google personnel could work directly together

21   at Google's Mountain View headquarters.

22        29.    In August 2010, Mr. Attia presented his Engineered Architecture technology to a

23   group of approximately 30 Google executives, including Page, Thrun and Teller at Google's

24   headquarters in Mountain View, California.  Defendant Page had an extensive discussion with

25   Mr. Attia after the presentation about his technology and the building and construction industry

26   – a subject about which Google knew very little.  Mr. Attia later answered several detailed

27   written questions from Google executives, including Page and Thrun, about the details of

28   Engineered Architecture.  Brin also was actively involved in the process of extracting as much

1   information as possible from Mr. Attia about the Engineered Architecture technology.   On

2   information and belief, all of the Google executives who were present during Mr. Attia's

3   presentation were aware of the NDA and of the fact that Mr. Attia was revealing his trade secrets

4   and other proprietary information in confidence.

5       30.    In September 2010, Page and Brin authorized Google X to proceed with

6   development of a software system implementing the Engineered Architecture technology.

7   Google and Mr. Attia began to negotiate an arrangement pursuant to which Google would agree

8   to engage Mr. Attia for a period of months during which Google would provide to him the

9   software engineers and the resources he needed to prove the technology's viability and the

10  industry's acceptance of it.   In exchange, Mr. Attia would share, for a limited time and for the

11  limited purpose of validating his invention, his trade secrets and other proprietary technology to

12  help Google develop his invention by essentially helping Google build a software system

13  capable of implementing the Engineered Architecture technology.   This project became known

14  as "Project Genie."   Project Genie was one of the first projects undertaken by the Google X

15  team.   Mr. Attia agreed to share with Google his trade secrets and other proprietary information

16  on the condition that, if the proof of concept program were successful and any of Mr. Attia's

17  trade secrets or proprietary information were used to develop the Genie project, Google would

18  reasonably compensate Mr. Attia for the use of his property.

19      31.    For example, on September 28, 2010, Teller sent Mr. Attia an e-mail setting forth

20  an outline of objectives, considerations and budget for Phase one of the Genie project.   Teller

21  enticed Mr. Attia about the substantial financial rewards he could receive from Google by telling

22  him that if Google "went into the full scale version" of the project "I can tell you with

23  confidence that you would find the compensation more than fair," and that "the $15K/month"

24  Mr. Attia would receive during Phase One "is not what I consider fair in the long run for you."

25  Teller uttered these enticements to Mr. Attia as part of his and Google's scheme to

26  misappropriate Mr. Attia's trade secrets and abscond with his intellectual property without

27  compensation.

28  ///

32.     This is exemplified by Teller's false representation to Mr. Attia on October 15, 2010, that the contractual arrangement between Google and Mr. Attia for Phase One of the Genie Project would include the confidentiality provisions of the NDA.  In early October 2010 Google sent Mr. Attia drafts of two proposed agreements – one entitled "Inbound Services Agreement" and the other entitled "Statement of Work."  Mr. Attia pointed out to Teller that the draft of the ISA provided that he was obligated to keep Google information confidential but he wanted a reciprocal provision obligating Google to keep his information confidential.  Teller told Mr. Attia that the ISA did not need to include such a provision because it "is already covered by the mutual NDA you signed."   After Google wrongfully disclosed and misappropriated Mr. Attia's trade secrets, Google took the position that the ISA superseded the NDA and that the NDA was no longer in effect.  This is but one example of Google's and Teller's bad faith intention to misappropriate Mr. Attia's trade secrets and other proprietary information.

33.     The parties continued to negotiate the terms of the ISA and SOW throughout October, November and December.  During this period, the parties exchanged several drafts of the SOW.  Each draft of the SOW contained an "Exhibit A" which was entitled "Pre-existing Property" listing a variety of materials described as property owned by Mr. Attia prior to entering into any arrangement with Google to develop Project Genie.  By January 6, 2011, the parties had worked out all of the terms governing the parties' duties and obligations relating to carrying out Phase One of Project Genie.  Mr. Attia and his wife finalized their plans to move to Mountain View, California, near Google's headquarters, to work with Google on Project Genie.

34.     The only contract language the parties continued to negotiate was the language describing the background and circumstances leading up to Google's decision to proceed with Project Genie.  Through January 10, 2011, the parties continued to exchange drafts of the ISA and the SOW.  Each of the drafts continued to contain an Exhibit A entitled "Pre-existing Property" listing materials owned by Mr. Attia prior to entering into any arrangement with Google to develop Project Genie.

///

35.     On January 11, 2011, Google's in-house counsel distributed the final, revised draft of the ISA and SOW for the parties to review and approve.  In this final draft, however, Google's in-house counsel, for the first time, altered the heading on Exhibit A of the SOW and inserted the words "Publicly available" in front of the label "Pre-existing Property" which had been in every draft of the SOW since October 2010.  None of the Google personnel involved in the negotiation or drafting of the SOW mentioned the need or desire to alter the heading of Exhibit A, or that it had been altered in this final draft.  Instead, the in-house Google lawyer stressed in their e-mail circulating the final drafts of the ISA and SOW that they made only a "few changes" without mentioning the first time change to the heading of exhibit to the SOW.  Google inserted this language at the last minute with the bad faith intent of undermining any later claim by Mr. Attia that Google misappropriated his trade secrets.  Mr. Attia was unaware of this change to the heading of Exhibit A and continued to believe that his confidential and propriety information about Engineered Architecture technology was protected from unauthorized disclosure by Google pursuant to the NDA, as Teller had previously represented to him.

36.     On January 12, 2011, Google and its affiliates entered into an Inbound Services Agreement ("ISA") (attached as Exhibit 2) and an associated Statement of Work agreement ("SOW") (attached as Exhibit 3) with Mr. Attia and Attia PC to develop Project Genie.  Teller was appointed head of Project Genie and Defendant Nicholas Chim was appointed the team leader for the project.  Google acknowledged in the Statement of Work that "[t]he Genie Project was inspired by [Mr. Attia's] experience and Pre-existing Intellectual Property."  To induce Mr. Attia to enter the ISA and SOW, Google, through Teller, specifically affirmed and represented to Mr. Attia that Google's confidentiality obligations under the NDA would continue to be in force and in effect and that Google would continue to abide by the NDA after execution of the ISA and SOW.

37.     In the SOW, Google acknowledges that the "Genie Project was inspired by [Mr. Attia's] experience and Pre-Existing Intellectual Property."  Exhibit A to the SOW describes the bulk of Mr. Attia's proprietary information regarding Engineered Architecture, including his

idea of "revolutionizing the global building industry by dramatically changing the way in which buildings are designed, fabricated and constructed..." The SOW identifies documents that contain Mr. Attia's proprietary information, including, without limitation, "All presentations & brochures," notes, emails, patents, and "other related intellectual property developed as of the SOW Effective Date." Under the ISA, any "invention, improvement, development, concept, discovery or other proprietary information" that Mr. Attia had an interest in before January 12, 2011, remain the property of Mr. Attia. During the negotiation of the ISA, Google, through Defendant Thrun, specifically told Mr. Attia that "any IP/know how" Mr. Attia brought to the Genie Project, including all the knowledge, information, and Pre-Existing Intellectual Property that Google admits inspired Genie, would continue to belong to Mr. Attia.

38.     During the negotiations between Google and Mr. Attia regarding the ISA and SOW, Google first asked for a non-exclusive, royalty-free, perpetual, irrevocable, worldwide license from Mr. Attia to use his proprietary information. Attia rejected that request. Google then proposed to pay royalties to obtain a non-exclusive license, which Attia rejected as well. Ultimately, the parties agreed in the ISA that Mr. Attia would provide to Google a "non-commercial" and nonexclusive license to use his proprietary information only until June 31 [*sic*], 2011.

39.     The SOW contained the following provision regarding the proof of concept program in Phase One of Project Genie: "If the proof of concept program in Phase One is successful and to the extent any Pre-existing Property is used to develop Genie, (i) Google, in its sole discretion, will consider seeking an exclusive license and will make reasonable efforts to negotiate for a license to a portion or all of the Pre-existing Property at mutually agreed upon price and terms, and (ii) both parties intend to negotiate in good faith appropriate new terms and conditions in a separate SOW under the ISA pursuant to which Contractor will provide consulting services as to the development of Genie."

40.     Defendant Chim was put in charge of the Genie project. Neither defendant Chim nor Google had any knowledge of the construction industry before working with Mr. Attia. Mr. Attia proceeded to work with Google extensively on Project Genie for the next five months so

the Google software engineers and others working on the project thoroughly understood his Engineered Architecture invention and could automate as many of the steps of the invention as possible to develop a proof of concept software system for the project.

41.     Pursuant to the ISA/SOW, Mr. Attia began teaching the fundamentals of the construction industry and building design to the members of the Project Genie team based upon his 50 years of experience.  Mr. Attia disclosed and made available to the Project Genie team at Google his original written works describing the Engineered Architecture technology, including core concepts, details, and refinements of Engineered Architecture invention that were not in the public domain.  The materials shared with Google included, among other things, five booklets that describe in detail the Engineered Architecture technology.  Mr. Attia personally sat down with every member of the Project Genie team and taught them everything about the Engineered Architecture technology.

42.     The Project Genie team grew from ten computer and software engineers to more than 30 people including Defendants Carlile and Roman and Defendant Kaufmann, who acted as Mr. Attia's assistant during his time at Google.  Mr. Attia also introduced Google to building design and construction industry leaders to demonstrate the concept and gauge industry support for it.

**3.     The Success of the Phase One Proof of Concept Stage**

43.     At the conclusion of Phase One of Project Genie in June 2011, Google determined that the proof of concept program was successful.  In a June 2011 confidential report provided by Defendant Thrun to Defendants Page and Brin, the Project Genie team estimated that the Engineered Architecture technology could halve construction costs of large buildings and skyscrapers, and that the technology had the potential of generating $120 billion in annual income for Google.  Google's revenue in 2011 was approximately $37.9 billion, meaning that Project Genie stood to provide more than three times Google's current revenue.

44.     The confidential report states that "early this year, a small team at Google X began working with Eli Attia, an architect, the creator of Genie technology, to explore opportunities in the building construction industry."  It adds, "Eli's work led him to the creation

of 'Engineered Architecture,' which provided key concepts and technology behind Genie." Genie, the development team told Google's management "is a platform with a web-based design application that assists the design architect through the design process, and is mainly intended for the construction of large and tall buildings.  The application incorporates design rules from expert architects and engineers, and advanced analysis and simulation tools.  Genie enables the standardization and automation of design and construction processes, with unlimited design options, which allow an architect to preserve the uniqueness of the building in the urban environment."

45.     The development team's report to Google's management described Genie as "revolutionary technology for creating sustainable and environmentally friendly buildings, at a quality exceeding anything known.  The technology was presented as technology that can change the conservative global construction industry through a fundamental and revolutionary change in the way buildings are designed, built, and maintained, saving trillions of dollars."  In the report, the Google X team estimated that the Engineered Architecture technology would cut current direct construction costs by 30%, and the current time from the start of design to market by more than 30%.

46.     Google was so satisfied with the viability of Mr. Attia's Engineered Architecture technology that it applied to the United States Patent and Trademark Office for patents containing numerous claims reciting Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.  Moreover, the specifications of the Google patent applications and patents describe these claim elements in language identical or virtually identical to the language in Mr. Attia's disclosures.

47.     For example, on May 20, 2011, Google filed a patent application entitled "System and Methods for Structure, Design, Analysis, and Implementation" listing Mr. Attia as one of the inventors (the "`727 Application").  The `727 Application was based, in large part, on Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.  On June 11, 2011, Google filed

1   another patent application entitled "System and Methods Facilitating Collaboration in the

2   Design, Analysis, and Implementation of a Structure" again listing Mr. Attia as one of the

3   inventors (the "`307 Application"). The `307 Application also was based, in large part, on Mr.

4   Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by

5   Mr. Attia to Google pursuant to the NDA and the ISA/SOW, and stated that it was "related to

6   and claims priority from" the `727 Application. Google filed several other patent applications

7   based on Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets,

8   disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.

9        48.    Using Mr. Attia's lifetime of well-developed design and construction industry

10   contacts, Attia and Defendant Chim also presented Genie to several industry leaders, among

11   them renowned architect Richard Meier, major developers, construction companies, and

12   potential investors. During presentations, Defendants and Mr. Attia used a professionally

13   produced video to show a "prototype" software application which consisted entirely of Mr.

14   Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by

15   Mr. Attia to Google pursuant to the NDA and the ISA/SOW. The response was uniformly

16   enthusiastic. Mr. Meier indicated that he would use the product if it were available at that

17   moment. Another potential investor almost immediately began negotiations with Google to

18   partner in Genie's development.

19        49.    The "prototype" used not only the core concept that Mr. Attia developed, but also

20   many of the details of Mr. Attia's Pre-existing Property, including his Engineered Architecture

21   trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW. The

22   prototype shows Engineered Architecture in action, including the use of the specific "super

23   cells" and "cells" that Mr. Attia invented. In essence, the "prototype" followed the blueprint of

24   Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed

25   by Mr. Attia to Google pursuant to the NDA and the ISA/SOW. In the documentary

26   presentation that Defendants Teller and Chim showed along with the "prototype" video, Google

27   described Mr. Attia as the "creator of core Genie concepts."

28   ///

50.     Google internally acknowledged in a "Fact Sheet" that Mr. Attia is "the creator of Genie technology."  Google admitted that the "key technical insights" of Genie came from Mr. Attia and that Mr. Attia's "work led him to the creation of [Engineered Architecture] which provided key concepts and technology behind Genie."  The "Fact Sheet" described "key insights" that match directly with Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.

51.     Google, seeing the potential in Mr. Attia's Engineered Architecture technology, extended Project Genie an additional seven months and planned to spin-off Project Genie into a separate company.  Then Google and Mr. Attia engaged in a *de facto* joint venture to create a separate company to develop and to bring to market products employing Mr. Attia's Engineered Architecture proprietary technology.

52.     In the course of discussing the creation of a new company, Google offered Mr. Attia a seven percent (7%) interest in the new company specifically to compensate Mr. Attia for his proprietary information.  Google's draft "Cap Tables" identify shares for "Google IP" and shares for "Eli IP," admitting that "Genie" employed Mr. Attia's proprietary information and that Google should pay for it.  Google offered Mr. Attia an additional eight percent (8%) as a co-founder of the new venture in addition to a percentage for his proprietary information.

**4.     Google's Scheme to Squeeze Mr. Attia Out of the Genie Project and Misappropriate his Trade Secrets**

53.     While Google was pumping Mr. Attia for all his Engineered Architecture trade secrets, Defendants Google, Page, Brin, Thrun, Teller, Kaufmann, Carlile, Roman, and Chim were plotting to squeeze Mr. Attia out of his own project and misappropriate Mr. Attia's Engineered Architecture Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.

54.     Google and members of the Project Genie team went to considerable lengths to conceal their intent to squeeze out Mr. Attia and misappropriate his proprietary Engineered Architecture technology.  For example, when Mr. Attia unexpectedly walked into a conference

room where members of the Project Genie team were meeting, the participants immediately stopped all conversation, each staring at the others like a fox caught in the henhouse, until Defendant Chim ordered everyone to disperse.

55.    While Defendants were meeting secretly, they slashed Mr. Attia's compensation and then proceeded to completely purge him from the project and joint venture.

56.    Even while squeezing Mr. Attia out of the project, Defendant Teller asked Mr. Attia for a "license for [his] pre-existing IP," again acknowledging that "Genie" employed Mr. Attia's proprietary information and know-how.  Google, Page, Brin, Thrun, and the other Defendants fully understood "Genie" was an absolute manifestation of Mr. Attia's proprietary information and know-how.

57.    Google then pretended to kill the Genie Project to give Mr. Attia the false impression that Google was not planning to misappropriate Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.  On December 7, 2011, another date that will live in infamy, Defendant Chim informed the Genie team by e-mail that he was torpedoing Project Genie.  "We learned a new industry," he wrote, "solved very interesting technical problems and wowed the industry with the ambitiousness of our vision."  He stated flatly, "Effective Friday, we'll stop working on Genie."  That very same day, defendant Teller wrote to Mr. Attia, "I'm very sorry Genie will end.  It would have been a great thing to make for the world."  Chim and Teller were creating a cover story to mask their plan to steal and exploit Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.

58.    Within a week, however, Mr. Attia learned that Google, rather than shutting down Project Genie, was surreptitiously taking steps to develop and promote Genie further.  For example, Defendant Chim resumed speaking to the same potential partners and investors he had previously visited with Mr. Attia, this time telling them that Mr. Attia was no longer involved with Genie, but that Google had the right to continue with the project.

///

59.     On December 16th, only nine days after Google informed Mr. Attia that Google was shutting down Project Genie, Mr. Attia informed Defendant Thrun, "I've just heard the fourth version of Nick's pitch to industry leaders.  And [Defendant Chim stated], 'I've got the license and control of Genie's IP.'"

60.     On December 21st, exactly two weeks after acknowledging "with regret" the end of Genie, Defendant Teller sent an e-mail to Mr. Attia containing a proposed agreement between Defendant Chim and Mr. Attia ending with the words, "Eli will continue to pursue his path and the Genie team will continue with a different path."  "The Genie team will continue."

**5.     Google's Breach of the ISA/SOW and Misappropriation of Mr. Attia's Trade Secrets and Bad Faith**

61.     After Google and the Google X leadership team squeezed Mr. Attia out of Project Genie, they continued to make presentations to investors showing the "prototype" video utilizing Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the ISA/SOW.  These Defendants did not obtain any license from Mr. Attia to use his proprietary information.  By using Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the ISA/SOW without obtaining a license from Mr. Attia, these Defendants misappropriated this proprietary information.  By failing to compensate Mr. Attia for the use of this proprietary information, Google also breached its express obligations under the ISA/SOW.

62.     Upon information and belief, Defendants Google and Chim have falsely represented to third parties that they owned rights to Mr. Attia's proprietary information, including his trade secrets.

63.     In July 2012, the `307 patent application filed by Google was issued and published as United States Patent No.  8,229,715.  Google also allowed its `727 patent application to be published by the United States Patent and Trademark Office in November 2012.  As discussed above, the `715 patent and the `727 patent application were based, in large part, on Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW.

64.     Although Mr. Attia was aware in 2011 that Google was filing patent applications using his trade secrets and other proprietary information, Mr. Attia did not believe that this conduct by Google was wrongful, because he conditionally authorized Google to use his trade secrets and other proprietary information to develop Project Genie, but on the condition that Google compensate him for such use as provided in the SOW.   At any time before the publication of Google's patent applications using Mr. Attia's trade secrets and other proprietary information, Google could have abandoned or withdrawn those applications, thereby preserving the confidentiality of that information.   Google, however, allowed the patent applications containing Mr. Attia's trade secrets and other proprietary information to be published, thereby irrevocably using that information and extinguishing his trade secrets.

65.     Google, however, reneged on its agreement to compensate Mr. Attia for use of his "Pre-existing Property," including his trade secrets and other proprietary information, when it allowed the patent applications disclosing Attia's trade secrets to be published by the PTO, as a published application or issued patent and then refused to compensate Attia for its use and disclosure of his trade secrets, thereby extinguishing their trade secret status.   It was at that time – in July 2012 – when Google's use and disclosure of Attia's trade secrets became unauthorized and constituted misappropriation of Mr. Attia's trade secrets.

66.     In late 2011 through at least June 2012, Mr. Attia's counsel sent letters to Google inquiring about whether Google was improperly using any of Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW after Google squeezed Mr. Attia out of Project Genie.   Google's counsel sent Attia PC's counsel several letters falsely providing assurances to Mr. Attia that Google was complying with its commitments under the NDA and ISA/SOW, and that it had not done anything wrong or in violation of those agreements.   Google, through its counsel, feigned ignorance of any proprietary information provided by Mr. Attia to Google, even though Google acknowledged the nature and scope of such proprietary information in Exhibit A to the SOW and repeatedly referred to such proprietary information in the ISA/SOW and other documents. Google's counsel specifically misrepresented to Mr. Attia that "[t]here is no basis for your

assertion regarding Google's supposedly improper use of undefined intellectual property," that "Google has no interest in using any intellectual property to which it does not have rights," that Google "has no reason to believe any such use has occurred here," and that "Google has done nothing wrong."

67.   In 2011, while Defendant Teller was telling Mr. Attia that "Genie will end," Teller along with Defendants Google, Page, Brin, Thrun and Carlile, formed a new company to continue to develop the Genie technology based upon Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW using approximately one million dollars of Google's money. This company was called Vannevar Technology.  The company's name was changed to Flux Factory, Inc., in 2014 (Vannevar Technology and Flux Factory shall be referred to collectively as "Flux Factory").

68.   On information and belief, the Google Defendants raised $2.2 million in capital when Flux Factory was established.  Later, based upon the Executive Summary estimating the potential value of a business employing the Engineered Architecture concept as producing revenues of $120 billion, the Google Defendants raised at least at least $39.3 million of investment capital for the Flux Factory business from some of the world's largest venture capital firms including Borealis Ventures, Andreesen Horowitz, Obvious Ventures, South Park Ventures, Far East Ventures, Sj, DFJ and Google Ventures. The Google Defendants improperly used Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, to attract these investors.

69.   Flux Factory is simply a reconstitution and continuation of the Project Genie project under a different name.  Flux Factory employs several individuals who worked at Google on the project, including Defendants Kaufmann, Carlile, and Roman, with defendant Chim acting as CEO.  Defendant Teller sits as chairman of the board of directors for Defendant Flux Factory.  Being nothing more than a spin-off of Google's Project Genie, Flux Factory inherited from Google all of its contractual duties under the NDA and ISA/SOW.

///

70.     Since 2014, Flux Factory has offered for sale an automated software system called the Flux Metro Austin Preview for the building design and construction industry.  This software uses trade secrets and proprietary information that Mr. Attia developed as part of his Engineered Architecture invention.  In fact, most, if not all, of the Flux features embody the trade secrets and proprietary information stolen from Mr. Attia.

71.     On information and belief, Flux Factory currently employs individuals, including Defendants Carlile, Roman, Teller, Chim, and Kaufmann, who are fully aware that Flux Factory's products and services incorporate Mr. Attia's stolen trade secrets and proprietary information.

72.     As a result of Defendants' misappropriation of Mr. Attia's trade secrets and other proprietary information and their misrepresentations to others that they own the technology, other potential development partners have shunned Mr. Attia's attempts to further develop and commercialize the Engineered Architecture technology.  His reputation within the architectural community and the global construction industry has consequently been tarnished.

73.     In September 2013, Mr. Attia sent Page a letter informing him that "the Genie project that was being pursued under Google X was an implementation of my life's work – EA technology," and that, after he had been removed from the project, the project was converted to "Project Vannevar" also "based on my inventions."  Mr. Attia informed Mr. Page that "[o]n December 30, 2011 Sebastian [Thrun] called me and said: 'Genie is spinning out, it's spinning out without you unfortunately, and that is that.  It's a miserable situation because it's true that you got to Google with your life's vision to implement what's happening, and the fact that you are not part of it is the worst part of all.  But there is nothing I can do about it.  So you have to take it.'"  Mr. Attia told Page that "I've been treated unjustly" and requested a chance to speak with Page.  Page never responded to Mr. Attia.  Page ignored Mr. Attia's letter, perpetuating The Google Defendants' scheme to misappropriate Mr. Attia's trade secrets and other proprietary information and derive unjust enrichment from doing so.

74.     In view of Page's refusal to respond to Mr. Attia's letter, in October 2013 Mr. Attia sent letters to members of Google's Board of Directors and to Google Senior Advisors,

including Defendant Brin, alerting them to the theft of his Engineered Architecture trade secrets by Page, Brin and the members of the Project Genie team at Google X, and requested Google to acknowledge that Genie is based on Mr. Attia's proprietary technology and to compensate him fairly for Google's use of his proprietary technology.  No one from Google responded to Mr. Attia.

75.     On information and belief, Defendants Kaufmann, Chim, Carlile, Roman, Teller, and Flux Factory continue to publicly claim that the work done at Genie and being done at Flux Factory stem from their original ideas.  They continue to refuse to acknowledge Mr. Attia's hard work in the development of his trade secrets and other proprietary information that comprise Flux Factory's services.

76.     In short, Google and the other Defendants had express and implied obligations to Mr. Attia to use his proprietary and confidential information only in support of a joint effort with Mr. Attia to develop technologies.  The Google Defendants had the obligation to negotiate a license to use Mr. Attia's Pre-existing Property, including his Engineered Architecture trade secrets, disclosed by Mr. Attia to Google pursuant to the NDA and the ISA/SOW and to fairly compensate Mr. Attia if it wanted to continue using it.  The Google Defendants refused to do so and intentionally misappropriated for its own benefit Mr. Attia's proprietary Engineered Architecture invention.

## FIRST CAUSE OF ACTION
### (Misappropriation of Trade Secrets by Eli Attia Against All Defendants)

77.     Plaintiffs reallege, and incorporate herein by reference, as though fully set forth, paragraphs 1-76 above.

78.     Mr. Attia owns trade secrets, including confidential and proprietary information that can be used to create buildings dramatically better, faster, with fewer resources, and with less energy and environmental impact than conventional methods.

79.     Mr. Attia has made reasonable efforts to maintain the secrecy of his trade secrets and other confidential and proprietary information.  Mr. Attia has not shared this information with third parties except in the course of confidential business communications.

80.     At all material times, Mr. Attia fully and clearly identified to Google the pre-existing trade secret information he was disclosing to Google, as set forth in Exhibit A to the SOW, and Google acknowledged that use and disclosure of such information was limited as set forth in the NDA and later in the ISA/SOW.

81.     Mr. Attia's trade secrets derive independent economic value and competitive advantages from not being generally known.

82.     As detailed above, the Google Defendants were subject to both express and implied contractual obligations to maintain the secrecy of Mr. Attia's confidential and proprietary information, including his trade secrets.

83.     The Google Defendants willfully and maliciously misappropriated Mr. Attia's trade secrets by, among other acts, continuing to incorporate and use them in "Genie," or otherwise, after the end of the limited license period, by sharing Mr. Attia's trade secrets with third parties in an attempt to gain support for "Genie," and by using them in conducting the business of Flux Factory.

84.     Google misappropriated Mr. Attia's trade secrets by, among other things, using those trade secrets to develop the "Genie" software system without making a reasonable effort to negotiate with Mr. Attia for a license for such use of his trade secrets.  Google did not have any right to use Mr. Attia's trade secrets to develop the Genie software without a license from Mr. Attia to do so and without reasonably compensating Mr. Attia for such use.  Google's use of Mr. Attia's trade secrets to develop Genie includes using those trade secrets to build the Genie software system, applying for and obtaining patents covering the Genie software system, thereby resulting in the public disclosure of Mr. Attia's trade secrets, promoting the Genie software system to potential customers and investors, and disclosing Mr. Attia's trade secrets to Flux Factory and acting in concert with Flux Factory to make further developments to the Genie system and market that system.

85.     In particular, Mr. Attia conditioned Google's use of his trade secrets and other proprietary information in patent applications or other activities on Google's commitment to compensate Mr. Attia for any use of such information to develop Project Genie in the event the

proof of concept of Project Genie was successful.  Google's use and disclosure of Mr. Attia's trade secrets were unauthorized and constituted unlawful misappropriation of those trade secrets when Google reneged on its commitment to compensate Mr. Attia for its use of his trade secrets, which was a condition for his permission to use those trade secrets.  Thus, Google willfully misappropriated Mr. Attia's trade secrets by using and disclosing to third persons those trade secrets without Mr. Attia's express or implied consent.

86.     Flux Factory willfully misappropriated Mr. Attia's trade secrets by, among other things, largely continuing Google's conduct of misappropriation.  Flux Factory has misappropriated Mr. Attia's trade secrets by using those trade secrets to continue the development of the Genie software system now controlled by Flux Factory and, in particular, to build the Flux Metro Austin Preview product based on Mr. Attia's trade secrets as well as promoting the Genie software system to potential customers and investors.  At the time of Flux Factory's use and disclosure of Mr. Attia's trade secrets, Flux Factory officers and other personnel knew or had reason to know that its knowledge of Mr. Attia's trade secrets was derived from or through Google and the members of the Project Genie team at Google X – many of whom were now working at Flux Factory – who used improper means to acquire those trade secrets and acquired the trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit its use of the trade secrets, and was derived from or through Google and the members of the Project Genie team at Google X who owed a duty to Mr. Attia to maintain its secrecy or limit its use.

87.     Defendants Page and Brin willfully misappropriated Mr. Attia's trade secrets by directly and knowingly planning, participating in, facilitating, authorizing and/or consenting to Google's scheme to induce Mr. Attia to disclose his Engineered Architecture trade secrets to Google and then squeeze Mr. Attia out of the Genie project and unlawfully use his trade secrets to develop and market the Genie software system for Google's own exclusive benefit. Defendants Page and Brin were directly involved in the establishment and management of the Google X unit, the review of Mr. Attia's Engineered Architecture trade secrets pursuant to the NDA, the decision to initiate Project Genie at Google X based upon Mr. Attia's trade secrets, the

use and disclosure of those trade secrets to develop and promote the Genie software system without a license to do so from Mr. Attia, Google's refusal to compensate Mr. Attia for its use of his trade secrets, and the decision to form and invest in Flux Factory to continue the unauthorized use of those trade secrets.  Thus, Defendants Page and Brin personally planned, authorized, directed and/or participated in the misappropriation of Mr. Attia's trade secrets by Google and Flux Factory.  Defendants Page and Brin knowingly consented to and approved the acts of misappropriation committed by the members of the Project Genie team, including the acts of misappropriation committed by Sebastian Thrun, Eric "Astro" Teller, Michelle Kaufmann, Jennifer Carlile, Augusto Roman, and Nicholas Chim.  Indeed, as alleged above, Mr. Attia notified Defendants Page and Brin in writing in September and October of 2013 that Google and Flux Factory had misappropriated his trade secrets, but neither of them took any action to rectify the situation.  Thus, Defendants Page and Brin specifically knew or reasonably should have known that Google was using and disclosing Mr. Attia's trade secrets without a license from Mr. Attia to do so and not only failed to take any appropriate action to prevent such misappropriation of those trade secrets but actively encouraged these Google personnel to unlawfully use and disclose the trade secrets.  An ordinarily prudent person, knowing what Page and Brin knew, would not have acted similarly under the circumstances.

88.     Defendant Thrun willfully misappropriated Mr. Attia's trade secrets by directly and knowingly planning, participating in, facilitating, authorizing and/or consenting to Google's scheme to misappropriate Mr. Attia's trade secrets.  Defendant Thrun was involved in the formation of the Google X unit and initially ran it.  Defendant Thrun directly participated in the review of Mr. Attia's Engineered Architecture trade secrets pursuant to the NDA, the decision to initiate Project Genie at Google X based upon Mr. Attia's trade secrets, the use and disclosure of those trade secrets to develop and promote the Genie software system without a license to do so from Mr. Attia, the decision to squeeze Mr. Attia out of Project Genie, Google's refusal to compensate Mr. Attia for its use of his trade secrets, and the decision to form Flux Factory to continue the unauthorized use of those trade secrets, and the management of Flux Factory's continued misappropriation of Mr. Attia's trade secrets.

89.     Defendant Teller willfully misappropriated Mr. Attia's trade secrets by directly and knowingly planning, participating in, facilitating, authorizing and/or consenting to Google's scheme to misappropriate Mr. Attia's trade secrets.  As with Defendant Thrun, Defendant Teller was involved in the management of Google X unit since its formation and succeeded Thrun as the head of the unit.  Defendant Teller also directly participated in the review of Mr. Attia's Engineered Architecture trade secrets pursuant to the NDA, the decision to initiate Project Genie at Google X based upon Mr. Attia's trade secrets, the use and disclosure of those trade secrets to develop and promote the Genie software system without a license to do so from Mr. Attia, the decision to squeeze Mr. Attia out of Project Genie, Google's refusal to compensate Mr. Attia for its use of his trade secrets, and the decision to form Flux Factory to continue the unauthorized use of those trade secrets, and the management of Flux Factory's continued misappropriation of Mr. Attia's trade secrets.

90.     Defendant Chim willfully misappropriated Mr. Attia's trade secrets by directly and knowingly planning, participating in, facilitating, authorizing and/or consenting to Google's scheme to misappropriate Mr. Attia's trade secrets.  Defendant Chim was in charge of the Genie project.  He directly and knowingly participated in the unauthorized use and disclosure of Mr. Attia's trade secrets to develop and promote the Genie software system without a license to do so from Mr. Attia, the decision to squeeze Mr. Attia out of Project Genie, Google's refusal to compensate Mr. Attia for its use of his trade secrets, and the decision to form Flux Factory to continue the unauthorized use of those trade secrets, and the management of Flux Factory's continued misappropriation of Mr. Attia's trade secrets.

91.     Defendants Kaufmann, Carlile and Roman willfully misappropriated Mr. Attia's trade secrets by directly and knowingly planning, participating in and facilitating Google's scheme to misappropriate Mr. Attia's trade secrets.  These Defendants directly and knowingly participated in the unauthorized use and disclosure of Mr. Attia's trade secrets to develop and promote the Genie software system without a license to do so from Mr. Attia, the decision to squeeze Mr. Attia out of Project Genie, and the decision to form Flux Factory to continue the unauthorized use of those trade secrets, and the continued misappropriation of Mr. Attia's trade

1   secrets at Flux Factory.

2        92.    By reason of the Google Defendants' unlawful conduct described above, Mr.

3   Attia will suffer great and irreparable harm and damage, which damage will be difficult to

4   ascertain, and Mr. Attia is without an adequate remedy at law.  Mr. Attia is entitled to an

5   injunction restraining Google from further misappropriation.

6        93.    As a result of the Google Defendants' misappropriation of Mr. Attia's trade

7   secrets, Mr. Attia has been damaged and Defendants have been unjustly enriched in an amount

8   to be determined at trial.

9   **SECOND CAUSE OF ACTION**
10  **(Breach of Contract by all Plaintiffs Against Google – ISA/SOW)**

11       94.    Plaintiffs reallege, and incorporate herein by reference, as though fully set forth,

12  paragraphs 1-93 above.

13       95.    On or about January 12, 2011, Google entered into a contractual relationship with

14  Mr. Attia and Attia PC referred to as an Inbound Services Agreement ("ISA").  The parties' ISA

15  is an enforceable contract between the parties.

16       96.    On January 12, 2011, Google also entered into a contractual relationship with Mr.

17  Attia and Attia PC referred to as a Statement of Work ("SOW").

18       97.    In the alternative, if Mr. Attia is not deemed an actual party to the ISA/SOW, Mr.

19  Attia is a third party beneficiary under those agreements.  Paragraph 3 of the ISA contains a

20  provision granting "Contractor and Contractor's spouse or spouse's lineal descendant" a limited

21  license to certain patent rights "to permit Contractor or Contractor's spouse or spouse's lineal

22  descendant .  .  .  to engage in his professional practice in a personal capacity, .  .  ."  The ISA

23  also provides for Google to provide compensation for the express benefit of Mr. Attia in return

24  for Mr. Attia's personal consulting services.  The ISA also contains provisions limiting the

25  scope of the non-commercial license of the Engineered Architecture trade secrets granted to

26  Google by Mr. Attia, as an owner of those trade secrets and protecting Mr. Attia's ownership

27  and rights to those trade secrets.  The SOW also provides for compensation by Google to Mr.

28  Attia for Google's use of any of Mr. Attia's trade secrets in Project Genie, and for Google to

1  negotiate a new SOW providing for compensation to Mr. Attia.  This clearly shows that

2  ISA/SOW was made expressly for the benefit of Mr. Attia as well as the professional

3  corporation owned and operated by him.

4       98.    The SOW contains the following provision regarding the proof of concept

5  program in Phase One of Project Genie:  "If the proof of concept program in Phase One is

6  successful and to the extent any Pre-existing Property is used to develop Genie, (i) Google, in its

7  sole discretion, will consider seeking an exclusive license and will make reasonable efforts to

8  negotiate for a license to a portion or all of the Pre-existing Property at mutually agreed upon

9  price and terms, and (ii) both parties intend to negotiate in good faith appropriate new terms and

10  conditions in a separate SOW under the ISA pursuant to which Contractor will provide

11  consulting services as to the development of Genie."

12       99.    As alleged above, the proof of concept program in Phase One of the SOW was

13  deemed successful by Google, and Google used Mr. Attia's "Pre-existing Property" to develop

14  Genie.  Google, however, breached this provision of the ISA/SOW by failing and refusing to

15  make reasonable efforts to negotiate for a license to the Pre-existing Property it used to develop

16  Genie at mutually agreed upon price and terms.

17       100.   Google also breached this provision of the ISA/SOW by failing and refusing to

18  negotiate in good faith appropriate new terms and conditions in a separate SOW under the ISA

19  pursuant to which Mr. Attia would provide consulting services as to the development of Genie.

20       101.   Flux Factory, as the successor to the contractual obligations of Google pursuant

21  to the ISA/SOW, has breached the ISA/SOW also by failing and refusing to make reasonable

22  efforts to negotiate for a license to the Pre-existing Property it used to develop Genie at mutually

23  agreed upon price and terms.

24       102.   Mr. Attia has performed all conditions, covenants and promises required on his

25  behalf to be performed in accordance with the terms and conditions of the ISA, or his

26  performance has been excused by virtue of Google or Flux's conduct.

27       103.   Google and Flux also have breached the ISA/SOW by engaging in the conduct

28  alleged herein, including, without limitation, using Mr. Attia's Pre-existing Property for

commercial purposes and doing so beyond the termination date recited in the ISA/SOW without the permission of Mr. Attia or Attia PC.

104.    As a result of Google and Flux's breaches of their agreements with Mr. Attia, he has suffered damages in an amount to be proven at trial.

105.    In addition, Mr. Attia has suffered and will suffer harm that cannot be remedied in damages, and that will require equitable relief.

**THIRD CAUSE OF ACTION**
(<u>**Declaratory Relief Against All Defendants**</u>)

106.    Plaintiffs reallege, and incorporate herein by reference, as though fully set forth, paragraphs 1-105 above.

107.    Mr. Attia has an interest in certain pre-existing intellectual property rights under the ISA and SOW.   Specifically, Mr. Attia owns certain trade secrets, other proprietary information, and know-how that he brought to the "Genie Project" and which now make up the services being sold by Flux Factory.

108.    Defendants have created a controversy regarding Mr. Attia's pre-existing intellectual property by continuing to incorporate this intellectual property in "Genie" and Flux Factory after the end of Google's license period with Mr. Attia.  Defendants have also disclosed Mr. Attia's intellectual property to third parties in an attempt to gain support for Genie and Flux Factory.

109.    Plaintiffs seek a declaration that Mr. Attia owns certain trade secrets, proprietary information and know-how that he brought to the "Genie Project," and has the exclusive right to license his intellectual property.

110.    Plaintiffs seek a declaration that the Defendants had express and implied obligations to Mr. Attia to use his proprietary and confidential information only in support of a joint effort with Mr. Attia to develop technologies.

///

///

1

**FOURTH CAUSE OF ACTION**
2   **(For racketeering under 18 U.S.C. § 1962(c) [Conducting or participating in racketeering]**
**against Google, Inc., Larry Page, and Sergey Brin)**

3        111.    Plaintiffs re-allege, and incorporate herein by reference, as though fully set forth,

4   paragraphs 1-110.

5                        **1.   Defendants have a long history of theft of others intellectual**
                             **property which continues to date and which constitutes a pattern of**
6                            **racketeering activity**

7        112.    Defendants have engaged in a pattern of racketeering activity, as defined in 18

8   U.S.C. § 1961(5), through the repeated, relentless, and purposeful theft of other companies' IP and

9   trade secrets.

10        113.    Defendants have engaged, and continue to engage, in a pattern of activity whereby

11   Defendants: 1) seek out inventors; 2) promise such inventors that Google will invest in, partner

12   with and/or seek to acquire a license for any proprietary inventions of the investor; 3) sign a non-

13   disclosure agreement (NDA) with inventors; 4) upon inducing inventors to reveal trade secrets and

14   other confidential information, Google disregards the NDA and misappropriates the trade secrets;

15   and 5) Google then subsequently attempts to box-out the victim inventors from the market by

16   filing numerous patent applications which result in the unauthorized disclosure of the inventors'

17   trade secrets and the subsequent granting of a monopoly on the technology by the issuance of the

18   patent.   Where no NDA is required, Google has simply copied and criminally stole other

19   inventors' copyrights.

20        114.    Defendants' pattern of theft is so persistent that almost every modern and popular

21   arm of Google, Inc. is derivative and comes from the stolen work of others, such as: Android

22   Operating System (stolen in part from Oracle[1]), Google Wallet (stolen from PayPal and EBay),

23   YouTube (Video Optimization technology for videos stolen from VSL Communications, LTD),

24   Google Hangouts (Stolen entirely from Be In, Inc.), AdSense—one of Google's most profitable

25   ventures—(stolen from Digital Envoy, Inc.) and Google Maps (Points of interest and reviews

26

27   _____

28   [1] *See Oracle America, Inc. v. Google, Inc.*, 3:10-cv-03561-WHA (N.D. Cal. 2010).

stolen from various sources).[2] In fact, even Google's original business model around its search features was stolen, in part, from Overture.[3]

115.   Google, Inc. and its executives—among others—have repeatedly had criminal and anti-trust investigations brought against them by governments around the world for their repeated theft.[4] For example:

- Google was fined $500 million by the U.S. government for its role in the promotion of piracy through illegal online pharmacies;[5]
- In June of 2017, Google was hit with a $2.7 billion fine from the European Union for its anti-competitive conduct in skewing search results. Google is still under investigation for its conduct with regards to its AdSense and Android software and business model which may lead the company to face even further fines;[6]
- The U.S. Federal Trade Commission concluded that Google "used anticompetitive tactics and abused its monopoly power in ways that harmed Internet users and rivals";[7]
- Google was charged by the FTC with engaging in deceptive privacy practices for stealing and publishing consumers email contact lists and was ordered to submit to

---

[2] *See PhantomALERT, Inc. v. Google, Inc., et al.*, 3:15-cv-03986-JCS (N.D. Cal. 2015); *see also* Juliette Garside, *Google 'illegally took content from Amazon, Yelp, TripAdvisor,' report finds*, The Guardian (March 20, 2015) ("[The Federal Trade Commission] also found Google illegally took content from Yelp, TripAdvisor and Amazon to improve its own services.").

[3] *See* Meland, Marius, *Google to Pay at Least $300M in Stock to Settle Yahoo! Patent Suit*, Law360 (Aug. 10, 2004) (The stock to pay for this settlement was before Google's IPO and now holds a current value of over $3 billion).

[4] *See generally*, Scott Cleland, *The Evidence Google's Systematic Theft is Anti-Competitive*, Forbes (Jan. 20, 2012), https://www.forbes.com/sites/scottcleland/2012/01/20/the-evidence-googles-systematic-theft-is-anti-competitive/#fdfec5b7d621 (describing various patterns of theft by Google, such as a "Willful Pattern of Android Property Infringement"); Jon M.  Garon, *Searching Inside Google: Cases, Controversies and the Future of the World's Most Provocative Company*, 30 Loy. L.A. Ent. L. Rev. 429, 429 (2009).

[5] Claire Miller, *Google Reaches $500 Million Settlement With Government*, THE NEW YORK TIMES (Aug. 24, 2011), https://bits.blogs.nytimes.com/2011/08/24/google-reaches-500-million-settlement-with-government/?_r=1

[6] *See* Ivana Kottasová, *EU slaps Google with record $2.7 billion fine*, CNN (June 27, 2017); Aoife White, Google's Record Fine Is Only the Start From the EU, Bloomberg (July 5, 2017).

[7] Brody Mullins, et al., *Inside the U.S.  Antitrust Probe of Google*, The Wall Street Journal (March 19, 2015), https://www.wsj.com/articles/inside-the-u-s-antitrust-probe-of-google-1426793274; *see also* Don Relslnger, *Ugly documents surface in antitrust case that Google settled with FTC*, CNet.com (Mar. 20, 2015), https://www.cnet.com/news/google-causes-real-harm-to-consumers-and-to-innovation-ftc-says/ (describing Google's antitrust settlement with the FTC and the documents which revealed numerous accusations against Google for theft and anticompetitive behavior).

regular independent privacy audits for the next 20 years;[8] and

- Google was investigated by numerous countries when it was learned that Google's street-view illegally stole persons' wifi information, passwords, names, addresses and emails among other personal information.[9]

116.    The following non-exclusive list of cases brought against Google, Inc., Larry Page, Sergey Brin, and Google's various accomplices shows a continuous pattern of criminal activities, which ultimately caused harm to Plaintiffs.

**b.    Violations of 18 U.S.C. § 1832 (Theft of Trade Secrets)**

***VSL Communications, LTD v. Google, Inc., et al***., 1-14-CV-269231 (Santa Clara Superior Crt., Cal., 2014).

117.    Constance Nash ('Nash"), through VSL Communications and Vedanti Systems, Ltd. ("VSL") developed patents and trade secrets for technology which dramatically reduced the volume or size of multi-media content during encoding and decoding which ultimately resulted in proportionally greater speed of transfer of such files without any significant loss of video or audio quality.  This technology allowed for more seamless streaming without constant "buffering."

*Meeting with Google and signing of the NDA*

118.    In March of 2010, Google, Inc.'s Chief Business Officer contacted Nash, VSL's Chief Executive Officer, to discuss a possible acquisition of VSL or a buy-out of VSL's technology.  To induce VSL to disclose its trade secrets, Google proposed and drafted a NDA which was signed in April of 2010.

119.    After the signing of the NDA by Megan Smith (Vice President of Google and Google X at the time), VSL acquiesced to Google's demand to turn over all trade secrets and working versions of the technology, and VSL even met with Google employees and showed them

---

[8] *FTC Charges Deceptive Privacy Practices in Google's Rollout of its Buzz Social Network*, FEDERAL TRADE COMMISSION (Mar. 30, 2011), https://www.ftc.gov/news-events/press-releases/2011/03/ftc-charges-deceptive-privacy-practices-googles-rollout-its-buzz    (describing Google's settlement with the FTC regarding allegations that it used deceptive tactics and violated its own promises to consumers).

[9] Chloe Albanesius, *FCC Investigating Google Street View Wi-Fi Data Collection*, PC Mag (Nov. 10, 2010), http://www.pcmag.com/article2/0,2817,2372498,00.asp; Alyssa Newcomb, *Google to Pay $7 Million Fine for Street View Privacy Breach*, ABC News (March 13, 2013); *Google Fined Over Illegal Wi-Fi Data Capture in Germany*, BBC News (April 22, 2013)

how to use the software.  Over the next several months, Google employees sent emails to VSL asking for more and more of VSL's proprietary information, which VSL responded to by sending hundreds of physical files and CD-ROM's.

*Negotiations breakdown*

120.    By December of 2010, Google still declined to commit to purchasing either VSL or its technology, and VSL asked for Google to return the documents and information VSL had disclosed to Google pursuant to the NDA.

*Google steals the trade secrets and technology*

121.    In mid to late-August 2011, VSL observed in an article that certain video compression technology that Google was using for the dissemination of video content referred to as WebMIVP8 had improved significantly in quality.  Additionally, throughout 2012, VSL observed on several occasions that Google's Android operating system for cell phones and tablets, as well as other Google software/systems for the dissemination of video content, had improved significantly in quality.  VSL undertook to analyze the publicly available source code for WebMNP8, and VSL discovered coding which was both similar and nearly identical to that underlying the VSL Codec, and which were unique to VSL when VSL disclosed the VSL Trade Secrets to Google in 2010 and were, in fact, present in the code of Android, VP8, and WebM.

*Google attempts to box competitors out of the market*

122.    After completing its theft, Google released to the public—through its open-source code—the trade secrets and proprietary information of VSL, thus effectively terminating any ability for VSL to further develop and commercialize its code.  Moreover, Google filed patents on VSL's technology falsely claiming that Google employees invented this technology and with the intent to obtain a monopoly on its newly stolen technology.

***Space Data Corp. v. X, Alphabet, Inc., et al.***, 5:16-cv-03260-BLF (N.D. Cal. 2016).

123.    In 1997 and 1998, Space Data was developed by two MIT engineers to build a constellation of floating balloons, each linked to the other, communicating from the stratosphere to earth-based mobile devices.  Instead of a laborious and expensive terrestrial buildout, Space Data envisioned an array of inexpensive floating balloons, quickly and cheaply creating a stratospheric

1  communications platform, thereby bringing Internet to all.

2       124.   Over years of development, and $75 million of private investment, Space Data

3  perfected its technology.  It filed for its first patent in 1999, and now owns many foundational

4  patents.  Space Data's technology has been purchased by the U.S. military and deployed in Iraq

5  and other war theaters.  Space Data also has numerous private sector commercial customers, *e.g.*

6  oil service companies needing network coverage in remote areas to monitor oil wells and

7  pipelines.

8  *Meetings with Google and signing of the NDA*

9       125.   Beginning in the fall of 2007, Google began a detailed technical due diligence of

10  the Space Data business, finances, and technology.  Space Data and Google executives first met at

11  the Google campus in September of that year where Space Data put on a presentation of basic and

12  public information on the Space Data platform.  Google cofounders (Larry Page and Sergey Brin)

13  attended this presentation.

14       126.   On December 4, 2007 Google forwarded its standard Mutual Non-Disclosure

15  Agreement to Space Data.  Pursuant to the NDA, Space Data disclosed proprietary information to

16  Google, in order to aid Google in its technical evaluation and pre-acquisition Space Data due

17  diligence.  This proprietary information included trade secrets regarding both the technology at

18  issue as well as Space Data's financials, customers, and business strategies.  By the end of

19  January, Google had evaluated Space Data's technical and financial information and wanted to

20  schedule a full day technical inspection and due diligence visit at the Space Data headquarters in

21  Arizona.

22       127.   Google's team, including the two Google cofounders Larry Page and Sergey Brin

23  visited Space Data's Arizona facility on February 15, 2008.  When Google arrived, Space Data

24  was flying a commercial constellation of balloons over Louisiana and West Texas, providing

25  Internet access to remote oil rigs.  Google's employees took pictures of all of Space Data's

26  equipment and technology during the tour for the purpose of facilitating its theft.

27  *Negotiations breakdown*

28       128.   Despite its earlier professed eagerness to acquire Space Data, Google abruptly went

dark weeks after this meeting.

*Google steals the technology and trade secrets*

129.   In mid-2011, Larry Page personally directed engineers at Google's experimental research group to begin planning a balloon-borne internet constellation.   This culminated in Google's "Project Loon" which would launch nearly identical balloons into a particular portion of the stratosphere which would communicate with each other and provide internet access to remote regions.   This project was kept secret until 2013, when their first public launch was conducted. The technical information Google released in the next few years was nearly identical to that of Space Data's.   The persons at Google who supposedly invented this technology included engineers who were at Space Data's Arizona site and otherwise had access to Space Data's trade secrets.

*Google attempts to box competitors out*

130.   During Google's secret research stage, Google filed over 100 patent applications fraudulently attempting to patent every aspect of a constellation balloon network.   Google incorporated into these patent applications Space Data's trade secrets and attempted to gain a monopoly over the possibly multi-billion dollar market of bringing internet to portions of the world which do not have it.   The U.S Patent office eventually ruled that Google's rights to these patents were inferior to Space Data.   Despite this, Google continues to advance Project Loon and use Space Data's trade secrets and intellectual property to this day.

***Be In, Inc. v. Google, Inc., et al.***, 5:12-cv-03373-LHK (N.D. Cal. 2012).

131.   Be In is the creator and developer of CamUp, an award-winning social entertainment consumption platform that allows a group of friends to simultaneously watch, listen, chat and collaborate around shared videos, music, and other media—such as educational content and documents—in a real-time, trusted environment.

132.   Since 2007, Be In has devoted extensive time, resources and ingenuity to creating the unique design, technology, and infrastructure for its platform, as well as proprietary strategies for integrating that platform into established content, and social media platforms.

*Meetings with Google and signing of an NDA*

133.   In May 2011, approximately two months after Be In publicly unveiled CamUp at South By Southwest ("SXSW") in Austin, Texas (in a booth next to Google's), Be In met with a high-level Google executive to discuss Be In's vision and strategy for how the CamUp platform could transform Google's business with respect to social media, advertising, and analytics.  After signing an NDA, Be In disclosed to Google during the meeting, in detail, its strategy for—among other things—using CamUp's platform to implement a social entertainment strategy for YouTube and other Google products, and thus to create community and social context around Google's vast, anonymous user base.

*Negotiations breakdown*

134.   Google responded enthusiastically to CamUp and Be In's social entertainment integration strategy, and asked Be In to provide even more information, in writing, following the meeting.  The next day, Be In emailed Google a summary of its proprietary social integration strategy.  After Be In shared its strategic roadmap, Google abruptly terminated all communications with Be In, refusing to respond to e-mails seeking to arrange follow-up steps discussed during their meeting.

*Google steals the technology and trade secrets*

135.   In June 2011, approximately one and a half months after Plaintiff's disclosure, Google launched Google+.  As part of Google+, Google launched "Hangouts"—an integrated social entertainment consumption platform which is virtually identical to CamUp.  It allows groups of friends from within the Google+ social network to "hangout" together in a familiar online room, simultaneously watching, listening, chatting and collaborating around shared media and video.  Before Google launched Hangouts, no company other than CamUp had created this type of social entertainment consumption platform.

136.   Google not only copied Be In's unique entertainment consumption platform but also implemented, and continues to implement on a step-by-step basis, each of the proprietary business strategies Be In disclosed to Google in confidence.

***Digital Envoy, Inc. v. Google, Inc.***, C-04-01497-RS (N.D. Cal. 2005)

137.   Digital Envoy was the inventor and market leader in IP Intelligence technology

34

1   which essentially delivers specific information about a visitor to a website, including: geographic

2   location down to the closest city, connection speed and, in some cases, the industry in which the

3   visitor works.   The Internet contains more than 4 billion IP addresses, which incorporate no

4   geographical information.   Digital Envoy's proprietary technology essentially maps the Internet's

5   ever-changing topology and overlays a geographical map which allows the technology to tie an IP

6   address to a geographic location.

7   *Meetings with Google and signing of an NDA*

8        138.   In November 2000, Google and Digital Envoy began to negotiate a license

9   agreement whereby Google would have use of Digital Envoy's IP Technology to obtain the

10  geographic location of visitors to its website to sell geographically targeted "paid links" on its own

11  website.

12       139.   Under the Agreement, Google is expressly prohibited from selling, licensing,

13  distributing, sharing or otherwise giving, in any form, the Database Libraries to any other party or

14  using it outside of Google's site.

15  *Google unilaterally expands its license and misappropriates Digital Envoy's trade secrets*

16       140.   In May–June 2003, Google launched a new program which it called "Google

17  AdSense" wherein Google would supply advertisements to any content-based website which

18  signed up.   This technology put Google's advertisements not only on Google's search pages, but

19  also on third-party sites.   Thus, Google unilaterally made the decision to license Digital Envoy's

20  proprietary information to third parties without permission or any additional compensation to

21  Digital Envoy.

22       141.   In February 2004, Digital Envoy notified Google that it considered Google's use of

23  Digital Envoy's IP Intelligence technology and Database Libraries to provide geographically

24  targeted advertising on third party websites to be unauthorized under the Agreement.   Google

25  admitted to its conduct but refused to stop its improper behavior and continued to use Digital

26  Envoy's trade secrets in an unauthorized manner.   AdSense has made tens of billions of dollars at

27  the expense of Digital Envoy.

28  ***PayPal, Inc., et al.   v. Google, Inc., et al.***, 1-11-CV-201863, (Santa Clara Superior Crt., Cal.,

1    2014).

2        142.    PayPal is the world's leading online payment processor and a leader in the

3    multibillion-dollar mobile payment industry.

4    *Meetings with Google*

5        143.    From 2008 to 2011, Google and PayPal were negotiating a commercial deal where

6    PayPal would serve as a payment option for mobile app purchases on Google's Android Market.

7    During that time, PayPal provided Google with an extensive education in mobile payments.

8    Osama Bedier was the senior PayPal executive accountable for leading negotiations with Google

9    during this period.

10   *Negotiations breakdown*

11       144.    PayPal and Google had a deal finalized and signature-ready on October 26, 2010.

12   By that time, unknown to PayPal, Bedier had just finished a series of job interviews with Google

13   senior executives, culminating with a meeting on October 21 between Bedier, Google Senior Vice

14   President Jonathan Rosenberg & and then-President of Google Larry Page.

15       145.    Though Google's leadership had directed negotiations toward the October 26

16   finalization months earlier, it now balked when presented with the very deal they had requested.

17   The companies had a term sheet, a two-phase rollout with dates, and all other details nailed down.

18   But, in the interim, Google's leadership had interviewed Bedier.

19   *Google steals the technology and trade secrets*

20       146.    Rather than go through with the deal, Google hired PayPal's Vice President of

21   Platform, Mobile, and New Ventures (who was negotiating on behalf of PayPal at the time) and

22   put him in charge of all of Google's mobile payments and what would become Google Wallet.

23   Google then developed Google Wallet through the use of stolen trade secrets gained through their

24   prior negotiations and through hiring an employee (who had signed an NDA) to disclose such

25   trade secrets to Google.

26   ***VoiceOne Comm., LLC v. Google, Inc., et al.***, 12-cv-9433 (S.D.N.Y. 2012)

27       147.    VoIP and VoiceOne spent many years developing proprietary, patented and

28   confidential transmission technologies for the delivery of voice communications over the Internet.

This technology included the ability for the owner of a website to allow its visitors to initiate a voice call on the website, successfully transmit through both the Internet and the traditional telephone network, and connect with an individual using a traditional telephone.  This technology, also known as "Click to Call," enables users to immediately speak with merchants or other third parties simply by clicking a link on a website.  The "Click to Call" technology includes software programs and algorithms for which they held a copyright.

*Meeting with Google and signing of an NDA*

148.   On or about September 1, 2005, plaintiff VoiceOne and Google entered into a written Master Services Agreement, which included a non-disclosure provision.  Pursuant to the Agreement, VoiceOne agreed to and did provide Google with proprietary, patented, and confidential technology, including the "Click to Call" technology, described in the preceding paragraph.

149.   VoiceOne provided Google with proprietary and confidential information including, without limitation, source codes, algorithms, training, expertise, and know-how to enable Google to learn how to monetize internet-telephony through Click to Call technology for a myriad of its products.

*Google breaks-up the relationship*

150.   In or about January 2007, Google unilaterally provided notice to VoiceOne that it was terminating the Agreement, based on a purported unauthorized disclosure that identified Google as a VoiceOne customer.

*Google blatantly steals VoiceOne's copyrights and trade secrets*

151.   On or about August 28, 2006, Google and Ebay announced a multiyear agreement and plans to "integrate and launch 'click-to-call' advertising functionality" that would allow users to initiate a "call to participating eBay merchants or Google advertisers directly from either company's respective sites, using Skype or Google Talk."

152.   Google's new technology continued to incorporate in VoiceOne's trade secrets after Google ended the relationship with VoiceOne and still continued to use the copyright for "click-to-call" willfully and illegally.

c.   **Theft of others intellectual property is the Google and Flux Factory Enterprise's regular way of doing business**

153.   Violations of RICO predicate acts (e.g. theft of trade secrets and criminal infringement of copyright) are the regular way of conducting Defendants' businesses.   The previous non-exclusive list of acts of racketeering evidences a pattern of racketeering, the acts of which are related, not isolated, and continue to date by threat of further operation of Defendants' business and through Defendants continued use of already stolen trade secrets for profits.   Based on all of the following, Defendants have demonstrated that their regular way of doing business is through racketeering (e.g. by theft of trade secrets and criminal infringement of copyright) such that they are liable for harm done to others by their acts of racketeering under the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq*.

6.   **Larry Page, Sergey Brin, Google, Inc., and its associates have participated in a criminal enterprise**

154.   Each Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3); 1964(c).

155.   Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

156.   Google, Inc., the employees of Google, including the Individual Defendants, who participated in "Project Genie," along with the Plaintiffs, constituted an association-in-fact, that is, an "enterprise" (the "Google Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and, at all relevant times, were engaged in, and the activities of which affected, interstate and/or foreign commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c).   The Google Enterprises had two purposes, one lawful: (1) the use and development of Plaintiffs' trade secrets; and one unlawful: (2) the theft and misappropriation of Plaintiffs' trade secrets.   At all relevant times, Google was the mastermind behind each purpose.   The Plaintiffs were the unwitting victims of the unlawful purpose.   When "Project Genie" was spun off into Flux Factory, Inc., Individual Defendant Chim became the CEO of Flux Factor, Inc., and Individual Defendant Teller became chairman of its board of directors.   Google remained the mastermind behind Flux Factory, Inc.

157.   Employees of Google, including the Individual Defendants, who participated in "Project Genie" were merged by Google into Flux Factory, Inc., a corporation, that is, an

"enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and, at all relevant times, were engaged in, and the activities of which affected, interstate and/or foreign commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c).  Google remains as the mastermind behind the unlawful scheme to steal and misappropriate; Individual Defendant Chim became the CEO of Flux Factory, Inc., and Individual Defendant Teller became chairman of its board of directors.

158.    Google, and employees of Google, including the Individual Defendants, operated the business and financial affairs of "Project Genie," the Google Enterprise, and Flux Factory, Inc., (enterprises under RICO) through a pattern of racketeering, theft and misappropriation of trade secrets within the meaning of 18 U.S.C. §§ 2, 1832, 1961(1) (B), 1961 (5), 1962(c), and continue to do so.

159.    Google's and the Individual Defendants' pattern of racketeering and corresponding violations of 18 U.S.C. § 1962(c) proximately and/or directly caused the Plaintiffs to suffer injury to their business and/or property (theft and misappropriation of trade secrets) within the meaning of 18 U.S.C. § 1964(c), and continue to do so.  Plaintiffs' damage to business and property was and is reasonably foreseeable and anticipated as a substantial factor and natural consequence of the pattern of racketeering by Google and the Individual Defendants.

### 7.    Defendants have committed acts of racketeering causing harm to Plaintiffs

160.    18 U.S.C. § 1832 (Theft of Trade Secrets), in relevant part, provides:

(a)  Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly--

(1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;

(2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;

(3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

(4) attempts to commit any offense described in paragraphs (1) through (3); or

(5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,

[Commits a criminal offense under this statute].

161.    Google and the Individual Defendants committed acts of racketeering when they intentionally stole and misappropriated Plaintiffs' trade secrets, a violation of 18 U.S.C. § 1832. Such a violation is continuing to this date, as Defendants continue to use Plaintiffs' trade secrets wrongfully.  Such violations have caused, and continue to cause, Plaintiffs to suffer injury to their business and property; that is, lost profits and business opportunities.

162.    Google and the Individual Defendants' pattern of racketeering and corresponding violation of 18 U.S.C. § 1962(c) proximately and/or directly caused the Plaintiffs to suffer injury to their business and/or property (theft and misappropriation of trade secrets) within the meaning of 18 U.S.C. § 1964(c), and continue to do so.  Plaintiff's damage to business and property was and is reasonably foreseeable and anticipated as a substantial factor and natural consequence of the pattern of racketeering of Google and the Individual Defendants.  The gross profits, including salaries and/or bonuses, of Google and the Individual Defendants ought in fairness and equity to be disgorged and paid to the Plaintiffs.

## FIFTH CAUSE OF ACTION
### (For racketeering under 18 U.S.C. §1962(d) [Conspiracy to violate subsection (a)—use or investment of income gained through racketeering], against all Defendants.)

163.    Plaintiffs re-allege, and incorporate herein by reference as though fully set forth, paragraphs 1-162.

164.    Each Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3); 1964(c).

165.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

166.    Google Enterprise and Flux Factory, Inc., are "enterprises" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a), and, at all relevant times, were engaged in, and the activities of which affected, interstate and/or foreign commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(a).

167.    Google, the Individual Defendants, and Flux Factory, Inc., conspired with each other within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(a), that is, Google, the Individual Defendants, and Flux Factory conspired among themselves to receive income, directly or indirectly, from the operation of Google, the Google Enterprise, and Flux Factory by a

pattern of racketeering within 18 U.S.C. §§ 1961(1)(B) (18 U.S.C. § 1832)(Theft of Trade Secrets)), 1961(5) and 1962(a), and continue to do so, in which they participated as principals within the meaning of 18 U.S.C. § 1961(1)(B)(18 U.S.C. § 1832 (Theft of Trade Secrets)) & 1962(a) and to use or invest such income, or the proceeds of such income, and continue to do so, directly or indirectly, in the operation of Google, the Google Enterprise, and Flux Factory (RICO enterprises), which are engaged in, or the operations of which affect, interstate or foreign commerce.

168. Plaintiffs hereby incorporate in the pattern of racketeering shown in ¶¶ 112–153. This pattern of racketeering evidences an intent by Defendants to continuously conspire to make income from acts of racketeering (e.g. theft of trade secrets) and to invest and/or use those funds within the greater Google Enterprise.

169. Moreover, Google, the Individual Defendants, and Flux Factory, Inc., conspired with certain venture capital firms (Does 1, 2, and 3) in order to assist in the development of the Flux Enterprise.

170. Does 1, 2, and 3 knew that Google, the Individual Defendants, and Flux Factory, Inc., constituted an enterprise which was engaged in a pattern of racketeering and that Flux Factory, Inc. was only one of many thefts which had occurred both in the past and which were to occur in the future. Does 1, 2, and 3 invested in Google with the intent of aiding the criminal enterprise in the investment and use of income earned from acts of racketeering (e.g. theft of trade secrets).

171. Evidence of Does 1, 2, and 3's knowledge of the pattern of criminal activity is evidenced by: a) there was a rotating door of employees and managers between Does 1, 2, and 3, Google, Inc., Google Ventures, and Google X during the time of the predicate acts mentioned above; b) Does 1, 2, and 3 jointly invested with Google in other ventures which were made possible by the thefts described above; and c) Does 1, 2, and 3 conducted extensive due diligence on Flux Factory, Inc. before investing in the company and knew the company was built upon the theft of Mr. Attia's trade secrets and would only profit from the continuing illegal use of such. Does 1, 2, and 3 invested and assisted the illegal enterprise because the venture capital firms had

previously made substantial amounts of money when Google purchased several other entities the venture capital firms had put money into. The venture capital firms and Google thus had an understanding they would provide capital to Google's riskier investments coming out of Google X—such as Flux—and Google would purchase the venture capital firms more developed products. Additionally, Does 1, 2, and 3 invested in Flux Factory with the hope that more companies would split out of and "graduate" from Google X and that they would be given the opportunity to invest into those projects for substantial profit. Does 1, 2, and 3 made such agreement with knowledge that Google's regular way of doing business was through acts of racketeering and that any new investments would be tainted by such.

172. Google, the Individual Defendants, and Flux Factory knew and acted with intent to steal and misappropriate Plaintiffs' trade secrets, a violation of 18 U.S.C. § 1832 (Theft of Trade Secrets), and would (and continue to) cause Plaintiffs to suffer injury to their business and property, that is, lost profits and business opportunities.  The gross profits, including salaries and/or bonuses, of Google and the Individual Defendants ought in fairness and equity to be disgorged and paid to the Plaintiffs.

## SIXTH CAUSE OF ACTION
### (For racketeering under 18 U.S.C. §1962(d) [Conspiracy to violate subsection (c)— Conducting or participating in racketeering], against all Defendants)

173. Plaintiffs re-allege, and incorporate herein by reference, as though fully set forth, paragraphs 1-172.

174. Each Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3); 1964(c).

175. Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d) [Conspiracy to violate (c)].

176. Google, the Google Enterprise, and Flux Factory, Inc., are "enterprises" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and, at all relevant times, were engaged in, and the activities of which affected, interstate and/or foreign commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(d) [Conspiracy to violate (c)].

177. Google, the Individual Defendants, and Flux Factory, Inc., conspired with each other within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c), that is, Google,

the Individual Defendants, and Flux Factory, Inc., conspired among themselves to operate Google, the Google Enterprise, and Flux Factory by a pattern of racketeering within 18 U.S.C. §§ 1961 (1) (B) (18 U.S.C. §1832)(Theft of Trade Secrets)), 1961(5) and 1962(d) (conspiracy to participate in acts of racketeering), and continue to do so. Google, the Individual Defendants, and Flux Factory, Inc., conspired with each other to operate Google and Flux Factory by a pattern of racketeering within the meaning of 18 U.S.C. § 1961 (1) (B)(18 U.S.C.§ 1832 (Theft of Trade Secrets)), 1962(d) (conspiracy to participate in acts of racketeering) in the operation of Google, the Google Enterprise, and Flux Factory, Inc., (RICO enterprises), which are engaged in, or the operations of which affect, interstate or foreign commerce.

178.    Plaintiffs hereby incorporate in the pattern of racketeering shown in ¶¶ 112–153. This pattern of racketeering evidences an intent by Defendants to continuously conspire to participate in acts of racketeering (e.g. theft of trade secrets) within the greater Google Enterprise.

179.    Google, the Individual Defendants, and Flux Factory knew and acted with intent to steal and misappropriate Plaintiffs' trade secrets, a violation of 18 U.S.C. § 1832 (Theft of Trade Secrets), and would (and continue to) cause Plaintiffs to suffer injury to their business and property; that is, lost profits and business opportunities.  The gross profits, including salaries and/or bonuses, of the Individual Defendants and Google ought in fairness and equity to be disgorged and paid to the Plaintiffs.

**SEVENTH CAUSE OF ACTION**
**(For racketeering under 18 U.S.C. §1962(b) [Use of racketeering to gain an interest in an Enterprise], against Google, Inc., Larry Page, and Sergey Brin)**

180.    Plaintiffs re-allege, and incorporate herein by reference, as though fully set forth, paragraphs 1-179.

181.    Each Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3); 1964(c).

182.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(b).

183.    Eli Attia Architect, P.C., is an "enterprise" (the Attia Enterprise) within the meaning of 18 U.S.C. §§ 1961(4) and 1962(b), and, at all relevant times, was engaged in, and the activities of which affected, interstate and/or foreign commerce within the meaning of 18 U.S.C.

§§ 1961(4); 1962(b).

184.    Google, the Individual Defendants, and Flux Factory, Inc., engaged in a pattern of racketeering, the purpose of which, ostensibly, was to develop the Attia Enterprise's trade secrets for market. However, in truth, the purpose was to acquire and maintain an interest in the Attia Enterprise; that is, to steal and misappropriate the Attia Enterprise's trade secrets. Their true purpose was successful and their corresponding violation of 18 U.S.C. § 1962(b) proximately and/or directly caused the Plaintiffs and the Attia Enterprise to suffer injury to their business and/or property (theft and misappropriation of trade secrets) within the meaning of 18 U.S.C. § 1964(b), and continue to do so.  Plaintiffs' and Attia Enterprise's damage to business and property was and is reasonably foreseeable and anticipated as a substantial factor and natural consequent of the pattern of racketeering of Google and the Individual Defendants.

185.    Google, the Individual Defendants, and Flux Factory, Inc., knew and acted with intent to steal and misappropriate the Attia Enterprise's trade secrets, a violation of 18 U.S.C. § 1832 (Theft of Trade Secrets), and would (and continues to) cause Plaintiffs to suffer injury to their business and property, that is, lost profits and business opportunities. The gross profits, including salaries and/or bonuses, of Google, the Individual Defendants, and Flux Factory, Inc. ought in fairness and equity to be disgorged and paid to the Plaintiffs.

186.    Plaintiffs hereby incorporate in the pattern of racketeering shown in ¶¶ 112–153. This pattern of racketeering evidences an intent by Defendants to continuously use acts of racketeering (e.g. theft of trade secrets) to gain an interest in legitimate entities by stealing their trade secrets and then pushing those entities out of the market when they complain about the theft.

**EIGHTH CAUSE OF ACTION**
**(For racketeering under 18 U.S.C. §1962 (d) [Conspiracy to violate subsection (b)—use of racketeering to gain an interest in an Enterprise], against all Defendants)**

187.    Plaintiffs re-allege, and incorporate herein by reference, as though fully set forth, paragraphs 1-186.

188.    Each Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3); 1964(c).

189.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d) to (b).

190.    Eli Attia Architect, P.C., (Attia Enterprise) is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(d) [Conspiracy to violate (b)], and, at all relevant times, was engaged in, and the activities of which affected, interstate and/or foreign commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(d) [Conspiracy to violate (b)].

191.    Google, the Individual Defendants, and Flux Factory, Inc., conspired with each other within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(b), that is, Google, the Individual Defendants, and Flux Factory, Inc., conspired among themselves to acquire and maintain an interest in Eli Attia Architect, P.C., by a pattern of racketeering within the meaning of 18 U.S.C. §§ 1961 (1) (B) (18 U.S.C. §1832)(Theft of Trade Secrets)), 1961(5) and 1962(d) [Conspiracy to violate (b)], and continue to do so.

192.    Google, the Individual Defendants, and Flux Factory knew and acted with intent to steal and misappropriate Plaintiffs' trade secrets, a violation of 18 U.S.C. § 1832 (Theft of Trade Secrets), and knew their corresponding violation within the meaning of 18 U.S.C. §§ 1962(d) to (b) would (and continue to) cause Plaintiffs to suffer injury to their business and property, that is, lost profits and business opportunities.

193.    Plaintiffs hereby incorporate in the pattern of racketeering shown in ¶¶ 112–153. This pattern of racketeering evidences an intent by Defendants to continuously conspire to use acts of racketeering (e.g. theft of trade secrets) to gain an interest in legitimate entities by stealing their trade secrets and then pushing those entities out of the market.

194.    Moreover, Google, the Individual Defendants, and Flux Factory, Inc., conspired with certain venture capital firms (Does 1, 2, and 3) in order to assist the enterprise in using acts of racketeering to gain an interest in other enterprises.

195.    Does 1, 2, and 3 knew that Google, the Individual Defendants, and Flux Factory, Inc., constituted an enterprise which was engaged in a pattern of racketeering and that Flux Factory, Inc. was only one of many thefts which had occurred both in the past and which were to occur in the future. Does 1, 2, and 3 invested in Google with the intent of aiding the criminal enterprise in gaining an interest in other legitimate enterprises through acts of racketeering (e.g. theft of trade secrets).

196.    Evidence of Does 1, 2, and 3's knowledge of the pattern of criminal activity is evidenced by: a) there was a rotating door of employees and managers between Does 1, 2, and 3, Google, Inc., Google Ventures, and Google X during the time of the predicate acts mentioned above; b) Does 1, 2, and 3 jointly invested with Google in other ventures which were made possible by the thefts described above; and c) Does 1, 2, and 3 conducted extensive due diligence on Flux Factory, Inc. before investing in the company and knew the company was built upon the theft of Mr. Attia's trade secrets and would only profit from the continuing illegal use of such. Does 1, 2, and 3 invested and assisted the illegal enterprise because the venture capital firms had previously made substantial amounts of money when Google purchased several other entities the venture capital firms had put money into. The venture capital firms and Google thus had an understanding they would provide capital to Google's riskier investments coming out of Google X—such as Flux—and Google would purchase the venture capital firms more developed products. Additionally, Does 1, 2, and 3 invested in Flux Factory with the hope that more companies would split out of and "graduate" from Google X and that they would be given the opportunity to invest into those projects for substantial profit. Does 1, 2, and 3 made such agreement with knowledge that Google's regular way of doing business was through acts of racketeering and that any new investments would be tainted by such.

197.    Google, the Individual Defendants, and Flux Factory knew and acted with intent to steal and misappropriate Plaintiffs' trade secrets, a violation of 18 U.S.C. § 1832 (Theft of Trade Secrets), and would (and continue to) cause Plaintiffs to suffer injury to their business and property, that is, lost profits and business opportunities.  The gross profits, including salaries and/or bonuses, of Google and the Individual Defendants ought in fairness and equity to be disgorged and paid to the Plaintiffs.

### IV.    PRAYER FOR RELIEF

198.    WHEREFORE, Plaintiffs pray for judgment against all defendants, severally and jointly, as follows:

199.    Actual, incidental, consequential, and threefold damages, together with pre- and post-judgment interest, in an amount to be proven at trial,

FOURTH AMENDED COMPLAINT – CASE NO. 1:14-CV-274103

1   200.   Recovery of amounts by which Defendant were unjustly enriched.

2   201.   For an order requiring an equitable accounting, the voiding of any unlawful

3   transfers, and that any money or funds and all gross profits that Google or the Individual

4   Defendants acquire or have acquired by their wrongful conduct and any money or funds that Flux

5   Factory, Inc., acquire or have acquired by wrongful conduct be placed into a constructive trust for

6   the sole benefit of the Plaintiffs.

7   202.   For restitution and/or disgorgement of all revenues, earnings, gross profits

8   compensation, and benefits that have been obtained by the Defendants as a result of their wrongful

9   conduct.

10   203.   Declaratory relief clarifying the parties' rights under the NDA, ISA, and Sow.

11   204.   For Plaintiffs attorneys' fees and costs in this matter.

12   205.   For such other relief as the Court may deem just and proper.

13   Dated:  July 24, 2017                    **BUETHER JOE & CARPENTER, LLC**

14                                            */s/ Eric W. Buether*
15                                            Eric W. Buether
                                             Christopher M. Joe
16                                            Brian A. Carpenter
                                             Niky Bukovcan
17                                            Michael D. Ricketts

18                                            Jamie L. Dupree
19                                            **FUTTERMAN DUPREE DODD CROLEY MAIER LLP**

20                                            **Attorneys for Plaintiffs**
                                             **Eli Attia and Eli Attia Architect PC**

21

22

23

24

25

26

27

28